# EXHIBIT A

# Exhibit E

Operating Agreement

# First AMENDMENT TO OPERATING AGREEMENT
## OF
## PARAGON COMPONENT SYSTEMS, LLC

**THIS FIRST AMENDMENT TO OPERATING AGREEMENT OF PARAGON COMPONENT SYSTEMS, LLC** (this "**Amendment**"), a Tennessee limited liability company (the "**Company**"), is made and entered into to be effective as of February 1st, 2018 (the "**Effective Date**"), by and among each person named a Member of the Company on the signature page hereto.

## RECITALS

A.    An Operating Agreement of the Company was entered into as of February 22, 2016, by the persons named as Members on Exhibit A thereto (the "**Operating Agreement**").

B.    The Company and the Members believe it to be in the best interest of the Company to amend the Operating Agreement to provide for, among other things, the issuance to employees, advisors and contractors of the Company up to an aggregate of twenty-five percent (25%) of the equity interests in the Company, all of which shall be designated as profits interests, to provide for incentive awards to employees, advisors and contractors of the Company.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the receipt and legal sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.    **Amendment of Section 4.2(B)**.    Section 4.2(B) of the Operating Agreement is hereby deleted and replaced in its entirety as follows:

B.    _Profits Interests_.    The Board shall have the authority to issue Profits Interests in the form of restricted Membership Units ("Restricted Units") to certain current and prospective Directors, Members, employees, advisors and other key service-providers of the Company.    The total number of restricted Membership Units shall not, in the aggregate, exceed twenty-five percent (25%) of the Percentage Interests of the Company.    Upon the issuance of any Restricted Units, the Board shall reserve such number of Membership Units (the "Available Incentive Units") so that at all times the sum of all issued Restricted Units plus all Available Incentive Units equals twenty-five percent (25%) of the total Percentage Interests.    Until issued by the Board, the Available Incentive Units will accrue to the benefit of and be deemed held by the Members on a pro rata basis, excluding for this purpose all Restricted Units. Restricted Units will be issued pursuant to a separate agreement, which may provide, among other things, that such Restricted Units shall have a vesting period and may be terminated by the Company for Cause or other reasons any time prior to the expiration of such vesting period; provided further, that any such Restricted Units shall have restrictions on resale or other transfers of interests therein.    The recipients of such

Restricted Units shall not necessarily be required to contribute any cash or other property to the Company in exchange for such interests; such Restricted Units may instead, in the Board's reasonable discretion and to the extent permitted by law, be issued in exchange for services. Members (unless in their capacity as employees, Directors or Officers) will not have a right to acquire any form of Restricted Units that may be reserved for issuance to the Company's Directors, Officers, employees, consultants, advisors or other Persons performing services for the Company. To the extent that the recipients of such Restricted Units are not required to contribute any cash or other property to the Company, such Restricted Units shall not have a capital interest (and shall not have a positive Capital Account balance) in the Company at the time of issuance.

2. **Admission of New Members; Issuance Restricted Units; Amendment of Exhibit A**. The Members hereby consent to the admission of Matthew Van Stelle, Jeffrey Cox, and Scott Hoelsema as Members of the Company in connection with the issuance by the Board of Restricted Units to each of them. Upon execution by each such new Member of a Restricted Unit Grant Agreement and a Joinder to the Operating Agreement, Exhibit A to the Operating Agreement is hereby amended and restated as set forth on <u>Exhibit A</u> attached hereto.

3. **Effect of Amendment**. Except as specifically provided herein, the Operating Agreement shall remain in full force and effect in all respects.

4. **Approval By Members**. The Members executing this Amendment are all of the Members of the Company, and as such, this Amendment is hereby approved and adopted.

5. **Miscellaneous**. The terms of this Amendment shall be binding upon and inure to the benefit of the Members. This Amendment may be executed in counterparts, each of which shall be an original and collectively shall constitute one instrument. Except as otherwise amended hereby, all terms, covenants and conditions of the Agreement are and shall remain in full force and effect, and all of such terms and covenants and conditions are hereby ratified and confirmed by the parties hereto in all respects.

6. **Definitions**. Capitalized terms not defined herein shall have the meanings provided for such terms in the Operating Agreement.

[Signature page to follow]

16297723v1

IN WITNESS WHEREOF, this Amendment has been executed by the undersigned Members of the Company, to be effective as of the date first above written.

MEMBERS:

DANIEL HOLLAND

JOHN HOLLAND

LISA HOLLAND

16297723v1                                                     3

# EXHIBIT A

## TO OPERATING AGREEMENT

| Member | Capital Contribution | Membership Units | Available Incentive Units | Restricted Units (Profits Interests) | Total Units | Percentage Interest |
|---|---|---|---|---|---|---|
| Daniel Holland | $12,453 of Personal Property | 51.0000 | 6.8000 | | 57.8000 | 37.5162% |
| John Holland | Intellectual Property | 49.0000 | 6.5333 | | 55.5333 | 36.0450% |
| Lisa Holland | $311,000 of Converted Indebtedness | 15.5500 | 2.0733 | | 17.6233 | 11.4388% |
| Matthew Van Stelle* | n/a | | | 7.7033 | 7.7033 | 5.0000% |
| Jeffrey Cox* | n/a | | | 7.7033 | 7.7033 | 5.0000% |
| Scott Hoelsema* | n/a | | | 7.7033 | 7.7033 | 5.0000% |
| **Total** | | **115.55** | **15.4067** | **23.1100** | **154.0667** | **100.0000%** |

\* Restricted Units issued pursuant to a Grant Agreement between such Member and the Company dated February 1st, 2018, and subject to a Participation Threshold of $2,311,000 and the vesting conditions set forth therein.

