UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

---

INSPIRED PURSUITS, LLC, QUALTIM, INC.,
CENTER FOR BUILDING INNOVATION, LLC,
DRJ ENGINEERING, LLC, KIRK GRUNDAHL,
and SUZANNE GRUNDAHL,

Plaintiffs,

v.                                                    Case No. 3:25-cv-00075-wmc

PARAGON COMPONENT SYSTEMS, LLC,                       JURY TRIAL DEMANDED
JOHN HOLLAND, JAMES HOLLAND,
CLEARSPAN COMPONENTS, INC., ROB
EASON,
and the ESTATE OF DANIEL HOLLAND, ex rel.
SPECIAL INDEPENDENT EXECUTOR
MARVIN B. SPEED,

Defendants.

---

**SECOND AMENDED COMPLAINT**

---

Plaintiffs Inspired Pursuits, LLC, Qualtim, Inc., Center for Building Innovation, LLC, DrJ

Engineering, LLC, Kirk Grundahl, and Suzanne Grundahl (collectively, "Plaintiffs"), for their

Second Amended Complaint against Defendants Paragon Component Systems, LLC, John

Holland, James Holland, Clearspan Components, Inc., Rob Eason, and the Estate of Daniel

Holland, ex rel. Special Independent Executor Marvin B. Speed (collectively, "Defendants"),

allege as follows.

## INTRODUCTION

1.     This case arises from the wrongful termination of a fifteen-year joint venture and

the unauthorized commercialization of the trade secrets and confidential engineering information

that gave the joint venture its value. For more than a decade, Plaintiffs and Daniel Holland and his

companies, Paragon Component Systems, LLC and Clearspan Components, Inc., worked as partners in a joint venture to build an independent, plate-agnostic structural-engineering platform for the metal-plate-connected wood truss industry. Plaintiffs supplied the professional engineering, proprietary testing, calibration, and authored engineering specifications—the Engineering Inputs—and the licensed professional engineering seal that make the platform function as a structural engineering tool. Within the joint venture, Paragon served as the computational tool that processed the Engineering Inputs, and Clearspan was the structural component manufacturer.

2.      Paragon is a company of software coders. It has no licensed professional engineer on staff and never did. The Paragon Truss Software functions as a structural engineering tool only because Plaintiffs supplied the engineering intelligence that makes it work. When Daniel Holland unexpectedly and tragically died on January 17, 2024, shortly before the planned commercial launch of the joint venture, Paragon and Clearspan terminated Plaintiffs' participation in the Enterprise, locked Plaintiffs out of the shared systems, precluded Plaintiffs from continuing to provide their professional engineering sealing and other services, and launched the software commercially, using Plaintiffs' Engineering Inputs and confidential information, without Plaintiffs' authorization and without accounting to Plaintiffs for a single dollar.

3.      This action was filed to address the wrongful termination of the joint venture and the misappropriation and commercialization of Plaintiffs' trade secrets and confidential information. These harms are independent of the question of who owns the copyright in the Paragon Truss Software, which is the subject of the companion action, Paragon Component Systems, LLC v. Qualtim, Inc., et al., Case No. 3:25-cv-00'170-wmc (W.D. Wis.) (the "'170 Action"). Even if Plaintiffs are not adjudicated co-owners of the software in the '170 Action, Defendants wrongfully terminated the joint venture, misappropriated and commercialized

Plaintiffs' trade secrets and confidential information without authorization, were unjustly enriched, and precluded Plaintiffs from performing the professional engineering sealing and other services that were Plaintiffs' role in the joint venture. A winding up of the joint venture does not, by itself, resolve the misappropriation and unjust-enrichment harms, for which Plaintiffs separately seek damages, restitution, and injunctive relief.

## PARTIES

4.      Plaintiff Inspired Pursuits, LLC ("IP-LLC") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. IP-LLC was initially formed as a Texas limited liability company in 2017 and subsequently redomesticated as a Wisconsin limited liability company in 2022. It was formed by Kirk Grundahl, Suzanne Grundahl, and Daniel Holland during the course of the Enterprise to hold intellectual property arising from the Enterprise. Its current members are Kirk Grundahl and Suzanne Grundahl, both citizens of Wisconsin.

5.      Plaintiff Qualtim, Inc. ("Qualtim") is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

6.      Plaintiff Center for Building Innovation, LLC ("CBI") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. Its members are citizens of Wisconsin. CBI is accredited under ANAB ISO/IEC '17025 for testing and ISO/IEC '17020 for inspection, and conducts the structural testing programs that supply the empirical data and calibration used in the Engineering Inputs.

7.      Plaintiff DrJ Engineering, LLC ("DrJ") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. Its sole member is Kirk Grundahl, a citizen of Wisconsin. DrJ provides the professional engineering services, including the licensed

professional engineering seal, for structural component design drawings produced within the Enterprise.

8.    Plaintiff Kirk Grundahl is an individual and citizen of Wisconsin. He is a licensed professional engineer and the founder and principal of Qualtim, DrJ, and CBI (collectively, the "Qualtim Companies"), and a founding member of IP-LLC. Kirk Grundahl holds professional engineering seals in 47 states and the District of Columbia and has more than forty-five years of experience in the structural building component industry, beginning in 1978.

9.    Plaintiff Suzanne Grundahl is an individual and citizen of Wisconsin and a founding member of IP-LLC.

10.    Defendant Paragon Component Systems, LLC ("Paragon") is a Tennessee limited liability company with its principal place of business in Chattanooga, Tennessee. Upon information and belief, Paragon's members are citizens of Georgia and/or Tennessee, and no member of Paragon is a citizen of Wisconsin. Daniel Holland owned and operated Paragon.

11.    Defendant John Holland is an individual and, upon information and belief, a citizen of Georgia. He is the President of Paragon and, following the events described below, became its sole or majority owner. He is the son of Daniel Holland.

12.    Defendant James Holland is an individual and, upon information and belief, a citizen of Mississippi. He is a shareholder of Clearspan and the son of Daniel Holland.

13.    Defendant Clearspan Components, Inc. ("Clearspan") is a Mississippi corporation with its principal place of business in Meridian, Mississippi. Clearspan manufactures structural building components and was the manufacturing participant in the Enterprise. Daniel Holland owned and operated Clearspan.

14.     Defendant Rob Eason is an individual and, upon information and belief, a citizen of Mississippi. He is the President of Clearspan.

15.     Defendant the Estate of Daniel Holland (the "Estate") is the estate of Daniel Holland, who was domiciled in Lauderdale County, Mississippi at the time of his death and whose estate is being administered in the Chancery Court of Lauderdale County, Mississippi (Case No. 24-00078). Lisa M. Holland served as executrix from February 8, 2024. On July 17, 2024, the court appointed Marvin B. Speed as Special Independent Executor under Miss. Code § 91-7-61, with exclusive fiduciary authority over matters involving Paragon, IP-LLC (Inspired Pursuits), and this litigation, because the executrix had a conflict of interest arising from the Estate's interests in both Paragon and IP-LLC. Lisa M. Holland resigned and John Holland was appointed successor Executor on November 17, 2025. For purposes of 28 U.S.C. § 1332(c)(2), the Estate is a citizen of Mississippi.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). There is complete diversity of citizenship: all Plaintiffs are citizens of Wisconsin, and no Defendant is a citizen of Wisconsin. The amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over each Defendant. Wisconsin's long-arm statute, Wis. Stat. § 801.05, authorizes the exercise of personal jurisdiction to the fullest extent permitted by the Due Process Clause, and the exercise of jurisdiction over each Defendant comports with due process. For more than a decade the Enterprise was centered in Madison, Wisconsin, where the Qualtim Companies developed and maintained the Engineering Inputs and the Enterprise's confidential information and performed their work, and each Defendant

purposefully directed its conduct at Wisconsin and at Plaintiffs in Wisconsin in connection with the Enterprise. Plaintiffs' claims arise out of and relate to that conduct.

18. Defendant John Holland is subject to personal jurisdiction in Wisconsin based on his own purposeful contacts with the State. Among other things, John Holland participated for years in the Enterprise's regular and bi-weekly meetings and communications with the Wisconsin-based Qualtim Companies; traveled to Madison, Wisconsin in August 2023, where he executed the Mutual Non-Disclosure Agreement on behalf of Paragon; participated with Daniel Holland and Kirk Grundahl in demonstrating the Paragon Truss Software and pitching the Enterprise's services to prospective customers; and, following Daniel Holland's death, personally directed into Wisconsin the communications and conduct by which Plaintiffs were excluded from the Enterprise, including the May 21, 2024 surrender letter presented to the Wisconsin Plaintiffs, the assertion of Paragon's sole ownership, the restriction of Plaintiffs' access to the Enterprise systems, and the communications to Plaintiffs' customers. Through this conduct John Holland committed intentional torts expressly aimed at Wisconsin, knowing that the brunt of the resulting harm would be suffered by Plaintiffs in Wisconsin.