# OPERATING AGREEMENT

# OF

# PARAGON COMPONENT SYSTEMS, LLC

### A TENNESSEE LIMITED LIABILITY COMPANY

THE MEMBERSHIP UNITS IN PARAGON COMPONENT SYSTEMS, LLC (THE "UNITS") ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT.  THE UNITS HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER (I) THE TENNESSEE SECURITIES ACT OF 1980 (THE "TENNESSEE ACT") (IN RELIANCE ON SECTION 48-2-103(B)(4) OF THE TENNESSEE ACT) (II) ANY OTHER STATE SECURITIES LAWS, OR (III) THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT").  NEITHER THE UNITS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED, OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE TENNESSEE ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE TENNESSEE ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH THE TENNESSEE ACT, (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY OTHER APPLICABLE STATE SECURITIES LAWS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER ANY SUCH SECURITIES LAWS OR WHICH IS OTHERWISE IN COMPLIANCE WITH SUCH SECURITIES LAWS, AND (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH THE FEDERAL ACT.

# TABLE OF CONTENTS

**Article I.**
**DEFINITIONS** ........................................................................................................... 1

**Article II.**
**ORGANIZATIONAL MATTERS** ............................................................................... 4

**Article III.**
**CAPITAL CONTRIBUTIONS** .................................................................................... 5

**Article IV.**
**MEMBERS** .................................................................................................................. 5

**Article V.**
**MANAGEMENT AND CONTROL OF THE COMPANY** .......................................... 7

**Article VI.**
**ALLOCATION OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS** ........................................... 11

**Article VII.**
**TRANSFER AND ASSIGNMENT OF INTERESTS** .................................................. 14

**Article VIII.**
**ACCOUNTING; RECORDS** ....................................................................................... 18

**Article IX.**
**DISSOLUTION AND WINDING UP** ......................................................................... 19

**Article X.**
**INDEMNIFICATION AND INSURANCE** .................................................................. 20

**Article XI.**
**MISCELLANEOUS** .................................................................................................... 21

# OPERATING AGREEMENT
## OF
## PARAGON COMPONENT SYSTEMS, LLC

This Operating Agreement ("Agreement") is made effective as of February 22, 2016, by and among the Members and such other Persons who shall execute this Agreement, with reference to the following facts:

On February 22, 2016, the Articles of Organization for Paragon Component Systems, LLC, a limited liability company formed under the laws of the State of Tennessee (the "Company"), were filed with the Tennessee Secretary of State.

NOW, THEREFORE, in consideration of the premises and conditions set forth herein, intending to be legally bound, the Members agree as follows:

## Article I.
## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

"**Act**" shall mean the Tennessee Revised Limited Liability Company Act, codified in the Tennessee Code Annotated Title 48, Chapter 249, *et seq.*, as the same may be amended from time to time.

"**Adjusted Capital Contribution Balance**" shall mean, with respect to each Member, the Capital Contributions of such Member less any distributions to such Member in repayment of such Member's Capital Contributions pursuant to Section 6.5.

"**Affiliate**" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

"**Agreement**" shall mean this Operating Agreement, as originally executed and as amended from time to time.

"**Articles**" shall mean the Articles of Organization for the Company originally filed with the Tennessee Secretary of State and as amended from time to time.

"**Bankruptcy**" shall mean: (a) the filing of an application by a Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a member generally to pay his or her debts as the debts become due within the meaning of Section 303 (h) (1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

"**Board**" shall mean the board of directors of the Company.

"**Capital Account**" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

"**Capital Contribution**" shall mean the total amount of cash contributed to the Company by the Members.

"**Cause**" shall mean (i) the unauthorized use or disclosure of the confidential information or trade secrets of the Company, which use or disclosure causes material harm to the Company, (ii) conviction of, or a plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof, (iii) material breach of any contract with the Company, (iv) willful violation of any Company policy which adversely affects the Company in a material way, (v) gross negligence, gross insubordination or gross incompetence, or (vi) continued failure to perform assigned duties after receiving written notification from the Board (or other Directors if the subject Person is a Director).

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

"**Company Minimum Gain**" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Regulations Section 1.704-2(d) and as otherwise defined in Article VI.

"**Directors**" shall mean the Persons named as such pursuant to this Agreement and who are serving at the relevant time as members of the Board.

"**Distributable Cash**" shall mean the amount of cash which the Board deems in its sole discretion to be available for distribution to the Members, taking into account (i) the availability of cash after normal operating expenses; and (ii) all Company debts, liabilities, and obligations of the Company then due and (iii) such amounts which the Board reasonably deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

"**Economic Interest**" shall mean a Member's or Economic Interest Owner's right to share in one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management or any right to information concerning the business and affairs of the Company.

"**Economic Interest Owner**" shall mean the owner of an Economic Interest who is not a Member.

"**Fiscal Year**" shall mean the Company's fiscal year, which shall be the calendar year.

"**Founder Member**" shall mean each of Daniel Holland and John Holland.

"**Majority Interest**" shall mean one or more Percentage Interests of the specified Members (excluding Profits Interests and Economic Interests, if any) which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests of such Members (excluding Profits Interests and Economic Interests, if any).

"**Members**" shall mean each Person holding Membership Units pursuant to the terms of this Agreement.

"**Member Nonrecourse Debt**" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4) and as otherwise defined in Article VI.

"**Member Nonrecourse Deductions**" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt and as otherwise defined in Article VI.

"**Membership Units**" shall mean member interest units of the Company representing the right to share in the Company's Net Profits, Net Losses and other distributions, the right to vote on matters submitted to the Members of the Company for a vote and to exercise the rights and privileges associated with the Membership Units described in this Agreement.

"**Net Profits**" and "**Net Losses**" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the accounting principles employed under the method of accounting at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

"**Nonrecourse Liability**" shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

"**Officers**" shall mean the Persons elected from time to time by the Board to serve as Officers of the Company.