19. Defendant James Holland is subject to personal jurisdiction in Wisconsin based on his own purposeful contacts with the State. Among other things, James Holland participated in Enterprise communications with the Wisconsin-based Qualtim Companies; met and communicated with Kirk Grundahl and Suzanne Grundahl regarding the Enterprise and the proprietary nature of the Engineering Inputs, including at a February 27–28, 2024 meeting at Clearspan with Kirk and Suzanne Grundahl and in March 2024; received and read the Qualtim Companies' written assertion of their ownership interests; and participated in the coordinated decision to exclude Plaintiffs from the Enterprise and to continue using Plaintiffs' Engineering

Inputs and confidential information. James Holland engaged in this intentional conduct knowing that the brunt of the resulting harm would be suffered by Plaintiffs in Wisconsin.

20.    Defendant Rob Eason is subject to personal jurisdiction in Wisconsin based on his own purposeful contacts with the State. Among other things, Rob Eason participated in Enterprise communications with the Wisconsin-based Qualtim Companies; met with Kirk Grundahl and Suzanne Grundahl at a February 27–28, 2024 meeting at Clearspan regarding the Enterprise and the Engineering Inputs; directed Clearspan to cease submitting truss design drawings to the Wisconsin-based DrJ; terminated Clearspan's inspection agreement with the Wisconsin-based CBI; and participated in the coordinated decision to exclude Plaintiffs from the Enterprise and to continue using Plaintiffs' Engineering Inputs and confidential information. Rob Eason engaged in this intentional conduct knowing that the brunt of the resulting harm would be suffered by Plaintiffs in Wisconsin.

21.    Defendant Clearspan is subject to personal jurisdiction in Wisconsin based on its own purposeful contacts with the State. For approximately fifteen years, Clearspan contracted with the Wisconsin-based Qualtim Companies to obtain the professional engineering and licensed professional engineering sealing services on which Clearspan's structural-component manufacturing depended, and it directed a continuous stream of truss design work into Wisconsin, where DrJ reviewed and sealed Clearspan's structural component design drawings from approximately 2009 through 2024. Clearspan paid the Wisconsin-based Qualtim Companies for those services, including the monthly design-service-access payments and other compensation that flowed to the Enterprise's Wisconsin participants. Daniel Holland, who owned and operated Clearspan, traveled to Wisconsin and communicated regularly with Kirk Grundahl and Suzanne Grundahl in connection with the Enterprise, and Clearspan participated through Daniel Holland in

the Enterprise's regular and bi-weekly meetings and communications with the Wisconsin-based Qualtim Companies. Following Daniel Holland's death, Clearspan directed into Wisconsin the communications and conduct by which Plaintiffs were excluded from the Enterprise, including by participating in the termination of Plaintiffs' participation through communications sent to the Wisconsin Plaintiffs, ceasing to submit truss design drawings to the Wisconsin-based DrJ for sealing, and continuing to use Plaintiffs' Engineering Inputs in its manufacturing without authorization. Plaintiffs' claims arise out of and relate to these Wisconsin contacts, and the exercise of jurisdiction over Clearspan comports with due process.

22. Paragon and Clearspan were both Daniel Holland's companies and have at all relevant times operated as a single, commonly controlled and financially intertwined Holland enterprise. As alleged below, Daniel Holland funded Paragon's operations through his private funds and through Clearspan, and Clearspan continues to fund Paragon today. The individual Defendants acted in concert, through and on behalf of these commonly controlled entities, to terminate the Enterprise and to seize and commercialize Plaintiffs' contributions. A corporate officer who personally participates in or directs tortious conduct is subject to personal jurisdiction for that conduct; the individual Defendants' personal participation in the intentional misappropriation, interference, and exclusion alleged herein subjects each of them to the jurisdiction of this Court regardless of the corporate form.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the formation and operation of the Enterprise, the development and communication of the Engineering Inputs, and the execution of the Mutual Non-Disclosure Agreement. This action is already pending in this District.

**DEFINED TERMS**

24.    The following defined terms are used consistently with the terms employed by the parties in discovery in this action and in the '170 Action.

(a) "Joint Venture Enterprise" or "Enterprise" means the joint venture business relationship among Kirk Grundahl, Suzanne Grundahl, and their affiliated companies Qualtim, DrJ, and CBI, on one side, and Daniel Holland and his companies Paragon and Clearspan on the other, together with their jointly controlled entity IP-LLC, in which the Qualtim Companies occupied both the input and output sides of the design process, providing the Engineering Inputs on the input side and DrJ's licensed professional engineering seal on the output side, Clearspan served as the structural component manufacturer, and Paragon served as the computational tool between those two functions. The Enterprise involved the development, application, testing, validation, and commercialization of engineering technologies and related services used in the structural building component industry, and arose from the parties' course of conduct and written, oral, and implied-in-fact agreements beginning in approximately March 2009 and continuing through approximately May 2024.

(b) "Engineering Inputs" means the proprietary engineering knowledge and methodologies created by Kirk Grundahl and the Qualtim Companies through professional engineering practice predating the Enterprise and the Paragon Truss Software, including engineering methods, calculations, design approaches, testing programs, calibration frameworks, engineering decision systems, engineering workflows, manufacturing and quality systems related to engineered designs, and professional engineering judgment used in structural component design and manufacturing. The Engineering Inputs exist independently of any software environment, are distinct from software source code, and were not created for

Paragon. The Engineering Inputs were never assigned or transferred to Daniel Holland, Clearspan, Paragon, or IP-LLC.

(c) "Paragon Truss Software" means the software environment created within the Enterprise as a computational tool for performing structural component design calculations using the Qualtim Companies' Engineering Inputs. The Paragon Truss Software did not exist before the Enterprise and was created to serve the Enterprise's commercial purposes. It is the subject of Paragon's declaratory judgment claims in the '170 Action.

## FACTUAL BACKGROUND

### A. Origins and Formation of the Enterprise

25.     The relationship between Kirk Grundahl and Daniel Holland dates to at least 1999, when Daniel Holland joined the board of the Wood Truss Council of America, of which Mr. Grundahl was a principal contributor, and of which Daniel Holland became President in 2004. Coordinated business activities forming the basis of the Enterprise began in approximately March 2009.

26.     For decades, the truss design industry has been dominated by a small number of metal connector plate manufacturers who control both the plate supply and the truss design software used throughout the industry. The five member companies of the Truss Plate Institute—MiTek, Alpine, Simpson Strong-Tie, Eagle Metal Products, and Cherokee Metal Products—historically provided their design software to component manufacturers at no or limited direct charge, conditioned on exclusive use of the company's proprietary metal connector plates. This arrangement commoditized truss design, eliminated value-added engineering differentiation, and concentrated pricing power in the plate manufacturers.

27.     Kirk Grundahl and Daniel Holland identified this as both a market problem and a commercial opportunity. They formed the Enterprise to develop and commercialize an

independent, plate-agnostic platform—combining the Qualtim Companies' proprietary Engineering Inputs, professional engineering services, professional ANAB ISO/IEC '17065 certified product evaluation services, professional ANAB ISO/IEC '17025 certified testing services, professional ANAB ISO/IEC '17020 certified inspection services, independent software, and non-proprietary connector plates—outside the plate-centric, supplier-controlled model.

28.     The Enterprise was structured as a shared-risk venture in which professional engineering services, manufacturing operations, and software-enabled design processing were undertaken in advance of full commercialization. Consistent with that structure, the Qualtim Companies provided substantial services on reduced-fee, deferred, and non-contemporaneously billed terms in anticipation of the imminent commercial launch. This shared-risk structure continued from 2009 through Paragon's termination of the Enterprise in 2024.

29.     In 2017, the Enterprise's principals—Daniel Holland, Kirk Grundahl, and Suzanne Grundahl—formed IP-LLC as the Enterprise's jointly controlled intellectual property holding entity. Daniel Holland held a 50% membership interest, and Kirk Grundahl and Suzanne Grundahl together held the remaining 50% in equal shares. All three principals were members and Managers. IP-LLC was to hold intellectual property arising from the Enterprise's activities for the benefit of all Enterprise participants. The members' understanding was first memorialized in writing in 2017 and again disseminated as part of a December 31, 2019 agenda designated Confidential and trade-secret, distributed to Daniel Holland, John Holland, Kirk Grundahl, and Suzanne Grundahl.

### B.  Structure of the Enterprise and the Parties' Roles

30.     Within the Enterprise, the Qualtim Companies occupied both the input and output sides of the engineered design process. On the input side, DrJ, CBI and the Qualtim Companies provided the Engineering Inputs that Paragon used to define the software's engineering logic,

testing, calibration, and decision frameworks. On the output side, DrJ provided the licensed professional engineering seal on every structural component design drawing produced by the software. Paragon served as the computational tool between these two functions—the software platform that received the Engineering Inputs, processed structural component design calculations using that engineering logic, and produced output drawings that DrJ then reviewed and sealed. Clearspan, owned and operated by Daniel Holland, was the structural component manufacturer. IP-LLC was to hold the Enterprise's intellectual property.