"**Percentage Interest**" shall mean the percentage interest of each Member as set forth on <u>Exhibit A</u> hereto, as amended from time to time, or in the books and records of the Company. The term Percentage Interest may if applicable mean the percentage interest of each Member in any group of Members voting as a class in relation to all Members in such class. The term Percentage Interest shall for purposes of distributions from the Company mean the percentage interest of each Member and Economic Interest Owner as set forth in the books and records of the Company.

"**Person**" shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

"**Profit Interest**" shall mean the right to participate in the distribution of Distributable Cash (or other distributable assets, if any) of the Company, without any Membership Units, voting rights, or rights upon liquidation.

"**Regulations**" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

"**Tax Matters Member**" shall be the Person so designated pursuant to Section 8.8. The initial Tax Matters Member shall be Daniel Holland.

## Article II.
## ORGANIZATIONAL MATTERS

2.1.    <u>Formation</u>. Pursuant to the Act, the Company was formed as a Tennessee limited liability company under the laws of the State of Tennessee by the filing of the Articles with the Tennessee Secretary of State. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2.    <u>Name</u>. The name of the Company is Paragon Component Systems, LLC. The business of the Company may be conducted under that name or "Paragon Component Systems" and any such other fictitious names as deemed advisable by the Board. The Board shall cause to be filed any fictitious name certificates and similar filings, and any amendments thereto, that the Board consider appropriate or advisable.

2.3.    <u>Term</u>. The term of existence of the Company commenced on the effective date of filing of Articles, and shall continue until terminated by the provisions of this Agreement or as provided by law.

2.4.    <u>Office and Agent</u>. The Company shall continuously maintain an office and registered agent in the State of Tennessee as required by the Act. The principal office of the Company and the registered agent shall be as stated in the Articles or as otherwise determined by the Board.

2.5.    Principal Place of Business.  The principal place of business of the Company is 3908 Tennessee Ave., Chattanooga, TN 37409.  The Company may locate its place of business at any other place or places as the Board from time to time deems advisable.

2.6.    Addresses of the Members.  The respective addresses of the Members are set forth on the signature pages to this Agreement or maintained in the Company's books and records.

2.7.    Purpose of Company.  The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

### Article III.
### CAPITAL CONTRIBUTIONS

3.1.    Capital Contributions.  Simultaneously with the execution of this Agreement, the Members have made the initial Capital Contributions set forth on Exhibit A.  Exhibit A shall be revised from time-to-time to reflect any additional Capital Contributions made in accordance with Section 4.2D.

3.2.    Withdrawal of Capital.  Except as expressly provided hereunder, no Member may withdraw capital from the Company without the unanimous consent of the Members.   No Member shall be entitled to interest on its contributions of capital to the Company.   The provisions of this Agreement with respect to distributions upon withdrawal are exclusive and no Member shall be entitled to claim any further or different distribution upon withdrawal under the Act or otherwise.

3.3.    Additional Capital Contributions.  No Member shall be required to make any additional Capital Contributions expect for what may be provided for in a Member's Subscription Agreement. Each Member shall receive a credit to his, her or its Capital Account in the amount of any additional capital which he, she or it contributes to the Company. Immediately following such Capital Contributions, the Percentage Interests shall be adjusted on Exhibit A to reflect the new Percentage Interests.

3.4.    Capital Accounts.  The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv).  If a Member transfers all or a part of his, her, or its Membership Units in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Units shall carry over to the new owner of such Membership Units pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.5.    No Interest.  No Member shall be entitled to receive any interest on his, her, or its Capital Contributions.

### Article IV.
### MEMBERS

4.1.    Limited Liability.  Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2.   <u>Series of Units; Preferences</u>.  The Company shall have one class of Membership Units.  The ownership of the Membership Units is set forth on <u>Exhibit A</u> attached hereto.

A.   <u>Additional Membership Units</u>.  From time to time as they deem advisable and subject to the provisions of this Agreement, the Board may create and establish such additional classes or series of Membership Units (including but not limited to Profits Interests) as it deems appropriate.

B.   <u>Profits Interests; Equity Incentive Plan</u>.  The Board shall have the authority to establish Profits Interests through the adoption of an equity incentive plan or such other action necessary to grant Profits Interests (which may be a new class of Membership Units) in the Company to certain current and prospective Directors, Members, employees, advisors and other key service-providers of the Company.  Such equity incentive plan may initially establish Profits Interests, in the aggregate, not to exceed ten percent (10%) of the Percentage Interests of the Company.  Any such Profits Interests may be issued pursuant to a separate agreement, which may provide, among other things, that such Profits Interests shall have a vesting period and may be terminated by the Company for Cause or other reasons any time prior to the expiration of such vesting period; provided further, that any such Profits Interests shall have restrictions on resale or other transfers of interests therein.  Such Profits Interests shall be non-voting, and the recipients of such Profits Interests shall not necessarily be required to contribute any cash or other property to the Company in exchange for such interests; such Profits Interests may instead, in the Board's reasonable discretion and to the extent permitted by law, be issued in exchange for services.  Members (unless in their capacity as employees, Directors or Officers) will not have a right to acquire any form of Profits Interests that may be reserved for issuance to the Company's Directors, Officers, employees, consultants, advisors or other Persons performing services for the Company.  To the extent that the recipients of such Profits Interests are not required to contribute any cash or other property to the Company, such Profits Interests shall not have a capital interest (and shall not have a positive Capital Account balance) in the Company at the time of issuance.

C.   <u>Admission of Additional Members</u>.  The Board may admit additional Members to the Company through any offering approved by the unanimous consent of the Members.

D.   <u>Operating Agreement</u>.  Each Person admitted as a Member shall sign a counterpart of this Agreement as a Member.  Upon the admittance of any additional Members (or the making of any additional Capital Contributions by the existing Members), the Percentage Interests of the Members shall be adjusted to reflect the new Percentage Interests following the issuance of such additional Membership Units.