31.     The Enterprise's business relationships were governed by fifteen years of written, oral, and implied contracts and course of dealing, including regular and bi-weekly meetings reflected in over 300,000 Slack communications, the provision of professional engineering services by the only licensed professional engineers in the Enterprise, non-disclosure and confidentiality arrangements protecting the Engineering Inputs, professional engineering services for sealing and repairs, plant manufacturing inspections, software interface analysis and testing, and joint commercialization activities.

32.     The agreements and arrangements through which the Enterprise was formed and operated included: (a) the oral and implied-in-fact partnership and joint-venture agreements arising from the parties' course of conduct beginning in approximately March 2009; (b) an oral exclusivity agreement under which the Qualtim Companies served as the exclusive engineering and professional-engineering-sealing providers for Clearspan's structural-component manufacturing operations; (c) oral exclusivity agreements under which DrJ supervised and provided all of the Engineering Inputs used in the Paragon Truss Software and provided the licensed professional engineering seal for the sealing services performed through that software; (d) the formation and operating agreement of IP-LLC as the Enterprise's intellectual-property holding entity; (e) the

written agreement between CBI and Clearspan for the third-party annual inspection services required by ANSI/TPI 1 from approximately 2021 through approximately July 2024; (f) the August 8, 2023 Mutual Non-Disclosure Agreement among Qualtim, DrJ, CBI, Pushing7, and Paragon; (g) revenue-sharing, profit-allocation, deferred-compensation, and shared-risk arrangements under which Plaintiffs provided services on reduced-fee, deferred, and non-contemporaneously billed terms in anticipation of the planned commercialization; and (h) the parties' sustained course of dealing reflected in their regular and bi-weekly meetings and the more than 300,000 Slack communications through which the Engineering Inputs were provided. These agreements and arrangements are further identified in Plaintiffs' Answer to Interrogatory No. 3.

33. Paragon has no licensed professional engineer on staff and never did. At the December 10, 2025 motion hearing in these actions, Paragon's counsel acknowledged to the Court that Paragon's principal is a computer programmer and that his company consists of computer software developers. Paragon's corporate representative, John Holland, confirmed under oath that Paragon's software developers are not professional engineers and that Paragon does not undertake professional engineering truss design. At his deposition, John Holland confirmed that the authors of the Paragon Truss Software are not professional engineers, and acknowledged that professional engineers were asked for, and did give, engineering judgment and advice that was used in the development of the software.

34. Daniel Holland was a mechanical engineer but was not a licensed professional engineer and never provided sealing services, as confirmed by James Holland at his deposition. Daniel Holland himself acknowledged the limits of Paragon's software team. At a May 2018 Enterprise meeting, Daniel Holland stated that, although Paragon had an excellent software team, most of its members had "never swung a hammer," had "never really worked with wood," and did

not have the engineering experience that the Qualtim Companies brought, with the result that "none of the parts can function as well independently as they can together."

35. The absence of any licensed professional engineer at Paragon defined the limit of Paragon's structural engineering capacity. Paragon's coders could implement engineering specifications once those specifications were provided to them by the Qualtim Companies, but they could not originate, evaluate, validate, or seal structural engineering judgments. The Paragon Truss Software functions as a structural engineering tool only because of the Engineering Inputs and professional engineering judgment that the Qualtim Companies supplied and that Paragon used in the software's calculations.

36. The specific numerical parameters, threshold values, decision criteria, calibration factors, and analytical sequences that constitute the Engineering Inputs were not dictated by any published standard. The ANSI/TPI 1 standard and ASCE 7 establish minimum requirements and general frameworks but expressly leave the design engineer to supply specific implementation judgments through professional expertise. The same public standards are available to all five TPI member companies, yet each has developed proprietary software whose engineering outputs differ materially from one another and from the Paragon Truss Software.

37. At a meeting on or about February 22, 2023 with a prospective customer, John Holland confirmed that Paragon's analysis was "completely our own and separate from anything" the other plate manufacturers do, and further acknowledged that "one of the great values of our partnership with DrJ/Qualtim" was the ability to go beyond what is contained in the TPI standard and the codes. John Holland's statement that Paragon's analysis was "their own" distinguished Paragon's results from those of the competing plate manufacturers; it was not a claim that Paragon's analysis was independent of the Qualtim Companies' Engineering Inputs, which John

Holland acknowledged in the same statement were the source of the partnership's ability to go beyond the public baseline. The existence of multiple non-identical software systems built from the same public baseline, together with John Holland's acknowledgment that the partnership's value lay in going beyond that baseline, establishes that the Qualtim Companies' specific engineering judgments were chosen expressions of professional judgment, protectable as trade secrets and confidential information.

### C.  Engineering Contributions

38.     Prior to the formation of Paragon, Kirk Grundahl and the Qualtim Companies worked with Daniel Holland and Clearspan using CompuTrus, a third-party truss design software. CompuTrus was acquired by MiTek, the dominant plate manufacturer, returning it to the plate-centric ecosystem the Enterprise had been formed to escape. Beginning in approximately 2014, the Qualtim Companies began providing Engineering Inputs to John Holland, then a coder at Clearspan, for use in developing an independent replacement. Paragon was formed in 2016 to be that replacement, and the Qualtim Companies continued providing Engineering Inputs to Paragon's coders through the termination of the Enterprise in 2024.

39.     Whatever software Clearspan transferred to Paragon at Paragon's 2016 formation was Daniel Holland's personal, discarded attempt at a truss design program. At the February 22, 2023 meeting, Daniel Holland acknowledged that John Holland took everything Daniel Holland had and threw it out and started over. The Paragon Truss Software as it exists today is not derived from anything Clearspan owned or transferred. To the extent any Engineering Inputs assisted Daniel Holland's early effort, those Engineering Inputs were never assigned to Daniel Holland, Clearspan, or Paragon.

40.     Paragon knew how to obtain ownership of work it intended to own. At his deposition, John Holland confirmed that Paragon used written work-for-hire agreements with its own software consultants, including beginning as early as 2016 or 2017. Paragon never entered into any work-for-hire agreement or written assignment with the Qualtim Companies, and the Qualtim Companies never assigned or transferred the Engineering Inputs to Paragon. The Engineering Inputs accordingly remained the property of the Qualtim Companies, and Paragon's characterization of them as mere outside "consulting services" is contradicted by Paragon's own practice and by the absence of any such agreement.

41.     The Engineering Inputs are the product of Kirk Grundahl's and the Qualtim Companies' professional engineering practice, developed through decades of independent testing, calibration, validation, and professional judgment in structural component design. The Qualtim Companies' personnel who developed and applied the Engineering Inputs include multiple licensed professional engineers and technical specialists with decades of experience in the structural building component industry.

42.     Throughout the Enterprise period, Paragon used no fewer than sixty distinct Engineering Inputs of the Qualtim Companies in the Paragon Truss Software, identified by number and generic descriptor in the table below. The specific content of each Engineering Input—the engineering methodology, the basis for its development, and its distinction from any published standard—is set forth in Plaintiffs' Answer to Interrogatory No. 10 and Schedule A in this action and in the Qualtim Companies' Answer to Revised Interrogatory No. 5 in the '170 Action, including all corrections, amendments, and supplements, all designated Confidential under the applicable Protective Orders and incorporated herein by reference.  The Inputs are generally listed below:

| No. | Engineering Input Contribution |
| --- | --- |
| 1 | QC Tolerance Polygon System |
| 2 | Engineering vs. Manufacturing Decision Framework |
| 3 | Composite Section/Stacked Chord Methodology |
| 4 | Bending Capacity Factor Analysis Protocol |
| 5 | Top Chord Bearing Software Module (StrongEnd Truss) |
| 6 | Gross Plate Area Design Methodology |
| 7 | Plate Shear Resistance Methodology |
| 8 | ASCE 7 Wind and Snow Load Implementation |
| 9 | TPI Standard Implementation and Interpretation |
| 10 | Testing Data and Calibration |
| 11 | Tooth Withdrawal and Incising Factor Specifications |
| 12 | Multi-Ply Girder Design Methodology |
| 13 | Finite Element Analysis (FEA) Methodology and Calibration |
| 14 | Heel Joint Moment Check Methodology (TPI Check 8.7.1.1) |
| 15 | Stacked Floor Truss Top Chord Bearing Force Distribution Protocol |
| 16 | LVL/LSL Lumber Design Value Implementation |
| 17 | Web Member Lateral Restraint and Bracing Design Methodology |
| 18 | Bearing Block Plating Rules |
| 19 | Split Vertical End Condition Analysis Methods |
| 20 | Wood Splitting Prevention |
| 21 | Strong Axis vs. Weak Axis Determination for Multi-Ply Members |
| 22 | Analog Model Calibration Methods |
| 23 | Vector Diagram Load Path Analysis Protocol |
| 24 | Preservative Treatment and Moisture Content Design Guidance |
| 25 | Applied Loads Review and Competitive Positioning Process |
| 26 | Panel Length Deflection Check Policy |
| 27 | Moment Reduction Method |
| 28 | Wood-to-Wood Force Transmission |
| 29 | Compression Reduction Rule for Plating |
| 30 | Wind Load Database Implementation |
| 31 | Fundamental vs. Risk-Targeted Spectral Response Acceleration |
| 32 | Roof Pitch and Slope Correction Factors |
| 33 | Repetitive Member Factor Application Protocol |
| 34 | Drag Strut and Diaphragm Load Transfer Methodology |
| 35 | Hip Set Engineering and Load Distribution |
| 36 | Cantilever Design Rules and Deflection Limits |
| 37 | Piggyback Truss Load Transfer Protocol |
| 38 | Structural Insulated Panel (SIP) Interface Design |
| 39 | Mono Truss Slope and Loading Protocol |
| 40 | Valley Set Design Methodology |
| 41 | Scissors Truss Design and Geometry Rules |
| 42 | Attic Truss Live Load and Storage Criteria |