4.3.   <u>Transactions with the Company</u>.  Subject to any limitations set forth in this Agreement, a Member may lend money to and transact other business with the Company on terms that are fair and appropriate under the circumstances as if made on an arm's length basis, provided that such involvement is approved by the Board.

4.4.   <u>Remuneration to Members</u>.  Except as otherwise authorized in, or pursuant to, this Agreement, no Member is entitled to remuneration for acting on the Company business, subject

to the entitlement of Directors or Members winding up the affairs of the Company to reasonable compensation pursuant to Section 9.3.

4.5.   <u>Members Are Not Agents</u>.   Pursuant to Section 5.1 and the Articles, the management of the Company is vested in the Board.  No Member, acting solely in the capacity of a Member, is an agent of the Company; nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

4.6.   <u>Voting Rights</u>.  Members may vote upon, consent, or approve matters only to the extent and on the terms provided in the Act, the Articles or this Agreement.

4.7.   <u>Meetings of Members</u>.  Meetings of Members may be held at such date, time and place as the Board may fix from time to time.  No annual or regular meeting of Members is required.  Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by any Director, or upon the written demand of Members holding more than twenty five percent (25%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.  Adequate written notice of a meeting of Members shall be sent or otherwise given before the date of the meeting.  The presence in person or by proxy of the holders of sixty percent (60%) of the Percentage Interests shall constitute a quorum at a meeting of Members.    Any action that may be taken at a meeting of Members may be taken without a meeting if consented to in writing by all of the Members.

## Article V.
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1.   <u>Management of the Company by Board.</u>

A.   <u>Management by Board</u>.  Except for situations in which the approval of the Members is expressly required by the Articles, this Agreement, the Act or the Code, the business, property and affairs of the Company shall be managed exclusively by the Board, and the Board shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

B.   <u>Meetings of Board</u>.  Meetings of Board may be called by any Director, the President, Chief Executive Officer or by the Secretary.  All meetings shall be held upon two (2) days' written notice by mail or twenty-four (24) hours' notice delivered personally or by telephone or email.  A notice need not specify the purpose of any meeting.  Notice of a meeting need not be given to any Director who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Director.  All such waivers, consents and approvals shall be filed with the Company records or made part of the minutes of the meeting.  A majority of the Directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.  If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment shall be given prior to the time of the adjourned meeting to the Directors who are not present at the time of the

adjournment. Meetings of the Board may be held at any place which has been designated in the notice of the meeting or at such place as may be approved by the Board. Directors may participate in a meeting through use of a conference telephone or similar communications equipment. Participation in a meeting in such manner constitutes a presence in person at such a meeting. All Directors are required to be present at a meeting of Board to constitute a quorum for the purpose of the transaction of any business.

        C.     Action of Board Without Meeting. Any action required to be taken by all of the Directors may be taken by the Board without a meeting, if all of the Directors consent in writing to such action. Such action by written consent shall have the same force and effect as a majority vote of such Board.

        D.     No Required Meetings. The provisions of this Section 5.1 govern the meetings of the Board if the Directors elect, in their discretion, to hold meetings. However, nothing in this Section 5.1 or in this Agreement is intended to require that meetings of Board be held, it being the intent of the Board that meetings of Board are not required.

    5.2.   Election of Directors.

        A.     Number, Term, and Qualifications. The Company shall have up to three (3) Directors. The number of Directors of the Company shall be fixed from time to time by the affirmative vote or written consent of Members holding a Majority Interest; provided that in no instance shall there be less than two (2) Directors. Unless he or she resigns or is removed, each Director shall hold office until a successor shall have been elected and qualified. Directors shall be elected as set forth below. A Director need not be a Member, an individual, a resident of the State of Tennessee, or a citizen of the United States.

        (i)     The Members agree to vote their Membership Units with respect to the election, removal and replacement of directors to effect the following:

        (a) For so long as a Founder Member continues to hold Membership Units, such Founder Member shall have the exclusive right to elect one Director and to remove and replace such Director elected by such Founder Member, which right shall be exercised by each of them in their sole discretion. The number of Directors of the Company shall be initially set at two (2) Directors and shall consist of: Daniel Holland, elected by Daniel Holland, and John Holland elected by John Holland.

        (b) If the Members increase the number of Directors, any additional Director shall be elected and removed by Members holding a Majority Interest.

        B.     Resignation. Any Director may resign at any time by giving written notice to the Members and remaining Directors without prejudice to the rights, if any, of the Company under any contract to which the Director is a party. The resignation of any Director shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. If all of the Directors resign in accordance with the terms of

this Section 5.2B, the Members may appoint new Directors in accordance with the provisions of Section 5.2A.

      C.    <u>Removal</u>.  Subject to Section 5.2(A)(i)(a), all or any lesser number of directors may be removed at any time without Cause by the affirmative vote of Members holding a Majority Interest at a meeting called expressly for that purpose.  Any removal shall be without prejudice to the rights of any Directors under any employment contract and, if the Director is also a Member, shall not affect the Director's rights as a Member or constitute a withdrawal of a Member.

    5.3.   <u>Governance</u>.

      A.    <u>Powers of Board</u>.  Without limiting the generality of Section 5.1, but subject the express limitations set forth in this Agreement, the Board shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company.