| No. | Engineering Input Contribution |
|---|---|
| 43 | Parallel Chord Truss Panel Point Load Distribution |
| 44 | Floor Truss Vibration and Deflection Control |
| 45 | Strongback Bracing Design Methodology |
| 46 | Notch and Hole Placement Rules for Structural Members |
| 47 | Girder Hanger and Connector Load Path Rules |
| 48 | Engineering Judgment Override Protocol |
| 49 | Manufacturing Tolerance Integration Framework |
| 50 | Quality System Inspection and Certification Protocol |
| 51 | ANAB-Accredited Evaluation Criteria Integration |
| 52 | Seismic Design Category Implementation Protocol |
| 53 | Snow Drift and Unbalanced Load Protocol |
| 54 | Ponding and Rain-on-Snow Surcharge Methodology |
| 55 | Long-Term Deflection and Creep Adjustment Protocol |
| 56 | Truss Repair and Field Modification Engineering Protocol |
| 57 | Specialty Truss Configuration Rules (Bowstring, Curved) |
| 58 | Structural Component Manufacturer QC Certification Protocol |
| 59 | Multi-Story Load Stacking and Transfer Framework |
| 60 | PE Seal Workflow and Professional Responsibility Integration |

43.     Distinct from the individual Engineering Inputs, the Enterprise's confidential business model is itself a trade secret of Plaintiffs. Described categorically and without disclosing its proprietary content, the business-model trade secret comprises: (i) the proprietary architecture of the collaborative relationship among the Enterprise participants—Clearspan as the manufacturing function, CBI as the testing function, DrJ as the professional-engineering function, and Paragon as the data-processing function—together with the related market-entry and expansion strategy by which the Enterprise was designed to operate independently of the dominant plate-manufacturer-controlled software ecosystem; (ii) confidential implementation procedures and pricing, including the processes for converting customer requests into sealed engineered design drawings, pricing structures, customer-acquisition workflows, and revenue-sharing arrangements; (iii) the confidential organizational and personnel structure of the Enterprise and the specialized roles contributed by each participant; (iv) the formation, purpose, and strategic rationale of IP-LLC and its function as the Enterprise's intellectual-property holding entity; and

(v) the existence, interrelationship, and competitive significance of the Enterprise's underlying proprietary engineering and testing assets. The specific content of the business-model trade secret is maintained as confidential within the Enterprise and is set forth, under the applicable Protective Orders, in Plaintiffs' Answers to Interrogatories; it is not reproduced in this Complaint.

44.     The generic descriptors in the table, and the categorical description of the business-model trade secret, identify the subject matter of those trade secrets for purposes of this pleading only. The specific content, methodology, and proprietary detail of each is set forth in the referenced discovery responses designated Confidential under the applicable Protective Orders. The use of generic descriptors and categorical descriptions in this Complaint is not a disclosure of that confidential content and is not a waiver of any trade secret, confidentiality, or other protection applicable to the Engineering Inputs or the business-model trade secret.

45.     The Engineering Inputs are maintained by the Qualtim Companies in fixed form in their own records, including spreadsheets with defined cell formulas and calculation sequences, written engineering specifications and documented calculation protocols, annotated drawings and diagrams, documented decision frameworks, testing reports defining engineered product load-resistance performance, and audiovisual recordings of engineering meetings and technical sessions. In the course of the Enterprise, the Qualtim Companies communicated Engineering Inputs to Paragon's coders through bi-weekly meetings, email, and Slack communications, all within the Enterprise's confidential framework, for Paragon to use in building, updating, and refining the Paragon Truss Software.

46.     The produced record reflects a sustained and documented pattern in which Paragon's coders requested Engineering Inputs from the Qualtim Companies' licensed professional engineers and then used the engineering direction provided in the Paragon Truss

Software. Paragon's own internal records confirm this pattern, including records reflecting that software development was performed per DrJ's instructions and based on a specification from DrJ. Truss design drawings produced within the Enterprise, including those DrJ produced and sealed for Clearspan, carried a DrJ Engineering, LLC copyright notice from at least 2016 through Paragon's termination of the Qualtim Companies in 2024. Following termination, Paragon removed the DrJ copyright notice, as confirmed by James Holland at his deposition, who described seeing different paper and different engineer seals on Clearspan truss designs after the termination.

47.    Contemporaneous recordings confirm that the Enterprise treated this engineering knowledge and testing as proprietary property. As early as January 2017, Daniel Holland acknowledged in a recorded message that the Enterprise's truss design drawings contained innovations owned by DrJ and Paragon, proposed that any such design be invalidated unless produced by an authorized licensee, and discussed copyright or patent protection for those innovations. In August 2017, Kirk Grundahl described the Qualtim Companies' proprietary truss-plate testing program—testing the major manufacturers' plates to derive reliable design properties—which the parties kept proprietary as intellectual property and used to calibrate the Paragon Truss Software.

### D.  Confidentiality of the Engineering Inputs and Enterprise Information

48.    Throughout the Enterprise period, the Engineering Inputs and the Enterprise's confidential business information were provided and used within a framework of confidentiality and non-disclosure, and Plaintiffs took measures that were reasonable under the circumstances to maintain their secrecy. Access was limited on a need-to-know basis: the Engineering Inputs and the Enterprise's planning were shared only with those directly involved in Enterprise operations and were not distributed publicly, and the full Enterprise model, including its strategic framework,

its commercialization and go-to-market strategy, and its intellectual-property structure, was restricted to the Enterprise's core principals, Kirk Grundahl, Suzanne Grundahl, and Daniel Holland. Meeting agendas and operational and market-development communications were generally marked with confidentiality and trade-secret designations.

49.     The Enterprise's commercialization and go-to-market strategy, including its plate-agnostic strategy, pricing approaches, customer-acquisition strategies, and revenue-sharing structures, was itself treated as a trade secret, maintained in confidence within the Enterprise, and not publicly disclosed; memoranda outlining these activities were generally stamped confidential and trade secret. When the Enterprise's principals discussed the Enterprise and its go-to-market strategy with prospective participants, they did so under non-disclosure agreements. The formation of IP-LLC was itself a confidentiality measure: it was organized initially in Texas in 2017 to protect the confidentiality of the Enterprise's formation and intellectual-property framework, and its membership was deliberately limited to the Enterprise's principals, so that the existence, structure, and purpose of the Enterprise were not made public.

50.     Plaintiffs' confidentiality measures further included confidentiality and trade-secret provisions in the Qualtim Companies' employment, contractor, and vendor agreements; the Qualtim Companies' physical and digital information-security measures, including role-based access controls and periodic permission audits, access revocation upon job change or termination, segregated secure repositories, multi-factor authentication and encrypted file transmission, firewalls, intrusion detection, and network segmentation, security cameras and locked, key-fob-controlled offices and laboratories, restricted visitor access requiring escort and execution of a non-disclosure agreement, and document marking identifying material as confidential intellectual property and trade secrets; the conduct of Engineering-Input communications through dedicated

Slack channels with access limited to authorized Qualtim and DrJ personnel; and the controlled disclosure of Enterprise information, as in the confidential February 27–28, 2024 briefing at Clearspan's offices, which was presented solely within a controlled meeting of Enterprise participants and was not intended for distribution beyond that group.

51.     During the Enterprise, Paragon itself recognized and enforced the confidentiality of the Engineering Inputs and the related testing and engineering analysis. On March 8, 2022, Paragon's Product Manager, Matt Van Stelle, wrote to Kirk Grundahl to follow up on their discussion about protecting the parties' confidential intellectual property and asked how to identify and protect it. In response, on March 11, 2022, Kirk Grundahl provided a written Paragon/DrJ confidential intellectual property policy that defined confidential intellectual property to include, among other things, all Paragon and DrJ reports generated about software development and analysis, all Paragon and CBI testing, all Paragon and DrJ policy, and all Paragon and DrJ calibration and analog-change analysis. On July 14, 2022, Matt Van Stelle forwarded that policy to John Holland. This exchange confirms that Paragon understood the Engineering Inputs, the CBI testing, and the DrJ calibration and analysis to be confidential intellectual property and participated in measures to keep them confidential. At his deposition, Matt Van Stelle confirmed that Paragon treated the core technical information in its software as confidential and was careful not to let it leave Paragon.