      B.    <u>Actions Requiring Approval of Members</u>.  Notwithstanding any other provisions of this Agreement, the Company shall not have the authority hereunder to cause the Company to engage in any of the following transactions without first obtaining the affirmative vote or written consent of a Majority Interest of the Members, unless in each case approved by the Board:

      (i)    Merging the Company with a corporation, limited liability company, limited partnership, general partnership or other Person;

      (ii)    Selling, exchanging or otherwise disposing of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a twelve (12) month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution;

      (iii)    Filing a voluntary petition or otherwise initiating proceedings to have the Company adjudicated bankrupt or insolvent, or consenting to the institution of bankruptcy or insolvency proceedings against the Company, or filing a petition seeking or consenting to reorganization or relief of the Company as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company; or seeking or consenting to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or all or any substantial part of the properties and assets of the Company, or making any general assignment for the benefit of creditors of the Company, or admitting in writing the inability of the Company to pay its debts generally as they become due or declare or effect a moratorium on the Company debt, or taking any action in furtherance of any of the foregoing actions; and

      (iv)    Confessing a material judgment against the Company, settling or adjusting any material claims against the Company, or commencing, defending or discontinuing any significant legal actions or proceedings involving the Company;

(v)    Lending funds belonging to the Company to any Person, including, without limitation, any Director, Member, or Officer, or their affiliates, or any third party;

(vi)    Incurring any indebtedness on behalf of the Company outside of the normal course of business, in excess of $500,000 or in connection with any bridge loan transaction, obligating the Company or another Member as a surety, guarantor, or accommodation party to any obligation, or granting any lien or encumbrance on any Company assets; or

(vii)    Extending credit on behalf of the Company to any Person other than in the ordinary course of business and on terms and conditions customary in the industry.

5.4.    <u>Members Have No Managerial Authority</u>.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act.  Unless expressly and duly authorized in writing to do so by the Board, no Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5.    <u>Performance of Duties; Liability of Directors</u>.  The Directors shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent Person in a like position would use under similar circumstances.  In performing their duties, the Directors shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following Persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Directors act in good faith and after reasonable inquiry when the need therefore is indicated by the circumstances:

(i)    one or more Officers, employees or other agents of the Company whom the Directors reasonably believe to be reliable and competent in the matters presented; or

(ii)    any attorney, independent accountant, or other person as to matters which the Directors reasonably believe to be within such person's professional or expert competence.

A Director who so performs the duties of a director shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been a result or fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of the law by the Director.

5.6.    <u>Fiduciary Duties</u>.  The fiduciary duties a Director owes to the Company and the Members are the fiduciary duties and obligations specified in the Act.

5.7.    <u>Transactions between the Company, Directors and their Affiliates</u>.  Notwithstanding that it may constitute a conflict of interest, the Directors may, and may cause their Affiliates to, engage in any transaction with the Company so long as the terms and

conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length.

5.8.   Officers.

A.   Appointment of Officers.   The Board may appoint Officers at any time. The Officers of the Company, if deemed necessary by the Board, which may include a Chairman, President and/or Chief Executive Officer, one or more Vice Presidents, a Secretary, an Assistant Secretary, a Chief Financial Officer and/or a Chief Technology Officer.   The Officers shall serve at the pleasure of the Board, subject to all rights, if any, of an Officer under any contract of employment.   Any individual may hold any number of offices.   No Officer need be a resident of the State of Tennessee or a citizen of the United States.   The Officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Board.

B.   Removal, Resignation and Filling of Vacancy of Officers.   Subject to the rights, if any, of an Officer under a contract of employment, any Officer may be removed, either with or without Cause, by the Board at any time.   Any Officer may resign at any time by giving written notice to the Board.   Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.   Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the Officer is a party.   A vacancy in any office because of death, resignation, removal, disqualification or any other Cause shall be filled in the manner described in this Agreement for regular appointments to that office.

C.   Salaries of Officers.   Any compensation of Officers shall be approved by the Board, and may be set forth in a separate compensation agreement.

D.   Duties and Powers of the Officers.   All Officers of the Company shall exercise and perform such powers and duties as may be from time to time assigned to such person by the Board or prescribed by this Agreement or in any employment or compensation agreement by and between such Officer and the Company.

E.   Limited Liability.   No Person who is a Director or an Officer or both a Director and an Officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Director or Officer or both a Director and Officer of the Company.

**Article VI.**
**ALLOCATION OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS**

6.1.   Allocation of Net Profit and Net Loss

A.    Net Loss.  Net Loss shall be allocated to the Members and Economic Interest Owners *pro rata* in accordance with their respective Percentage Interests; provided that allocations to a Member or Economic Interest Owner shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member or Economic Interest Owner in excess of an amount, if any, equal to such Member's or Economic Interest Owner's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property.  Any loss not allocated to a Member or Economic Interest Owner because of the foregoing provision shall be allocated to the other Members or Economic Interest Owners, to the extent the other Members or Economic Interest Owners are not limited in respect of the allocation of losses under this Section 6.1A.

B.    Net Profit.  Net Profit shall be allocated to the Members and Economic Interest Owners as follows: (i) first to and among the Members and Economic Interest Owners, *pro rata*, in proportion to and to the extent by which (a) the cumulative losses allocated to the Members and Economic Interest Owners pursuant to Section 6.1A hereof for all prior fiscal years exceeds (b) the cumulative profits allocated to the Members and Economic Interest Owners pursuant to this Section 6.1B for all prior fiscal years, and (ii) thereafter, to all Members and Economic Interest Owners *pro rata* in accordance with their Percentage Interests.

6.2.    Special Allocations.

A.    Minimum Gain Chargeback.  Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of the Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2).  Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A.  The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f).  This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt.  Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of the Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with regulations Section 1.704-2(i)(5)).  Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B.  The items to be so allocated shall be determined in accordance with regulations Section 1.704-2(i)(4).  This

Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Sections 1.704-2(i)(4) and shall be interpreted consistently therewith.

C.     Nonrecourse Deductions.  Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specifically allocated to the Members in proportion to their Percentage Interests.

D.     Member Nonrecourse Deductions.  Notwithstanding Section 6.1, those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specifically allocated to the Member who bears an economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

E.     Qualified Income Offset.  Notwithstanding Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specifically allocated to such member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each member pursuant to the provisions of this Section 6.2E if such unexpected adjustments, allocations, or distributions had not occurred.