52.     On or about August 8, 2023, at an Enterprise strategic planning meeting in Madison, Wisconsin, the Qualtim Companies and Paragon executed a Mutual Non-Disclosure Agreement (the "NDA"), which John Holland executed on behalf of Paragon, and which Paragon personnel separately executed. The NDA required the parties to hold in confidence, and to refrain from using outside the permitted purpose, the Engineering Inputs, business strategies, and other

confidential information associated with the Enterprise, and required the return or destruction of confidential information upon termination. As part of the Enterprise, Paragon received the Engineering Inputs in confidence and with full knowledge that they were the proprietary property of the Qualtim Companies.

### E. The Parties' Course of Dealing and Acknowledgments of the Partnership

53.     At a meeting on or about November 16, 2021, Daniel Holland acknowledged that Clearspan had recently made a large amount of money and that the Qualtim Companies had not been compensated for their contributions. Daniel Holland stated that he viewed the three participants as being at the same table pulling the rope the same way, that the money was coming to one leg and needed to be spread to the other two, and that the parties were on the same team and would take care of each other.

54.     In his own words at that meeting, Daniel Holland told Kirk Grundahl that "Clearspan, in the last couple of months, has made an enormous amount of money," that "part of the reason for that is DrJ sealing my trusses," and that "DrJ hasn't made any money doing that." He acknowledged that the Qualtim Companies "have spent a considerable amount of money supporting Paragon and Clearspan in ways that allowed us to buy plates from anybody," which he called "a significant factor in our success."

55.     Clearspan thus began benefiting from the Enterprise as soon as it could substitute lower-cost connector plates, while DrJ and the Qualtim Companies were not compensated for the engineering that made that substitution possible. Daniel Holland recognized this imbalance and stated that he needed to address it going forward, explaining that "the money's all coming to one leg and I need to spread it to the other two," and that he had "got to fix that, because I need you to

keep going." That imbalance persisted, without profit-sharing or adequate compensation to the Qualtim Companies, through Daniel Holland's death in 2024.

56.     Daniel Holland repeatedly acknowledged, in recorded Enterprise discussions that the Qualtim Companies' contributions were undercompensated and that Paragon and Clearspan owed them value. In a May 2020 discussion, Daniel Holland recognized the co-dependency of the two companies: DrJ could not provide sealing without the Paragon tool and that Paragon could not develop or validate the truss design software without DrJ's engineering, referred to "the debt that Paragon owes to DrJ," and proposed recording that debt on Paragon's books.

57.     In November 2021, after Clearspan earned substantial profits from selling trusses sealed by DrJ, Daniel Holland told Kirk Grundahl that the Qualtim Companies had spent a considerable amount of money supporting Paragon and Clearspan, that the three participants were "on the same team," and that he needed shift profit to the Qualtim Companies, including by having Paragon invoice Clearspan at an inflated amount in order to redistribute some of Clearspan's profits. On July 27, 2023, in a recorded Enterprise discussion, Daniel Holland reiterated his commitment to the partnership, stating that he was "committed to you guys" and that he wanted to "make this work as a whole."

58.     In the same period, Clearspan paid Paragon $500,000, and a payment of $262,847 was made to the Qualtim Companies, implemented through invoicing at Daniel Holland's direction as a mechanism to redistribute Clearspan's profits to the other Enterprise participants. That payment was not a settlement of, or a partial payment toward, the Qualtim Companies' contributions; it was a distribution of Enterprise profits, consistent with Daniel Holland's repeated direction to share Clearspan's profits among the Enterprise participants, and it is evidence of the profit-sharing character of the joint venture. No written settlement, release, or agreement of any

kind accompanied that payment, and how that profit distribution should be treated in relation to the parties' respective contributions and the amounts at issue is disputed by the parties.

59.     Throughout the Enterprise, and apart from the design-service and sealing payments that flowed among Enterprise participants, Clearspan paid Paragon no less than $30,000 per month for design service access, plus per-use sealing software fees. The per-use sealing software fee was nominal, billed at approximately fifteen cents per seal request, and was separate from the professional engineering seal itself, which DrJ provided. For the professional engineering seal on Clearspan's truss design drawings, Clearspan paid DrJ only commodity-level prices; the most recent per-seal price was $1.40 per seal in June 2024, and repair work was billed at $62 per half-hour unit, which is $104 per hour, well below the Qualtim Companies' published hourly rates of $150 to $250 per hour depending on the individual performing the work. These commodity per-seal and per-use fees were never intended to, and could not, compensate the Qualtim Companies for the engineering inputs, professional engineering judgment, and investment they contributed to the Enterprise.

60.     Rob Eason confirmed at his deposition the monthly design-service-access payments from Clearspan to Paragon and the $500,000 payment, and confirmed that Daniel Holland authorized payments to Paragon by placing his initials on the invoices, after which Eason signed the checks. The Qualtim Companies continued to provide Engineering Inputs without full compensation up to Paragon's termination of the Enterprise in 2024.

61.     Paragon and Clearspan were both Daniel Holland's companies, and they have at all relevant times functioned as a single, commonly controlled and financially intertwined Holland enterprise rather than as independent, arm's-length businesses. Daniel Holland funded Paragon's operations through his private funds and through Clearspan, transferring operating funds to

Paragon. That arrangement continues today: Clearspan pays Paragon more than $30,000 per month—more than the cost of any software license seat—and continues to pay for the benefits of Paragon's employees. Paragon has never operated as a standalone, independently profitable software business; it has been sustained by Clearspan and the Holland family. This financial dependency confirms that the Enterprise participants on the Holland side were a unified, commonly controlled group and that Paragon's characterization of the Qualtim Companies' Engineering Inputs as mere outside "consulting services" is false.

62.     At the time of his death, Daniel Holland owned an approximately forty-four percent membership interest in Paragon—with the remaining interests held by his wife Lisa Holland and John Holland—owned and controlled Clearspan, and was a fifty-percent member of IP-LLC; Paragon and Clearspan were Holland family-controlled companies rather than independent, arm's-length businesses.

63.     At his deposition, John Holland confirmed that there were no written agreements governing the Paragon–Clearspan relationship, and acknowledged that the Grundahls and their companies spent money supporting Paragon, including by paying employees who provided valuable consultation to Paragon. The Qualtim Companies devoted close to 8,000 hours to Paragon alone, for which they received no compensation. Among other contributions, the Qualtim Companies provided an employee to perform interface testing and analysis for the Paragon Truss Software, the cost of which the Qualtim Companies shared. Paragon, however, did not even fully pay the limited amount it was billed for that work. The Paragon Truss Software has a functional user interface because of the Qualtim Companies' interface testing and analysis.

64.     On or about December 6, 2023, Kirk Grundahl and Daniel Holland met at Clearspan's facility in Meridian, Mississippi as part of a two-day Enterprise strategic planning

session and addressed what constituted protected intellectual property as distinguished from the public engineering baseline. Daniel Holland confirmed that the Enterprise had a great deal of intellectual property consisting of everything past the TPI standard and the public domain, observed that a person without decades of experience could not even read the TPI standard, and expressed concern that Paragon's coders could not themselves distinguish the protected Engineering Inputs and might inadvertently disclose them. The parties agreed to document the intellectual property delineation; that documentation was never completed. Daniel Holland died on or about January 17, 2024, forty-two days later. The planned commercial launch of the integrated platform was scheduled for the first quarter of 2024.

### F. Commercialization and Marketing of the Enterprise

65.    A central part of the Enterprise was the commercialization of the parties' relationship and of the integrated platform, including how that platform was to function and be brought to market. The participants jointly developed how the Enterprise would operate and be presented to the market, integrating the Qualtim Companies' testing and engineering contributions, the Paragon Truss Software, and Clearspan's manufacturing, together with the pricing, market-positioning, and customer-acquisition strategies that would allow the Enterprise to compete outside the plate-centric, supplier-controlled model.

66.    As part of that commercialization effort, Daniel Holland, Kirk Grundahl, and at times John Holland, met with prospective clients to pitch the Enterprise's services and the integrated platform. For example, at a meeting on or about February 22, 2023 attended by John Holland, Daniel Holland, Kirk Grundahl, Suzanne Grundahl, and a prospective customer, John Holland demonstrated the Paragon Truss Software and described the value of Paragon's partnership with DrJ and Qualtim, including the ability to go beyond the TPI standard and the

codes. As mentioned above, John Holland confirmed that Paragon's analysis was "completely our own and separate from anything" the other plate manufacturers do, and further acknowledged that "one of the great values of our partnership with DrJ/Qualtim" was the ability to go beyond what is contained in the TPI standard and the codes. John Holland's statement that Paragon's analysis was "their own" distinguished Paragon's results from those of the competing plate manufacturers.