6.3.     Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article VI, in accordance with Section 704(c) and the regulations promulgated thereunder, income, gain, loss, and deduction, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among Members so as to take into account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes.  As such, they shall not affect or in any way be taken into account in computing a Members Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

6.4.     Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest.  If any Member Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Membership Units at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, Membership Units which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated of the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month). Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Units as of the date such sale or other disposition occurs.

6.5.   <u>Distribution of Assets by the Company</u>.   Subject to applicable law and any limitations contained elsewhere in this Agreement, distributions shall be made to the Members according to their respective Percentage Interests.  All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.   Neither the Company nor any Director shall incur any liability for making distributions in accordance with this Section 6.5.

6.6.   <u>Form of Distribution</u>.   A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money.   No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.  Except upon dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

## Article VII.
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1.   <u>Transfer and Assignment of Interests</u>.   Except as expressly provided herein, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, her, or its Membership Units except with the prior written consent of all of the Members.  Such consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as the Board may determine in their sole discretion.   After the consummation of any transfer of any Membership Units, the Membership Units so transferred shall continue to be subject to the terms and provisions of this Agreement, and any further transfers shall be required to comply with all the terms and provisions of this Agreement. Transfers in violation of this <u>Article VII</u> shall only be effective to the extent set forth in Section 7.7.

7.2.   <u>Further Restrictions on Transfer of Interests</u>.   In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, her, or its Membership Units: (i) unless in compliance with Section 7.8, and (ii) if the Membership Units to be transferred, assigned, sold or exchanged, when added to the total of all other Membership Units sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Board.

7.3.    Substitution of Members.  A transferee of Membership Units shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 relating to consent of Members, securities and tax requirements hereof are met, (ii) such Person executes an instrument satisfactory to the Board accepting and adopting the terms and provisions of this Agreement, and (iii) such Person pays any reasonable expenses in connection with his, her, or its admission as a new Member.  The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Units from any liability that such Member may have to the Company.

7.4.    Family and Affiliate Transfers.  Subject to Section 7.9, the Membership Units of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of the Members as required by Section 7.1, by the Member (i) by *inter vivos* gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member, or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member, or (ii) to any Affiliate of the Member.

7.5.    Effective Date of Permitted Transfers.  Any permitted transfer of all or any portion of Membership Units shall be effective as of the date provided in Section 6.4 following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met.  The Board shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met.  Any transferee of Membership Units shall take subject to the restrictions on transfer imposed by this Agreement.

7.6.    Rights of Legal Representatives.  Subject to Section 7.9, if a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member.  If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his, her, or its legal representative or successor.  If a Director dies, such Director shall immediately be deemed to have resigned as a Director of the Company.

7.7.    No Effect to Transfers in Violation of Agreement.    Upon any transfer of Membership Units in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.    Notwithstanding the immediately preceding sentences, if, in the determination of the Board, a transfer in violation of this Article VII would cause the termination of the Company, in the sole discretion of the Board, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

7.8.    Right of First Refusal.

A.    If a Member wishes to transfer any or all of the Member's Membership Units pursuant to a Bona Fide Offer (as defined below), other than pursuant to Section 7.4, the Member shall give notice to the Board at least thirty (30) days in advance of the proposed sale or Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror. The Company and the other Members shall have the option to purchase the Membership Units proposed to be transferred at the price and on the terms provided in this Agreement. If the price for the Membership Units is other than cash, the fair value in dollars of the price shall be as established in good faith by the parties. For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the selling Member. For thirty (30) days after the notice is given, the Company shall have the right to purchase the Membership Units offered, on the terms stated in the notice for the price stated in the notice (or price, as adjusted for the dollar value of noncash consideration, as the case may be), which notice period may be waived by the Board.

B.    If the Company does not exercise the right to purchase all of the Membership Units, then, with respect to the portion of the Membership Units that the Company does not elect to purchase, that right shall be given to the other Members for an additional thirty (30) day period, beginning on the day that the Company's right to purchase expires. Each of the other Members shall have the right to purchase, on the same terms, as part of the interest of the offering Member in the proportion that the Member's Percentage Interest bears to the total Percentage Interests of all of the Members who choose to participate in the purchase; provided, however, that the Company and the participating Members may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

C.    If the Company and the other Members do not exercise their rights to purchase all of the Membership Units, the offering Member may, within ninety (90) days from the date the notice is given (or such lesser period resulting from any valid waiver of notice) and on the terms and conditions stated in the notice, sell or exchange that Membership Units to the offeror named in the notice.

7.9.    Required Purchase Upon Death of Certain Members.

A.    For so long as Daniel Holland ("Daniel") or John Holland ("John") remain Members of the Company, upon the death of either of Daniel or John, the Company shall purchase all of the Membership Units owned by the decedent (or by such decedent's transferee pursuant to Section 7.4) (the "Interests"), and the estate or transferee of such decedent (herein sometimes referred to as a "Selling Member") shall sell such Interests to the Company. The sale of such Interests shall be at the Purchase Price (defined below) and upon the terms set forth in this Section 7.9. Within three (3) months following the date of the Selling Member's death, the Company and the executor or personal representative of the Selling Member shall establish a time and place for closing at which time title to such Interests shall be transferred to the Company against payment of the consideration for the Interests. If the death of the survivor precedes the closing referred to in the preceding sentence, then this Section 7.9 shall be of no effect and the estate of either decedent shall not be required to sell the Interests as provided hereunder.

B.      As promptly as possible after the date of this Agreement, the Company shall purchase life insurance policies covering the lives of each of Daniel and John in the amounts specified in <u>Schedule 1</u> to this Agreement (each a "<u>Policy</u>" and together the "<u>Policies</u>"). The Company shall be named as the direct beneficiary under each Policy and shall be the sole owner of each Policy.  The amounts specified in <u>Schedule 1</u> shall be updated from time to time by agreement of the Members such that the total of the amounts set forth on <u>Schedule 1</u> is approximately equal to the Total Value (defined below) multiplied by the Percentage Interest then owned by Daniel and John.