67. At that demonstration, John Holland presented the Paragon Truss Software to the prospective customer as a cloud-based commercial product. These statements reflect the parties' strategic approach to commercialization and marketing of the integrated platform.

68. [Intentionally Removed Per Oral Rule 06/26/26]

69. The planned commercial launch of the integrated platform was scheduled for the first quarter of 2024, with sales visits scheduled, and the Qualtim Companies continued to provide

their engineering contributions without full compensation in anticipation of that imminent commercialization.

### G. Termination of the Enterprise and Paragon's Unauthorized Commercialization

70.    On or about February 27–28, 2024, Kirk Grundahl and Suzanne Grundahl met with Rob Eason and James Holland at Clearspan's offices in Meridian, Mississippi and presented the full Enterprise framework, including the role and proprietary nature of the Qualtim Companies' Engineering Inputs that the Paragon Truss Software uses, the mutual dependencies among the participants, and the confidentiality framework governing the Enterprise's confidential information. Rob Eason stated that the information would be provided to John Holland and that John Holland would need to be part of any meetings going forward.

71.    On or about March 22, 2024, the Qualtim Companies transmitted a written memorandum to Paragon outlining their ownership interests in the Engineering Inputs, portions of which had previously been sent to Daniel Holland and John Holland in November 2023 and January 2024. James Holland confirmed at his deposition that he received and read this memorandum on or about March 25, 2024. Paragon thus had actual written notice of Plaintiffs' asserted ownership of the Engineering Inputs before it undertook the termination described below, before it commenced its declaratory-judgment litigation, and before its commercial market launch.

72.    Following Daniel Holland's death, Paragon and Clearspan, acting through John Holland, Rob Eason, and James Holland, undertook a series of actions to remove the Qualtim Companies from the Enterprise. On or about May 21, 2024, John Holland personally presented the Qualtim Companies, at Clearspan's offices, with a letter written as though Kirk Grundahl and Suzanne Grundahl were disclaiming all ownership interests in the Engineering Inputs and the Paragon Truss Software, which they had not authorized and did not sign.

73.     On or about May 23, 2024, Paragon's counsel sent a letter asserting Paragon's sole and exclusive ownership of the software and characterizing the Qualtim Companies' Engineering Inputs as consulting services, and Paragon downgraded DrJ's access to a sealing-only tier. On or about June 3, 2024, Paragon's counsel sent further demands to the same effect, and Clearspan ceased all truss design drawing submissions to DrJ, ending a continuous sealing relationship dating to 2009.

74.     Between on or about July 11 and July 24, 2024, Paragon restricted all of the Qualtim Companies' access to the Paragon Truss Software, the shared Slack communications, and other shared Enterprise systems, while retaining the complete Slack channel history containing Engineering Inputs, and directly emailed the Qualtim Companies' clients stating that they could no longer share jobs with DrJ. On or about July 26, 2024, Rob Eason terminated Clearspan's inspection agreement with CBI in writing.

75.     On or about July 23, 2024, Paragon, through its attorneys, commenced declaratory-judgment litigation against the Qualtim Companies in the United States District Court for the Eastern District of Tennessee and publicly filed on the court docket, without any motion to seal, exhibits that were marked confidential and trade secret and that disclosed the Enterprise's confidential business model, the existence and purpose of IP-LLC, and the Enterprise's related strategies.

76.     Competitors had no knowledge of IP-LLC's existence until that disclosure. Paragon and its attorneys were aware of the court's requirements for filing documents under seal, and there was no requirement that the exhibits be filed with the complaint; on information and belief, Paragon and its attorneys nonetheless filed the marked-confidential documents publicly, rather than under seal, in order to support an argument that the Engineering Inputs and Enterprise

information were not trade secrets or had been publicly disclosed. Plaintiffs sought to have the documents sealed, and Paragon opposed those requests.

77.    Clearspan has continued to operate its structural-component manufacturing using the Paragon Truss Software and the Engineering Inputs while no longer obtaining DrJ's licensed professional engineering seal on its design drawings, and thus continues to exploit Plaintiffs' Engineering Inputs and engineering work without authorization and without the professional engineering sealing that was Plaintiffs' role in the Enterprise.

78.    In approximately October 2024, Paragon commercially launched the Paragon Truss Software to the broader market, licensing it to structural component manufacturers throughout the industry, including competitors of Clearspan, using the Qualtim Companies' Engineering Inputs, without Plaintiffs' authorization and without any accounting to Plaintiffs. This commercial launch was outside the Enterprise's intended integrated business model.

79.    Paragon also began publicly marketing the Enterprise's truss-plate-agnostic truss design drawing engineering strategy under the name "Paragon AnyPlate," and disclosed Enterprise information at industry conferences, including the May 2024 Virginia Tech conference, the October 2024 and October 2025 BCMC conferences, the February 2025 and February 2026 International Builders' Shows, and the October 2024 and October 2025 NCSEA Summit.

80.    Paragon continues to use, market, and license the Paragon Truss Software, using the Engineering Inputs, without authorization from, compensation to, or accounting to Plaintiffs. At his deposition, John Holland confirmed that Paragon applied to register the "AnyPlate" and "TrussLink" trademarks beginning in approximately June 2024, contemporaneously with Plaintiffs' exclusion from the Enterprise, and that Paragon now licenses the Paragon Truss

Software through tiered subscription and enterprise plans ranging from monthly fees to enterprise arrangements that can cost hundreds of thousands of dollars.

### H.  The Estate's Conduct Following Daniel Holland's Death

81.    During his lifetime, Daniel Holland, as a 50% member and one of three Managers of IP-LLC, owed IP-LLC and its other members duties of loyalty, care, and good faith, and he conducted himself consistently with those duties, acknowledging the Qualtim Companies' contributions, seeking to compensate them, and treating the Enterprise participants as partners. Daniel Holland did not repudiate Plaintiffs' interests in the Engineering Inputs or the Enterprise.

82.    Upon Daniel Holland's death, his financial interest in IP-LLC passed to the Estate, and responsibility for that interest and for the Enterprise relationship fell to the Estate and its representatives. On or about April 2024, the Estate was in contact with Plaintiffs regarding the valuation of IP-LLC. Without explanation, the Estate then ceased communications with Plaintiffs and aligned itself with the other Defendants in excluding Plaintiffs from the Enterprise.

83.    Lisa Holland served as executrix from February 8, 2024. Recognizing that she had a conflict of interest in the anticipated litigation because the Estate held interests in both Paragon and IP-LLC, Lisa Holland petitioned the Chancery Court of Lauderdale County, Mississippi, which on July 17, 2024 appointed Marvin B. Speed as Special Independent Executor under Miss. Code § 91-7-61, with exclusive fiduciary authority over matters involving Paragon, IP-LLC, and this litigation. Lisa Holland later resigned, and John Holland was appointed successor Executor on November 17, 2025.

84.    Notwithstanding the contractual mandatory buy-sell mechanism in Paragon's operating agreement, the required life insurance, and the fair-market-value appraisal that Paragon had represented to the Mississippi Chancery Court was in progress, Daniel Holland's

approximately forty-four percent membership interest in Paragon was ultimately acquired by Paragon for consideration of ten dollars, more than one million dollars below the contractual floor, leaving John Holland as the owner of approximately ninety-seven to ninety-nine percent of Paragon. At his deposition, John Holland confirmed that Paragon paid ten dollars for Daniel Holland's membership interest, that the sale price was determined by Lisa Holland, the executrix, and John Holland negotiating in his capacity as Paragon's President, and that he does not know whether Marvin B. Speed, the Special Independent Executor who held exclusive authority over matters involving Paragon, ever approved the sale or the price. The sale of the Estate's Paragon interest—a matter within the Special Independent Executor's exclusive authority—was thus negotiated by conflicted insiders without the Special Independent Executor's approval.

85.     The Estate took no action to protect the value of Daniel Holland's interest in the Enterprise or in IP-LLC, or the Engineering Inputs and confidential information of the Enterprise; instead, it acquiesced in and facilitated Paragon's seizure and unauthorized commercialization of the Engineering Inputs, and in January 2026, under John Holland as Executor, the Estate obtained an order approving an interim distribution of substantially all of the Estate's property other than Daniel Holland's IP-LLC membership interest and a five-hundred-thousand-dollar reserve. The Estate thus continues to hold Daniel Holland's IP-LLC membership interest while taking no action to protect it, to assert the interests of IP-LLC and the Enterprise, or to wind up the Joint Venture Enterprise.