C.      The Company shall pay all premiums due on the Policies.  If the Company fails to pay a premium within 15 days after the premium due date, the Member whose life is covered under such policy may pay such premium.  Such payment shall be considered a loan to the Company in default, and the Member making the payment shall be entitled to recover such amount with interest from the date of payment at 10% per annum.

D.      The Company shall not, during the term of this Agreement, revoke or change the beneficiary designation or modify or impair any of the rights or values under the Policy without the approval of a Majority in Interest of the Members.

E.      Notwithstanding any provision of this Agreement, the insurers issuing the Policies are authorized to act in accordance with the terms of such Policies.  Payment or other performance or obligations of such insurers shall completely discharge such insurers from all claims, suits, and demands of all persons whomsoever.

7.10.   <u>Purchase Price</u>.

A.      For purposes of Section 7.9, the Total Value of the Company shall be the amount set forth on <u>Schedule 2</u> attached hereto, as such <u>Schedule 2</u> shall be updated from time to time by agreement of a Majority in Interest of the Members ("<u>Total Value</u>").  Such stipulation of the Total Value shall remain in effect until updated by a subsequent written stipulation of the Total Value executed by a Majority in Interest of the Members no less frequently than once each twelve (12) months, provided that the most recent written stipulation of Total Value so executed shall remain in effect notwithstanding the failure of a Majority in Interest of the Members to agree upon and update such written stipulation of Total Value as provided herein.

B.      The purchase price of Interests shall be the greater of (i) (A) the Total Value multiplied by (B) the Percentage Interest that the Interests being sold represent of all the issued and outstanding Membership Units in the Company; or (ii) the amount of insurance under the Policy in respect of such Selling Member (the "<u>Purchase Price</u>").

C.      At the closing of the purchase of the Interests, the Selling Member shall receive for the Interests cash or other immediately available funds in an amount equal to the Purchase Price.

D.      At the closing of the purchase of the Interests, the Selling Member shall deliver to the Company an agreement executed by the Selling Member and representing and warranting that the Selling Member's Interests are free and clear of all liens, claims and

14143224v1

Page 17 of 23

encumbrances of every kind and agreeing to indemnify the purchaser against, and to hold the purchaser harmless from, any loss, cost or damage which the purchaser may incur by reason of the breach of such representations and warranties.

E.    Title to the Interests shall pass to the Company immediately upon delivery of the consideration as provided above, and thereafter, shall pass immediately to Daniel, if he survives, or John, if he survives.  If the Selling Member fails to comply with Sections 9.9 or 9.10, the Company may place the Purchase Price in escrow for the Selling Member, whereupon the Company shall be entitled to transfer on the books and records of the Company, the Interests to Daniel, if he survives, or John, if he survives.  The Purchase Price shall be released from escrow only upon the Selling Member's compliance with this Agreement.

F.    Following the death of either Daniel or John, if the survivor's death should precede the closing of the Company's purchase of the Interests owned by the Selling Member, then Section 7.9 and 7.10 (other than this Section 7.10(F)) shall be of no further force or effect.

**Article VIII.**
**ACCOUNTING; RECORDS**

8.1.    <u>Books and Records</u>.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with accounting principles determined by the Board, consistently applied.  The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.

8.2.    <u>Filings</u>.  The Board, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities.  The Board, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative authorities, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other current applicable laws, rules, and regulations.  If a Director required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Director or Member may prepare, execute and file that document with the Tennessee Secretary of State.

8.3.    <u>Bank Accounts</u>.  The Board shall cause the Company to maintain the Company's funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

8.4.    <u>Accounting Decisions and Reliance on Others</u>.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board.  The Board may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

8.5.    <u>Tax Matters for the Company Handled by Board and Tax Matters Member</u>.  The Board shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members.  The Tax Matters Member shall represent

the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company's funds for professional services and costs associated herewith. The Tax Matters Member shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Member can no longer serve in that capacity or ceases to be a Member and/or Director, as the case may be, Members holding a Majority Interest may designate another Member to be Tax Matters Member.

## Article IX.
## DISSOLUTION AND WINDING UP

9.1.    <u>Dissolution</u>.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

> A.    Upon the happening of any event of dissolution specified in the Articles;
>
> B.    Upon the entry of a decree of judicial dissolution;
>
> C.    Upon the unanimous vote of Members; or
>
> D.    The sale of all or substantially all of the assets of the Company.

9.2.    <u>Certificate of Dissolution</u>.  As soon as possible following the occurrence of any of the events specified in Section 9.1, an Officer designated by the Board or, if none, the Members, shall execute articles of dissolution and/or termination in such form as shall be prescribed by the Tennessee Secretary of State and shall file such articles as required by the Act.

9.3.    <u>Winding Up</u>.  Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  An Officer designated by the Board or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.5. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Officer designated by the Board or Members winding up affairs of the Company shall be entitled to reasonable compensation for such services.

9.4.    <u>Liquidation Proceeds</u>.  From and after the dissolution of the Company, the proceeds from the liquidation of the Company's property and from the operation of the Company's business in accordance with Section 9.3 above shall be applied and distributed in the following order:

> A.    The expenses of liquidation and the debts of the Company shall be paid in the order of priority provided by law, except the claims of secured creditors whose obligations

will be assumed or otherwise transferred upon the liquidation or distribution of the Company assets;

    B. The parties responsible for winding up shall be paid the compensation to which they are entitled for their services in winding up the affairs of the Company; and;

    C. Thereafter, in accordance with <u>Section 6.5</u> above.

  9.5. <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of his, her, or its positive Capital Account balance and shall have no recourse for his, her, or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Directors or any other Member except as otherwise provided herein.