86.     Marvin B. Speed was appointed Special Independent Executor precisely so that the Estate's interests in the Paragon and Inspired Pursuits matters would be protected independently of the family's conflict of interest. He did the opposite. On the representations of John Holland and Lisa Holland alone, that the Estate did not own and did not claim any interest in Paragon or in

its intellectual property, and without obtaining the Estate's records or any independent valuation of Daniel Holland's interests, Marvin B. Speed executed a declaration in Paragon's related Tennessee action stating that the Estate owns no membership interest in Paragon and does not own or claim any of Paragon's intellectual property, software code, or trade secrets, and consenting to the personal jurisdiction of the Tennessee court.

87.    The Estate's separate counsel was suggested by Paragon's own counsel, and the Estate's counsel thereafter coordinated with Paragon's counsel. Marvin B. Speed also entered into a common-interest defense agreement with the other Defendants in this litigation. At his deposition, Marvin B. Speed testified, among other things, that he had not been provided many of the Estate's documents, that he did not know of any valuation of Daniel Holland's interests, and that he had not been informed of the Estate's distributions.

88.    The Defendants have thus aligned themselves in a common defense of this litigation. At his deposition, John Holland confirmed that Paragon and Clearspan entered into a common-interest defense agreement and that he personally entered into such an agreement with others in connection with the litigation; on information and belief, that common-interest defense arrangement includes Paragon, Clearspan, John Holland, James Holland, Rob Eason, and the Estate. The result is that the very fiduciary appointed to protect the Estate's interests in the Paragon and Inspired Pursuits matters independently of the family's conflict instead adopted the position of, and aligned the Estate with, the parties who seized and commercialized the Engineering Inputs, abandoning the Estate's interest in IP-LLC and the Enterprise, to the detriment of Plaintiffs as IP-LLC co-members and joint-venture co-venturers.

## CAUSES OF ACTION

### COUNT I
### Misappropriation of Trade Secrets—Wis. Stat. § 134.90
### (Against Paragon, John Holland, Clearspan, James Holland, and Rob Eason)

89.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

90.    The Engineering Inputs and the confidential Enterprise information identified above and in Plaintiffs' Answer to Interrogatory No. 10, Schedule A, are trade secrets within the meaning of Wis. Stat. § 134.90(1)(c). They derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use, and they are the subject of efforts that are reasonable under the circumstances to maintain their secrecy, as described above.

91.    The categories of trade secrets and confidential information that Plaintiffs contend were misappropriated include, without limitation: engineering methodologies for structural component design; structural testing programs and empirical testing data developed through CBI; calibration frameworks and engineering adjustment systems; engineering decision systems and validation logic; engineering workflow systems integrating testing, analysis, and design; professional engineering validation and sealing procedures developed through DrJ; the Engineering Inputs as used in the Paragon Truss Software; and the confidential Enterprise structure and commercialization systems, including the plate-agnostic strategy, the structure and purpose of IP-LLC, and the Enterprise's pricing, market-development, and revenue-sharing strategies.

92.    Defendants Paragon, John Holland, Clearspan, James Holland, and Rob Eason acquired the Engineering Inputs and confidential information through their participation in the

Enterprise and under circumstances giving rise to a duty to maintain their secrecy and limit their use, including the NDA and the Enterprise's confidential framework.

93.    These Defendants misappropriated the Engineering Inputs and confidential information by using and disclosing them after the termination of Plaintiffs' participation in the Enterprise, without Plaintiffs' express or implied consent, knowing or having reason to know that their knowledge of the trade secrets was acquired under a duty to limit their use. That use and disclosure includes Paragon's continued operation, marketing, and licensing of the Paragon Truss Software using the Engineering Inputs after termination; the approximately October 2024 commercial launch to the broader market and to Clearspan's competitors; the "Paragon AnyPlate" marketing of the Enterprise's plate-agnostic strategy; the disclosures at industry conferences; and Clearspan's and its principals' continued use of the Engineering Inputs in design and manufacturing without authorization. This conduct constitutes misappropriation within the meaning of Wis. Stat. § 134.90(2).

94.    Defendants' misappropriation was willful and malicious. Defendants acted with actual written notice of Plaintiffs' asserted ownership of the Engineering Inputs and continued to use and commercialize them. Plaintiffs are entitled to recover their actual loss and Defendants' unjust enrichment caused by the misappropriation under Wis. Stat. § 134.90(4)(a), to exemplary damages of up to twice that award under Wis. Stat. § 134.90(4)(b), and to their reasonable attorney fees under Wis. Stat. § 134.90(4)(c), together with injunctive relief under Wis. Stat. § 134.90(3).

## COUNT II
### Breach of Contract—Mutual Non-Disclosure Agreement
### (Against Paragon and John Holland)

95.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

96.     The NDA executed on or about August 8, 2023 is a valid and enforceable contract. The Qualtim Companies performed all of their obligations under the NDA.

97.     Paragon, acting through John Holland, and John Holland in executing the NDA on Paragon's behalf, breached the NDA through, among other things: continuing to use the Engineering Inputs in the Paragon Truss Software and related commercial activities after termination, beyond the purpose permitted by the NDA; commercially exploiting the Engineering Inputs through the post-termination launch, the marketing to Clearspan's competitors, and the "Paragon AnyPlate" marketing; disclosing the Engineering Inputs to unauthorized third parties, including through the conference disclosures; failing to maintain adequate security for the Engineering Inputs, including by permitting confidential communications to be automatically forwarded to outside parties; failing to return or destroy the Engineering Inputs upon termination and instead retaining and continuing to use them, including the complete Slack channel history; attempting to extinguish Plaintiffs' ownership rights through the May 2024 surrender letter and ownership demands; publicly disclosing confidential Enterprise information; and communicating with Plaintiffs' customers in a manner that disclosed and disparaged Plaintiffs' rights to the Engineering Inputs. The specific provisions breached are identified in Plaintiffs' Answer to Interrogatory No. 14.

98.     As a direct and proximate result of these breaches, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

**COUNT III**
**Breach of Joint Venture Agreement**
**(Against Paragon and Clearspan)**

99.     Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

100. The Enterprise was a joint venture among the Qualtim Companies, Paragon, and Clearspan for a common business purpose—the commercialization of an independent, plate-agnostic, engineering-based structural component design platform. The joint venture arose from the parties' written, oral, and implied-in-fact agreements and course of conduct beginning in approximately 2009, under which the participants agreed to combine their respective contributions, to share in the venture's profits and benefits, and to deal with one another in good faith.

101. At the time of Defendants' conduct, the joint venture's common purpose had not been accomplished; the planned commercial launch was scheduled for the first quarter of 2024, and the Qualtim Companies had continued providing Engineering Inputs without full compensation in anticipation of that imminent commercialization.

102. Paragon and Clearspan breached the joint-venture agreement by terminating Plaintiffs' participation, excluding Plaintiffs from the Enterprise and its systems, seizing and commercializing the Enterprise's assets, refusing to share the venture's profits and benefits with Plaintiffs, and preventing Plaintiffs from performing the professional engineering, sealing, and other services that were Plaintiffs' role in the Enterprise. That termination and exclusion were not authorized by the joint-venture agreement.

103. Plaintiffs seek damages for Paragon's and Clearspan's breach of the joint venture, including the value of Plaintiffs' lost participation in the Enterprise, Plaintiffs' uncompensated contributions, and the profits and benefits of which Plaintiffs were deprived, in an amount to be proven at trial.

### COUNT IV
### Unjust Enrichment
### (Against All Defendants)

104. Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein. No contract authorized Defendants' use or commercialization of the Engineering

Inputs and confidential information following the termination of Plaintiffs' participation in the Enterprise.

105.    Plaintiffs conferred substantial benefits on Defendants, including the Engineering Inputs, professional engineering services, structural testing, software interface testing and analysis that gave the Paragon Truss Software its functional user interface, approximately 8,000 hours of work devoted to Paragon alone, and confidential business information, all provided to and for the benefit of the Enterprise on reduced-fee, deferred, uncompensated, and non-contemporaneously billed terms in anticipation of the imminent commercial launch.

106.    Defendants appreciated and knowingly accepted and retained those benefits, and continue to use and profit from the Engineering Inputs and confidential information through the operation, marketing, and licensing of the Paragon Truss Software, under circumstances that make it inequitable for Defendants to retain the benefits without payment of their value.

107.    Defendants have been unjustly enriched at Plaintiffs' expense, and Plaintiffs are entitled to restitution and disgorgement of the value of the benefits conferred and the profits Defendants have derived, in an amount to be proven at trial.

### COUNT V
**Tortious Interference with Contract and Prospective Economic Advantage**
**(Against Paragon, Clearspan, John Holland, James Holland, and Rob Eason)**

108.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

109.    Plaintiffs had existing and prospective business relationships with structural component manufacturers and other industry participants, including the continuous professional engineering and sealing relationship between DrJ and Clearspan and relationships with truss-plant locations through the Enterprise, all with economic value to Plaintiffs.