  9.6. <u>No Action for Dissolution</u>.  Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes the dissolution of the Company. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 9.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests.  Accordingly, except where the Board has failed to liquidate the Company as required by this Article IX, each Member hereby waives and renounces his, her, or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member.  Damages for breach of this Section 9.6 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

**Article X.**
**INDEMNIFICATION AND INSURANCE**

  10.1. <u>Indemnification of Agents</u>.  The Company shall indemnify any Person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she was or is a Member, Director, Officer, employee or other agent of the Company (all such Persons being referred to herein as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit; provided, that any such indemnity shall not cover the fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law of any agent.  The Board shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Board deems appropriate.

14143224v1                   Page 20 of 23

Case 1:20-cv-00194-CLC-CHS     Document 1-7     Filed 07/09/20     Page 27 of 35
PageID #: 68

10.2. <u>Insurance</u>.  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company should have the power to indemnify such Person against any such liability under the provisions of Section 10.1 or under applicable law.

**Article XI.**
**MISCELLANEOUS**

11.1. <u>Complete Agreement</u>.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written or oral agreements or statements by and among the Members or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

11.2. <u>Binding Effect</u>.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

11.3. <u>Parties in Interest</u>.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

11.4. <u>Pronouns; Statutory References</u>.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

11.5. <u>Headings</u>.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

11.6. <u>Interpretation</u>.  In the event that any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

11.7. <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of Tennessee without regard for its choice of law provisions.

11.8. <u>Disputed Matters</u>. Except as otherwise provided in this Agreement, any controversy of every kind and nature arising out of this Agreement and any loss or damage shall be resolved by a Federal or State court located in Chattanooga, Tennessee.

11.9. <u>Exhibits</u>. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

11.10. <u>Severability</u>. If any provision of this Agreement or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected hereby.

11.11. <u>Additional Documents and Acts</u>. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

11.12. <u>Notices</u>. Any notice to be given or to be served upon the Company in connection with this Agreement shall be in writing and delivered personally, via first-class mail, or express courier service, charges prepaid. Any notice to be given or served upon any Member or Economic Interest Owner in connection with this Agreement shall be given personally, by first-class mail, courier, email, or fax, charges prepaid, addressed at the address of such Person appearing on the books of the Company or given by such Person to the Company for the purpose of notice. If no address for a Member appears on the Company's books or is given, notice shall be deemed to have been given if sent to that Member care of the Company's principal executive office. Notices to Members shall be deemed to have been given at the time when delivered personally, deposited in the mail, accepted by a courier, or sent by email, fax, or other means of written communication. If any notice addressed to a Member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand of the Member at the principal executive office of the Company for a period of one year from the date of the giving of the notice. Any party may, at any time by giving five (5) days prior written notice to the applicable other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

11.13. <u>Amendments</u>. All amendments to this Agreement must be in writing and signed by Members holding a Majority Interest, provided that all of the Members must approve in writing any amendment of Sections 3.3, 5.2, and 11.13 and <u>Articles VII</u> and <u>IX</u>.

11.14. <u>Reliance on Authority of Person Signing Agreement</u>. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

11.15.  <u>No Interest in Company Property; Waiver for Action for Partition</u>.  Except as set forth in Section 9.4 hereof, no Member or Economic Interest Owner has any interest in specific property of the Company.  Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she, or it may have to maintain any action for partition with respect to the property of the Company.

11.16.  <u>Multiple Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

11.17.  <u>Attorneys' Fees</u>.  In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

11.18.  <u>Time is of the Essence</u>.  All dates and times in this Agreement are of the essence.

(Signature Page Follows)

IN WITNESS WHEREOF, all of the Members of Paragon Component Systems, LLC, a Tennessee limited liability company, have executed this Agreement, effective as of the date first written above.

_____
Daniel Holland

_____
John Holland

JOINDER

TO OPERATING AGREEMENT OF

PARAGON COMPONENT SYSTEMS, LLC

December 31, 2016

The undersigned, by conversion of certain indebtedness pursuant to that certain Debt Conversion Agreement of even date herewith, is the owner and holder of 15.55 Membership Units in Paragon Component Systems, LLC, a Tennessee limited liability company (the "Company"), and hereby agrees to become a party to and be bound by that certain Operating Agreement of the Company dated as of February 22, 2016 (the "Operating Agreement"), as a Member.

A copy of the Operating Agreement and a revised <u>Exhibit A</u> to the Operating Agreement has been provided to the undersigned.

This Joinder shall become a part of the Operating Agreement and is executed as of the date first written above under the laws of the State of Tennessee.

_____
Lisa Holland

Accepted:

PARAGON COMPONENT SYSTEMS, LLC

By: _____
Name: John Holland
Title: Chief Executive Officer

15392348v1  28667-0001

## Exhibit A

| Member | Capital Contribution | Membership Units | Percentage Interest |
|---|---|---|---|
| Daniel Holland | $12,453 of Personal Property | 51.00 | 44.1367% |
| John Holland | Intellectual Property | 49.00 | 42.4059% |
| Lisa Holland | $311,000 of Converted Indebtedness | 15.55 | 13.4574% |
| **Total** | | **115.55** | **100.0000%** |

## **Schedule 1**

### **Schedule of Life Insurance**

| **Member** | **Policy** | **Policy Amount** |
|---|---|---|
| Daniel Holland | Life Policy No. _____, issued by _____ | **[$ 1,020,000]** |
| John Holland | Life Policy No. _____, issued by _____ | **[$ 980,000]** |

Schedule 2

Total Value

Total Value of Paragon Component Systems, LLC: $2,311,000

      The foregoing Total Value as of the 1ᵃ day of January 2017, has been stipulated by the Members this 1ᵃ day of January 2017.

_____
Daniel Holland

_____
John Holland

_____
Lisa Holland