110. Defendants Paragon, Clearspan, John Holland, James Holland, and Rob Eason knew of these relationships and intentionally and improperly interfered with them, including by directing Clearspan to cease submitting truss design drawings to DrJ, by restricting Plaintiffs' access to the shared systems through which Plaintiffs served their customers, and by communicating to Plaintiffs' existing and prospective customers that Plaintiffs no longer had rights to the Engineering Inputs.

111. Defendants' interference was not privileged or justified, was undertaken through improper means including the unauthorized use and disclosure of Plaintiffs' trade secrets and confidential information, and caused Plaintiffs to lose existing and prospective business and the benefit of the Enterprise's commercialization, in an amount to be proven at trial.

112. Defendants Paragon, John Holland, James Holland, and Rob Eason also intentionally induced the Estate of Daniel Holland to breach the fiduciary duties it owed to Plaintiffs as IP-LLC co-members and joint-venture co-venturers, including by pressing the Estate to take the position that Daniel Holland's estate had no significant IP-LLC interest to protect, no fiduciary obligation to its IP-LLC co-members, and no responsibility to wind up the Enterprise.

113. Because John Holland served simultaneously as Paragon's President and, from November 17, 2025, as the successor Executor of the Estate, the inducement was effected in part through John Holland's own dual role, constituting self-dealing by a fiduciary. This conduct caused the Estate to breach its fiduciary duties, to Plaintiffs' injury in an amount to be proven at trial. In interfering with Plaintiffs' relationships and inducing the Estate's breach as alleged in this Count, Defendants acted maliciously toward Plaintiffs and in intentional disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under Wis. Stat. § 895.043.

**COUNT VI**
**Unfair Competition and Misappropriation of Confidential Business Information**
**(Against Paragon, Clearspan, John Holland, James Holland, and Rob Eason)**

114. Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

115. To the extent any of the Enterprise's confidential business information does not qualify as a statutory trade secret, it nonetheless constitutes Plaintiffs' proprietary and confidential business information, including the confidential Enterprise structure, the plate-agnostic commercialization strategy, the structure and purpose of IP-LLC, and the Enterprise's pricing, market-development, and customer-acquisition strategies.

116. Paragon, Clearspan, John Holland, James Holland, and Rob Eason wrongfully appropriated and used that confidential business information after the termination of Plaintiffs' participation in the Enterprise, without Plaintiffs' consent. Paragon and John Holland used it to compete with Plaintiffs, including by commercializing the Paragon Truss Software and the plate-agnostic strategy under the "Paragon AnyPlate" name, while restricting Plaintiffs' access to the very work product Plaintiffs had developed. Clearspan, acting through Rob Eason and James Holland, has continued to use the Paragon Truss Software and the Engineering Inputs in its structural-component manufacturing while no longer obtaining DrJ's licensed professional engineering seal. This conduct constitutes unfair competition and the misappropriation of Plaintiffs' confidential business information.

117. As a direct and proximate result, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial. Defendants' appropriation and use of Plaintiffs' confidential business information was malicious toward Plaintiffs and in intentional disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under Wis. Stat. § 895.043.

## COUNT VII
### Breach of Fiduciary Duty
### (Against the Estate of Daniel Holland and John Holland)

118.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

119.    During his lifetime, Daniel Holland, as a 50% member and one of three Managers of IP-LLC, owed IP-LLC and its other members, Kirk Grundahl and Suzanne Grundahl, fiduciary duties of loyalty, care, and good faith under the IP-LLC operating agreement and Wisconsin law, and he honored those duties. Daniel Holland did not breach any duty owed to Plaintiffs.

120.    Upon Daniel Holland's death, his fifty-percent membership interest in IP-LLC, his position in the Joint Venture Enterprise, and the fiduciary obligations he owed to IP-LLC and its co-members passed to the Estate. As successor to Daniel Holland's IP-LLC membership and his role as a joint venturer, and as a fiduciary in the administration of the Estate charged with preserving and not impairing or dissipating the Estate's assets, the Estate owed Plaintiffs, as IP-LLC co-members and joint-venture co-venturers, fiduciary duties including: to identify, collect, inventory, possess, and prudently manage Daniel Holland's IP-LLC membership interest as an Estate asset; to wind up the Joint Venture Enterprise in good faith and to account to the co-venturers; to refrain from appropriating the Enterprise's assets for the benefit of one venturer at the expense of the others; and to refrain from participating in or facilitating the misappropriation of Plaintiffs' Engineering Inputs and confidential information.

121.    The Estate breached those duties. Marvin B. Speed, as Special Independent Executor with exclusive fiduciary authority over matters involving Paragon, IP-LLC, and this litigation, took no action to identify, inventory, value, or prudently manage Daniel Holland's IP-LLC membership interest, to communicate with Plaintiffs as IP-LLC co-members, or to participate in a good-faith wind-up of the Joint Venture Enterprise; nor did he approve the sale of the Estate's

Paragon interest, a matter within his exclusive authority, which conflicted insiders instead transacted for ten dollars.

122. Rather than protect those interests independently of the family's conflict, and on the family's representations alone and without obtaining the Estate's records or any valuation, he executed a declaration disclaiming that the Estate owns or claims any interest in Paragon or its intellectual property and consenting to jurisdiction in Paragon's related Tennessee action, and he aligned the Estate with Paragon and Clearspan in a common defense of this litigation. After initially engaging with Plaintiffs regarding the valuation of IP-LLC in April 2024, the Estate ceased communications, aligned itself with Paragon and Clearspan in excluding Plaintiffs, and acquiesced in and facilitated Paragon's seizure and unauthorized commercialization of the Engineering Inputs—an alignment that served the interests of the Estate's heirs, including James Holland, an heir of the Estate and a member of Clearspan's board, at Plaintiffs' expense.

123. John Holland became the successor Executor of the Estate of Daniel Holland on November 17, 2025. As Executor, John Holland owes fiduciary duties, including the duty of loyalty, to the Estate's beneficiaries and to IP-LLC's co-members, Kirk Grundahl and Suzanne Grundahl. John Holland has breached those duties through self-dealing and an irreconcilable conflict of interest: as Paragon's President and the owner of approximately ninety-seven to ninety-nine percent of Paragon, he negotiated and effected Paragon's ten-dollar acquisition of the Estate's Paragon interest, and, while serving as a fiduciary of the Estate, he has continued to direct Paragon to exclude Plaintiffs from the Enterprise and to appropriate and commercialize the Engineering Inputs and the Paragon Truss Software for Paragon's benefit, taking no action as Executor to protect the Estate's and IP-LLC's interests. The Estate's breach cannot be separated from that self-

dealing, because the Estate's own Executor is the person directing the conduct that gave rise to the breach.

124.    As a direct and proximate result of the breaches by the Estate and John Holland, Plaintiffs have been damaged in an amount to be proven at trial. The breaches, including John Holland's self-dealing acquisition of the Estate's Paragon interest and his use of his dual role to direct the conduct giving rise to the breach, were malicious toward Plaintiffs and in intentional disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under Wis. Stat. § 895.043.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a. Awarding Plaintiffs compensatory damages in an amount to be proven at trial through expert and other evidence, including actual loss and Defendants' unjust enrichment;

b. Awarding exemplary damages of up to twice the compensatory award under Wis. Stat. § 134.90(4)(b) for Defendants' willful and malicious misappropriation;

c. Ordering restitution and disgorgement of the profits and benefits Defendants derived from the Engineering Inputs and confidential information;

d. Enjoining Defendants from further use or disclosure of Plaintiffs' Engineering Inputs and confidential information, from representing that Plaintiffs have no rights in the Engineering Inputs, and from soliciting or servicing Plaintiffs' customers through the unauthorized use of the Engineering Inputs, and requiring Defendants to return or account for the Engineering Inputs and confidential information in their possession;

e. Awarding Plaintiffs their reasonable attorney fees under Wis. Stat. § 134.90(4)(c) and any other applicable provision of law, together with their costs and disbursements;

f.  Awarding pre-judgment and post-judgment interest as allowed by law;

g.  Awarding punitive damages against Defendants under Wis. Stat. § 895.043 for their

    malicious conduct and intentional disregard of Plaintiffs' rights; and

h.  Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated this  26th  day of  June , 2026.

**MURPHY DESMOND S.C.**
Attorneys for Plaintiffs Inspired Pursuits, LLC, Qualtim, Inc., Center for Building Innovation, LLC, DrJ Engineering, LLC, and Suzanne Grundahl.

Electronically Signed By: */s/ Scott G. Salemi*
        Scott G. Salemi
        State Bar Number: 1118960
        33 East Main Street, Suite 500
        Madison, WI 53701-2038
        Phone: (608) 257-7181
        Fax: (608) 257-2508
        ssalemi@murphydesmond.com

**KIRK GRUNDAHL**
Pro Se Plaintiff

Electronically Signed By: */s/ Kirk Grundahl*
        Kirk Grundahl
        1130 Fairway Court
        Lake Mills, WI 53551
        Phone: 608-217-3713
        kgrundahl@qualtim.com