**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

INSPIRED PURSUITS, LLC, QUALTIM, INC.,
CENTER FOR BUILDING INNOVATION, LLC,
DRJ ENGINEERING, LLC, KIRK GRUNDAHL,
and SUZANNE GRUNDAHL,

        Plaintiffs,

  v.

                              Case No. 3:25-cv-00075-wmc

PARAGON COMPONENT SYSTEMS, LLC,
JOHN HOLLAND, JAMES HOLLAND,
CLEARSPAN COMPONENTS, LLC, and THE
ESTATE OF DANIEL HOLLAND EX REL.
SPECIAL EXECUTOR MARVIN B. SPEED,

        Defendants.

---

**DEFENDANTS PARAGON COMPONENT SYSTEMS, LLC AND JOHN HOLLAND'S
ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED
COMPLAINT**

---

Defendants Paragon Component Systems, LLC ("Paragon") and John Holland (collectively, "Paragon Defendants") answer in like-numbered paragraphs Plaintiffs' Second Amended Complaint. The headings used in this Answer are adopted solely for organizational convenience and correspond to the headings in the Second Amended Complaint. Paragon Defendants deny any characterization, implication, or legal conclusion contained in any heading in the Second Amended Complaint.

**INTRODUCTION**

1.     This case arises from the wrongful termination of a fifteen-year joint venture and the unauthorized commercialization of the trade secrets and confidential engineering information

1

that gave the joint venture its value. For more than a decade, Plaintiffs and Daniel Holland and his companies, Paragon Component Systems, LLC and Clearspan Components, Inc., worked as partners in a joint venture to build an independent, plate-agnostic structural-engineering platform for the metal-plate-connected wood truss industry. Plaintiffs supplied the professional engineering, proprietary testing, calibration, and authored engineering specifications—the Engineering Inputs—and the licensed professional engineering seal that make the platform function as a structural engineering tool. Within the joint venture, Paragon served as the computational tool that processed the Engineering Inputs, and Clearspan was the structural component manufacturer.

**RESPONSE**:  Paragon Defendants deny the allegations.  Paragon Defendants admit that one or more Plaintiffs provided engineering consultation services to Paragon when Paragon was developing its truss design software platform.

2. Paragon is a company of software coders. It has no licensed professional engineer on staff and never did. The Paragon Truss Software functions as a structural engineering tool only because Plaintiffs supplied the engineering intelligence that makes it work. When Daniel Holland unexpectedly and tragically died on January 17, 2024, shortly before the planned commercial launch of the joint venture, Paragon and Clearspan terminated Plaintiffs' participation in the Enterprise, locked Plaintiffs out of the shared systems, precluded Plaintiffs from continuing to provide their professional engineering sealing and other services, and launched the software commercially, using Plaintiffs' Engineering Inputs and confidential information, without Plaintiffs' authorization and without accounting to Plaintiffs for a single dollar.

**RESPONSE:**  Paragon Defendants admit that Paragon is a software development company that does not employ licensed professional engineers.  Paragon Defendants admit that Paragon's relationship with Plaintiffs terminated following the death of Dan Holland on January 17, 2024 and

after one or more of Plaintiffs asserted ownership interest in the Paragon Truss software. The remaining allegations are denied.

3. This action was filed to address the wrongful termination of the joint venture and the misappropriation and commercialization of Plaintiffs' trade secrets and confidential information. These harms are independent of the question of who owns the copyright in the Paragon Truss Software, which is the subject of the companion action, Paragon Component Systems, LLC v. Qualtim, Inc., et al., Case No. 3:25-cv-00'170-wmc (W.D. Wis.) (the "'170 Action"). Even if Plaintiffs are not adjudicated co-owners of the software in the '170 Action, Defendants wrongfully terminated the joint venture, misappropriated and commercialized Plaintiffs' trade secrets and confidential information without authorization, were unjustly enriched, and precluded Plaintiffs from performing the professional engineering sealing and other services that were Plaintiffs' role in the joint venture. A winding up of the joint venture does not, by itself, resolve the misappropriation and unjust-enrichment harms, for which Plaintiffs separately seek damages, restitution, and injunctive relief.

**RESPONSE:** Paragon Defendants admit the allegations in the Second Amended Complaint do not involve claims of copyright ownership. The remaining allegations are denied.

## PARTIES

4. Plaintiff Inspired Pursuits, LLC ("IP-LLC") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. IP-LLC was initially formed as a Texas limited liability company in 2017 and subsequently redomesticated as a Wisconsin limited liability company in 2022. It was formed by Kirk Grundahl, Suzanne Grundahl, and Daniel Holland during the course of the Enterprise to hold intellectual property arising from the

3

Enterprise. Its current members are Kirk Grundahl and Suzanne Grundahl, both citizens of Wisconsin.

**RESPONSE**: Paragon Defendants admit that Plaintiff Inspired Pursuits, LLC ("IP-LLC") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin, that it was formed by Kirk Grundahl, Suzanne Grundahl, and Daniel Holland, and that it was initially formed as a Texas limited liability company in 2017. The remaining allegations are denied.

5.      Plaintiff Qualtim, Inc. ("Qualtim") is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

**RESPONSE**:   Paragon Defendants admit the allegation.

6.      Plaintiff Center for Building Innovation, LLC ("CBI") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. Its members are citizens of Wisconsin. CBI is accredited under ANAB ISO/IEC '17025 for testing and ISO/IEC '17020 for inspection, and conducts the structural testing programs that supply the empirical data and calibration used in Engineering Inputs.

**RESPONSE:**   Paragon Defendants admit that Plaintiff Center for Building Innovation, LLC ("CBI") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin.  Paragon Defendants are without sufficient information to admit or deny the remaining allegations of this complaint paragraph and therefore deny them.

7.      Plaintiff DrJ Engineering, LLC ("DrJ") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. Its sole member is Kirk Grundahl, a citizen of Wisconsin. DrJ provides the professional engineering services including the licensed

4

professional engineering seal, for structural component design drawings produced within the Enterprise.

**RESPONSE:**  Paragon Defendants admit that Plaintiff DrJ Engineering, LLC ("DrJ") is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. Paragon Defendants are without sufficient information to admit or deny the allegation regarding the membership of DrJ and therefore deny it.  Paragon Defendants admit DrJ has provided seals on structural component design drawings but deny the remaining allegations.

8.      Plaintiff Kirk Grundahl is an individual and citizen of Wisconsin. He is a licensed professional engineer and the founder and principal of Qualtim, DrJ, and CBI (collectively, the "Qualtim Companies"), and a founding member of IP-LLC. Kirk Grundahl holds professional engineering seals in 47 states and the District of Columbia and has more than forty-five years of experience in the structural building component industry, beginning in 1978.

**RESPONSE:**   Paragon Defendants admit that Plaintiff Kirk Grundahl is an individual and citizen of Wisconsin, a licensed professional engineer, the founder and principal of Qualtim, DrJ, and CBI (collectively, the "Qualtim Companies"), and a founding member of IP-LLC.  Paragon Defendants are without sufficient information to admit or deny the remaining allegations of this complaint paragraph and therefore deny them.

9.      Plaintiff Suzanne Grundahl is an individual and citizen of Wisconsin and a founding member of IP-LLC.

**RESPONSE:**   Paragon Defendants admit the allegations.

10.      Defendant Paragon Component Systems, LLC ("Paragon") is a Tennessee limited liability company with its principal place of business in Chattanooga, Tennessee.   Upon

information and belief, Paragon's members are citizens of Georgia and/or Tennessee, and no member of Paragon is a citizen of Wisconsin. Daniel Holland owned and operated Paragon.

**RESPONSE:** Paragon Defendants admit that Paragon is a Tennessee limited liability company with its principal place of business in Chattanooga, Tennessee, and that its members are citizens of Georgia and/or Tennessee. Paragon Defendants admit that Dan Holland was a member of Paragon when he was alive and deny the remaining allegations.

11.     Defendant John Holland is an individual and, upon information and belief, a citizen of Georgia. He is the President of Paragon and, following the events described below, became its sole or majority owner. He is the son of Daniel Holland.

**RESPONSE:**  Paragon Defendants admit the allegations.

12.     Defendant James Holland is an individual and, upon information and belief, a citizen of Mississippi. He is a shareholder of Clearspan and the son of Daniel Holland.

**RESPONSE:**  Paragon Defendants admit the allegations.

13.     Defendant Clearspan Components, Inc. ("Clearspan") is a Mississippi corporation with its principal place of business in Meridian, Mississippi. Clearspan manufactures structural building components and was the manufacturing participant in the Enterprise. Daniel Holland owned and operated Clearspan.

**RESPONSE:**     Paragon Defendants admit the allegations, except to deny that Clearspan was a participant in any cognizable Enterprise or joint venture.

14.     Defendant Rob Eason is an individual and, upon information and belief, a citizen of Mississippi. He is the President of Clearspan.

6

**RESPONSE:**  Paragon Defendants admit the allegations.

15.    Defendant the Estate of Daniel Holland (the "Estate") is the estate of Daniel Holland, who was domiciled in Lauderdale County, Mississippi at the time of his death and whose estate is being administered in the Chancery Court of Lauderdale County, Mississippi (Case No. 24-00078). Lisa M. Holland served as executrix from February 8, 2024. On July 17, 2024, the court appointed Marvin B. Speed as Special Independent Executor under Miss. Code § 91-7-61, with exclusive fiduciary authority over matters involving Paragon, IP-LLC (Inspired Pursuits), and this litigation, because the executrix had a conflict of interest arising from the Estate's interests in both Paragon and IP-LLC. Lisa M. Holland resigned and John Holland was appointed successor Executor on November 17, 2025. For purposes of 28 U.S.C. § 1332 (c)(2), the Estate is a citizen of Mississippi.

**RESPONSE:**  Paragon Defendants admit that Lisa Holland was Executrix of the estate, John Holland was appointed successor Executor, and that the estate of Dan Holland is being administered in Lauderdale County, Mississippi. Paragon Defendants are without knowledge sufficient to admit or deny the remaining allegations and therefore deny them.

### JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). There is complete diversity of citizenship: all Plaintiffs are citizens of Wisconsin, and no Defendant is a citizen of Wisconsin. The amount in controversy exceeds $75,000, exclusive of interest and costs.

**RESPONSE:**  Paragon Defendants admit the allegations.

17.    This Court has personal jurisdiction over each Defendant. Wisconsin's long-arm statute, Wis. Stat. § 801.05, authorizes the exercise of personal jurisdiction to the fullest extent permitted by the Due Process Clause, and the exercise of jurisdiction over each Defendant comports

7

with due process. For more than a decade the Enterprise was centered in Madison, Wisconsin, where the Qualtim Companies developed and maintained the Engineering Inputs and the Enterprise's confidential information and performed their work, and each Defendant purposefully directed its conduct at Wisconsin and at Plaintiffs in Wisconsin in connection with the Enterprise. Plaintiffs' claims arise out of and relate to that conduct.

**RESPONSE:** Paragon Defendants deny the allegations.

18.     Defendant John Holland is subject to personal jurisdiction in Wisconsin based on his own purposeful contacts with the State. Among other things, John Holland participated for years in the Enterprise's regular and bi-weekly meetings and communications with the Wisconsin-based Qualtim Companies; traveled to Madison, Wisconsin in August 2023, where he executed the Mutual Non-Disclosure Agreement on behalf of Paragon; participated with Daniel Holland and Kirk Grundahl in demonstrating the Paragon Truss Software and pitching the Enterprise's services to prospective customers; and, following Daniel Holland's death, personally directed into Wisconsin the communications and conduct by which Plaintiffs were excluded from the Enterprise, including the May 21, 2024 surrender letter presented to the Wisconsin Plaintiffs, the assertion of Paragon's sole ownership, the restriction of Plaintiffs' access to the Enterprise systems, and the communications to Plaintiffs' customers. Through this conduct John Holland committed intentional torts expressly aimed at Wisconsin, knowing that the brunt of the resulting harm would be suffered by Plaintiffs in Wisconsin.

**RESPONSE:** Paragon Defendants admit that John Holland traveled to Madison, Wisconsin in August 2023, participated remotely in various meetings or other communications with certain Plaintiffs and prospective customers, and terminated Paragon's business relationship with Plaintiffs, but Paragon Defendants deny that John Holland has committed any torts directed to, within, or

without, Wisconsin.  The remaining allegations are denied.

19.      Defendant James Holland is subject to personal jurisdiction in Wisconsin based on his own purposeful contacts with the State. Among other things, James Holland participated in Enterprise communications with the Wisconsin-based Qualtim Companies; met and communicated with Kirk Grundahl and Suzanne Grundahl regarding the Enterprise and the proprietary nature of the Engineering Inputs, including at a February 27–28, 2024 meeting at Clearspan with Kirk and Suzanne Grundahl and in March 2024; received and read the Qualtim Companies' written assertion of their ownership interests; and participated in the coordinated decision to exclude Plaintiffs from the Enterprise and to continue using Plaintiffs' Engineering Inputs and confidential information. James Holland engaged in this intentional conduct knowing that the brunt of the resulting harm would be suffered by Plaintiffs in Wisconsin.

**RESPONSE:**   The allegations in this paragraph are not directed to the Paragon Defendants and therefore no response is required.  To the extent a response is required, Paragon Defendants are without sufficient information to admit or deny the allegations and therefore deny them.

20.      Defendant Rob Eason is subject to personal jurisdiction in Wisconsin based on his own purposeful contacts with the State. Among other things, Rob Eason participated in Enterprise communications with the Wisconsin-based Qualtim Companies; met with Kirk Grundahl and Suzanne Grundahl at a February 27–28, 2024 meeting at Clearspan regarding the Enterprise and the Engineering Inputs; directed Clearspan to cease submitting truss design drawings to the Wisconsin-based DrJ; terminated Clearspan's inspection agreement with the Wisconsin-based CBI; and participated in the coordinated decision to exclude Plaintiffs from the Enterprise and to continue using Plaintiffs' Engineering Inputs and confidential information. Rob Eason engaged in this intentional conduct knowing that the brunt of the resulting harm would be suffered by Plaintiffs in

Wisconsin.

**RESPONSE:** The allegations in this paragraph are not directed to the Paragon Defendants and therefore no response is required. To the extent a response is required, Paragon Defendants are without sufficient information to admit or deny the allegations and therefore deny them.

21. Defendant Clearspan is subject to personal jurisdiction in Wisconsin based on its own purposeful contacts with the State. For approximately fifteen years, Clearspan contracted with the Wisconsin-based Qualtim Companies to obtain the professional engineering and licensed professional engineering sealing services on which Clearspan's structural-component manufacturing depended, and it directed a continuous stream of truss design work into Wisconsin, where DrJ reviewed and sealed Clearspan's structural component design drawings from approximately 2009 through 2024. Clearspan paid the Wisconsin-based Qualtim Companies for those services, including the monthly design-service-access payments and other compensation that flowed to the Enterprise's Wisconsin participants. Daniel Holland, who owned and operated Clearspan, traveled to Wisconsin and communicated regularly with Kirk Grundahl and Suzanne Grundahl in connection with the Enterprise, and Clearspan participated through Daniel Holland in the Enterprise's regular and bi-weekly meetings and communications with the Wisconsin-based Qualtim Companies. Following Daniel Holland's death, Clearspan directed into Wisconsin the communications and conduct by which Plaintiffs were excluded from the Enterprise, including by participating in the termination of Plaintiffs' participation through communications sent to the Wisconsin Plaintiffs, ceasing to submit truss design drawings to the Wisconsin-based DrJ for sealing, and continuing to use Plaintiffs' Engineering Inputs in its manufacturing without authorization. Plaintiffs' claims arise out of and relate to these Wisconsin contacts, and the exercise of jurisdiction over Clearspan comports with due process.

10

**RESPONSE:**  The allegations in this paragraph are not directed to the Paragon Defendants and therefore no response is required.  To the extent a response is required, Paragon Defendants are without sufficient information to admit or deny the allegations and therefore deny them.

22.     Paragon and Clearspan were both Daniel Holland's companies and have at all relevant times operated as a single, commonly controlled and financially intertwined Holland enterprise. As alleged below, Daniel Holland funded Paragon's operations through his private funds and through Clearspan, and Clearspan continues to fund Paragon today. The individual Defendants acted in concert, through and on behalf of these commonly controlled entities, to terminate the Enterprise and to seize and commercialize Plaintiffs' contributions. A corporate officer who personally participates in or directs tortious conduct is subject to personal jurisdiction for that conduct; the individual Defendants' personal participation in the intentional misappropriation, interference, and exclusion alleged herein subjects each of them to the jurisdiction of this Court regardless of the corporate form.

**RESPONSE:**  Paragon Defendants admit that Dan Holland had ownership interests in both Paragon and Clearspan but deny the remaining allegations.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the formation and operation of the Enterprise, the development and communication of the Engineering Inputs, and the execution of the Mutual Non-Disclosure Agreement. This action is already pending in this District.

**RESPONSE:**  Paragon Defendants admit that this action is pending in this District but deny the remaining allegations.

## DEFINED TERMS

24.    The following defined terms are used consistently with the terms employed by the parties in discovery in this action and in the '170 Action.

(a)    "Joint Venture Enterprise" or "Enterprise" means the joint venture business relationship among Kirk Grundahl, Suzanne Grundahl, and their affiliated companies Qualtim, DrJ, and CBI, on one side, and Daniel Holland and his companies Paragon and Clearspan on the other, together with their jointly controlled entity IP-LLC, in which the Qualtim Companies occupied both the input and output sides of the design process, providing the Engineering Inputs on the input side and DrJ's licensed professional engineering seal on the output side, Clearspan served as the structural component manufacturer, and Paragon served as the computational tool between those two functions. The Enterprise involved the development, application, testing, validation, and commercialization of engineering technologies and related services used in the structural building component industry, and arose from the parties' course of conduct and written, oral, and implied-in-fact agreements beginning in approximately March 2009 and continuing through approximately May 2024.

**RESPONSE:**    Paragon Defendants state that Plaintiff's purported definitional terms appear to be intended for pleading efficiency and are not factual allegations to which a response is required. To the extent a response is required, Paragon Defendants deny the accuracy of the definition in its entirety and deny the existence of any legally cognizable "Joint Venture Enterprise" or "Enterprise" under applicable law, and deny that Paragon Defendants were part of, or subject to, any alleged enforceable "Joint Venture Enterprise" or "Enterprise." Paragon Defendants deny any remaining allegations.

(b)    "Engineering Inputs" means the proprietary engineering knowledge and methodologies

12

created by Kirk Grundahl and the Qualtim Companies through professional engineering practice predating the Enterprise and the Paragon Truss Software, including engineering methods, calculations, design approaches, testing programs, calibration frameworks, engineering decision systems, engineering workflows, manufacturing and quality systems related to engineered designs, and professional engineering judgment used in structural component design and manufacturing. The Engineering Inputs exist independently of any software environment, are distinct from software source code, and were not created for Paragon. The Engineering Inputs were never assigned or transferred to Daniel Holland, Clearspan, Paragon, or IP-LLC.

**RESPONSE:** Paragon Defendants state that Plaintiff's purported definitional term appears to be intended for pleading efficiency and is not a factual allegation to which a response is required. To the extent a response is required, Paragon Defendants deny that Plaintiffs' alleged definition of "Engineering Inputs" accurately describes the engineering consultation services that Plaintiffs provided to Paragon, and that the alleged "Engineering Inputs" constitute proprietary engineering knowledge or methodologies. Paragon Defendants deny any remaining allegations.

(c)    "Paragon Truss Software" means the software environment created within the Enterprise as a computational tool for performing structural component design calculations using the Qualtim Companies' Engineering Inputs. The Paragon Truss Software did not exist before the Enterprise and was created to serve the Enterprise's commercial purposes. It is the subject of Paragon's declaratory judgment claims in the '170 Action.

**RESPONSE:** Paragon Defendants state that Plaintiff's purported definitional term appears to be intended for pleading efficiency and is not a factual allegation to which a response is required. To the extent a response is required, Paragon Defendants admit the Paragon Truss Software is a

13

computation tool but otherwise deny Plaintiffs' purported definition and characterization of the "Paragon Truss Software," and any remaining allegations.

## FACTUAL BACKGROUND

### A. Origins and Formation of the Enterprise

25.     The relationship between Kirk Grundahl and Daniel Holland dates to at least 1999, when Daniel Holland joined the board of the Wood Truss Council of America, of which Mr. Grundahl was a principal contributor, and of which Daniel Holland became President in 2004. Coordinated business activities forming the basis of the Enterprise began in approximately March 2009.

**RESPONSE:**   Paragon Defendants admit that Kirk Grundahl and Daniel Holland met in or around 1999 in connection with their involvement with the Wood Truss Council of America. Paragon Defendants admit that Daniel Holland was President of the Wood Truss Council of America in 2004.  Paragon Defendants deny the remaining allegations.

26.     For decades, the truss design industry has been dominated by a small number of metal connector plate manufacturers who control both the plate supply and the truss design software used throughout the industry. The five member companies of the Truss Plate Institute—MiTek, Alpine, Simpson Strong-Tie, Eagle Metal Products, and Cherokee Metal Products—historically provided their design software to component manufacturers at no or limited direct charge, conditioned on exclusive use of the company's proprietary metal connector plates. This arrangement commoditized truss design, eliminated value-added engineering differentiation, and concentrated pricing power in the plate manufacturers.

**RESPONSE:** Paragon Defendants admit that the truss design industry had been limited to

a small number of companies engaged in selling both software services and metal connector plates. Except as admitted, the allegations are denied.

27.     Kirk Grundahl and Daniel Holland identified this as both a market problem and a commercial opportunity. They formed the Enterprise to develop and commercialize an independent, plate-agnostic platform—combining the Qualtim Companies' proprietary Engineering Inputs, professional engineering services, professional ANAB ISO/IEC '17065 certified product evaluation services, professional ANAB ISO/IEC '17025 certified testing services, professional ANAB ISO/IEC '17020 certified inspection services, independent software, and non-proprietary connector plates—outside the plate-centric, supplier-controlled model.

**RESPONSE:**   Paragon Defendants deny the allegations.

28.     The Enterprise was structured as a shared-risk venture in which professional engineering services, manufacturing operations, and software-enabled design processing were undertaken in advance of full commercialization. Consistent with that structure, the Qualtim Companies provided substantial services on reduced-fee, deferred, and non-contemporaneously billed terms in anticipation of the imminent commercial launch. This shared-risk structure continued from 2009 through Paragon's termination of the Enterprise in 2024.

**RESPONSE:**   Paragon Defendants deny the allegations.

29.     In 2017, the Enterprise's principals—Daniel Holland, Kirk Grundahl, and Suzanne Grundahl—formed IP-LLC as the Enterprise's jointly controlled intellectual property holding entity. Daniel Holland held a 50% membership interest, and Kirk Grundahl and Suzanne Grundahl together held the remaining 50% in equal shares. All three principals were members and Managers. IP-LLC was to hold intellectual property arising from the Enterprise's activities for the benefit of

15

all Enterprise participants. The members' understanding was first memorialized in writing in 2017 and again disseminated as part of a December 31, 2019 agenda designated Confidential and trade-secret, distributed to Daniel Holland, John Holland, Kirk Grundahl, and Suzanne Grundahl.

**RESPONSE:** Paragon Defendants admit that IP-LLC was formed in 2017 and that Kirk Grundahl was a member but deny that Dan Holland and Suzanne Grundahl were members of the alleged LLC formed in 2017.   The remaining allegations are denied.

## B. Structure of the Enterprise and the Parties' Roles

30.     Within the Enterprise, the Qualtim Companies occupied both the input and output sides of the engineered design process. On the input side, DrJ, CBI and the Qualtim Companies provided the Engineering Inputs that Paragon used to define the software's engineering logic, testing, calibration, and decision frameworks. On the output side, DrJ provided the licensed professional engineering seal on every structural component design drawing produced by the software. Paragon served as the computational tool between these two functions—the software platform that received the Engineering Inputs, processed structural component design calculations using that engineering logic, and produced output drawings that DrJ then reviewed and sealed. Clearspan, owned and operated by Daniel Holland, was the structural component manufacturer. IP-LLC was to hold the Enterprise's intellectual property.

**RESPONSE:**  Paragon Defendants deny the allegations.

31.     The Enterprise's business relationships were governed by fifteen years of written, oral, and implied contracts and course of dealing, including regular and bi-weekly meetings reflected in over 300,000 Slack communications, the provision of professional engineering services by the only licensed professional engineers in the Enterprise, non-disclosure and

16

confidentiality arrangements protecting the Engineering Inputs, professional engineering services for sealing and repairs, plant manufacturing inspections, software interface analysis and testing, and joint commercialization activities.

**RESPONSE:**  Paragon Defendants deny the allegations.

32.    The agreements and arrangements through which the Enterprise was formed and operated included: (a) the oral and implied-in-fact partnership and joint-venture agreements arising from the parties' course of conduct beginning in approximately March 2009; (b) an oral exclusivity agreement under which the Qualtim Companies served as the exclusive engineering and professional-engineering-sealing providers for Clearspan's structural-component manufacturing operations; (c) oral exclusivity agreements under which DrJ supervised and provided all of the Engineering Inputs used in the Paragon Truss Software and provided the licensed professional engineering seal for the sealing services performed through that software; (d) the formation and operating agreement of IP-LLC as the Enterprise's intellectual-property holding entity; (e) the written agreement between CBI and Clearspan for the third-party annual inspection services required by ANSI/TPI 1 from approximately 2021 through approximately July 2024; (f) the August 8, 2023 Mutual Non-Disclosure Agreement among Qualtim, DrJ, CBI, Pushing7, and Paragon; (g) revenue-sharing, profit-allocation, deferred-compensation, and shared-risk arrangements under which Plaintiffs provided services on reduced-fee, deferred, and non-contemporaneously billed terms in anticipation of the planned commercialization; and (h) the parties' sustained course of dealing reflected in their regular and bi-weekly meetings and the more than 300,000 Slack communications through which the Engineering Inputs were provided. These agreements and arrangements are further identified in Plaintiffs' Answer to Interrogatory No. 3.

**RESPONSE:**  Paragon Defendants deny the allegations.

17

33.     Paragon has no licensed professional engineer on staff and never did. At the December 10, 2025 motion hearing in these actions, Paragon's counsel acknowledged to the Court that Paragon's principal is a computer programmer and that his company consists of computer software developers. Paragon's corporate representative, John Holland, confirmed under oath that Paragon's software developers are not professional engineers and that Paragon does not undertake professional engineering truss design. At his deposition, John Holland confirmed that the authors of the Paragon Truss Software are not professional engineers, and acknowledged that professional engineers were asked for, and did give, engineering judgment and advice that was used in the development of the software.

**RESPONSE:** Paragon Defendants admit that Paragon is a software development company that does not employ licensed professional engineers.  Paragon Defendants admit that John Holland has given a deposition and aver that his testimony speaks for itself.  Paragon Defendants admit that Paragon consulted with one or more engineers associated with Plaintiffs to verify the truss design software's outputs from an engineering standpoint and to evaluate Paragon's methods of analysis.  Except as admitted, the allegations are denied.

34.     Daniel Holland was a mechanical engineer but was not a licensed professional engineer and never provided sealing services, as confirmed by James Holland at his deposition. Daniel Holland himself acknowledged the limits of Paragon's software team. At a May 2018 Enterprise meeting, Daniel Holland stated that, although Paragon had an excellent software team, most of its members had "never swung a hammer," had "never really worked with wood," and did not have the engineering experience that the Qualtim Companies brought, with the result that "none of the parts can function as well independently as they can together."

**RESPONSE:**    Paragon Defendants admit that Dan Holland was a mechanical engineer

18

and not a professional engineer who engaged in sealing truss designs. Paragon Defendants admit that James Holland has given a deposition and aver that his testimony speaks for itself. Paragon Defendants admit the quoted statements are contained within the recorded statement but deny Plaintiffs' characterizations of the statement and refer the Court to the completed recording for context and accuracy. Except as admitted, the allegations are denied.

35.    The absence of any licensed professional engineer at Paragon defined the limit of Paragon's structural engineering capacity. Paragon's coders could implement engineering specifications once those specifications were provided to them by the Qualtim Companies, but they could not originate, evaluate, validate, or seal structural engineering judgments. The Paragon Truss Software functions as a structural engineering tool only because of the Engineering Inputs and professional engineering judgment that the Qualtim Companies supplied and that Paragon used in the software's calculations.

**RESPONSE:**   Paragon Defendants deny the allegations.

36.    The specific numerical parameters, threshold values, decision criteria, calibration factors, and analytical sequences that constitute the Engineering Inputs were not dictated by any published standard. The ANSI/TPI 1 standard and ASCE 7 establish minimum requirements and general frameworks but expressly leave the design engineer to supply specific implementation judgments through professional expertise. The same public standards are available to all five TPI member companies, yet each has developed proprietary software whose engineering outputs differ materially from one another and from the Paragon Truss Software.

**RESPONSE:**   Paragon Defendants deny the allegations.

37.    At a meeting on or about February 22, 2023 with a prospective customer, John Holland confirmed that Paragon's analysis was "completely our own and separate from anything"

19

the other plate manufacturers do, and further acknowledged that "one of the great values of our partnership with DrJ/Qualtim" was the ability to go beyond what is contained in the TPI standard and the codes. John Holland's statement that Paragon's analysis was "their own" distinguished Paragon's results from those of the competing plate manufacturers; it was not a claim that Paragon's analysis was independent of the Qualtim Companies' Engineering Inputs, which John Holland acknowledged in the same statement were the source of the partnership's ability to go beyond the public baseline. The existence of multiple non-identical software systems built from the same public baseline, together with John Holland's acknowledgment that the partnership's value lay in going beyond that baseline, establishes that the Qualtim Companies' specific engineering judgments were chosen expressions of professional judgment, protectable as trade secrets and confidential information.

**RESPONSE:**  Paragon Defendants admit that John Holland participated in a meeting on or about February 22, 2023 which was audio recorded.  Paragon Defendants admit the quoted portions of statements are contained within the recorded statement that speaks for itself.  Paragon Defendants deny Plaintiffs' characterizations of the statement and refer the Court to the completed recording for context and accuracy.  Except as admitted, the allegations are denied.

### C. Engineering Contributions

38.     Prior to the formation of Paragon, Kirk Grundahl and the Qualtim Companies worked with Daniel Holland and Clearspan using CompuTrus, a third-party truss design software. CompuTrus was acquired by MiTek, the dominant plate manufacturer, returning it to the plate-centric ecosystem the Enterprise had been formed to escape. Beginning in approximately 2014, the Qualtim Companies began providing Engineering Inputs to John Holland, then a coder at Clearspan, for use in developing an independent replacement. Paragon was formed in 2016 to be that replacement, and the Qualtim Companies continued providing Engineering Inputs to Paragon's coders through the termination of the Enterprise in 2024.

**RESPONSE:**    Paragon Defendants admit that Dan Holland and Clearspan used CompuTrus, a third-party truss design software; that CompuTrus was subsequently acquired by MiTek; that John Holland, while an employee of Clearspan, began writing code to develop new truss design software; that Paragon was formed in 2016 and began consulting with Qualtim Companies to assist in verifying and evaluating the truss design software being developed by Paragon from an engineering standpoint. Except as admitted, the allegations are denied.

39.     Whatever software Clearspan transferred to Paragon at Paragon's 2016 formation was Daniel Holland's personal, discarded attempt at a truss design program. At the February 22, 2023 meeting, Daniel Holland acknowledged that John Holland took everything Daniel Holland had and threw it out and started over. The Paragon Truss Software as it exists today is not derived from anything Clearspan owned or transferred. To the extent any Engineering Inputs assisted Daniel Holland's early effort, those Engineering Inputs were never assigned to Daniel Holland, Clearspan, or Paragon.

**RESPONSE:**    Paragon Defendants admit that the Paragon Truss Software developed

21

under John Holland's leadership at Paragon in 2016 and thereafter did not utilize the software previously developed by Dan Holland at Clearspan. Paragon Defendants admit that no written assignments have been made by Qualtim Companies to Paragon, or vice versa. Paragon Defendants are without sufficient information to admit or deny the remaining allegations of this complaint paragraph and therefore deny them.

40. Paragon knew how to obtain ownership of work it intended to own. At his deposition, John Holland confirmed that Paragon used written work-for-hire agreements with its own software consultants, including beginning as early as 2016 or 2017. Paragon never entered into any work-for-hire agreement or written assignment with the Qualtim Companies, and the Qualtim Companies never assigned or transferred the Engineering Inputs to Paragon. The Engineering Inputs accordingly remained the property of the Qualtim Companies, and Paragon's characterization of them as mere outside "consulting services" is contradicted by Paragon's own practice and by the absence of any such agreement.

**RESPONSE:** Paragon Defendants admit that Paragon has taken appropriate steps to protect its ownership of the Paragon Truss Software including, among other things, by use of work for hire agreements with its own employees and independent contractors who authored the software's source code, and by not sharing its source code with any outside party. Paragon Defendants admit that Paragon did not enter into work for hire agreements with Plaintiffs but deny that the alleged Engineering Inputs communicated to Paragon in the course of a consulting relationship and paid for are proprietary or otherwise belong to Plaintiffs or that the alleged character of the Engineering Inputs otherwise necessitated a work for hire agreement. Except as admitted, the allegations are denied.

22

41. The Engineering Inputs are the product of Kirk Grundahl's and the Qualtim Companies' professional engineering practice, developed through decades of independent testing, calibration, validation, and professional judgment in structural component design. The Qualtim Companies' personnel who developed and applied the Engineering Inputs include multiple licensed professional engineers and technical specialists with decades of experience in the structural building component industry.

**RESPONSE:** Paragon Defendants deny the allegations.

42. Throughout the Enterprise period, Paragon used no fewer than sixty distinct Engineering Inputs of the Qualtim Companies in the Paragon Truss Software, identified by number and generic descriptor in the table below. The specific content of each Engineering Input—the engineering methodology, the basis for its development, and its distinction from any published standard—is set forth in Plaintiffs' Answer to Interrogatory No. 10 and Schedule A in this action and in the Qualtim Companies' Answer to Revised Interrogatory No. 5 in the '170 Action, including all corrections, amendments, and supplements, all designated Confidential under the applicable Protective Orders and incorporated herein by reference. The Inputs are generally listed below:

| No. | Engineering Input Contribution |
|---|---|
| 1 | QC Tolerance Polygon System |
| 2 | Engineering vs. Manufacturing Decision Framework |
| 3 | Composite Section/Stacked Chord Methodology |
| 4 | Bending Capacity Factor Analysis Protocol |
| 5 | Top Chord Bearing Software Module (StrongEnd Truss) |
| 6 | Gross Plate Area Design Methodology |
| 7 | Plate Shear Resistance Methodology |
| 8 | ASCE 7 Wind and Snow Load Implementation |
| 9 | TPI Standard Implementation and Interpretation |
| 10 | Testing Data and Calibration |
| 11 | Tooth Withdrawal and Incising Factor Specifications |
| 12 | Multi-Ply Girder Design Methodology |
| 13 | Finite Element Analysis (FEA) Methodology and Calibration |

14      Heel Joint Moment Check Methodology (TPI Check 8.7.1.1)
15      Stacked Floor Truss Top Chord Bearing Force Distribution Protocol
16      LVL/LSL Lumber Design Value Implementation
17      Web Member Lateral Restraint and Bracing Design Methodology
18      Bearing Block Plating Rules
19      Split Vertical End Condition Analysis Methods
20      Wood Splitting Prevention
21      Strong Axis vs. Weak Axis Determination for Multi-Ply Members
22      Analog Model Calibration Methods
23      Vector Diagram Load Path Analysis Protocol
24      Preservative Treatment and Moisture Content Design Guidance
25      Applied Loads Review and Competitive Positioning Process
26      Panel Length Deflection Check Policy
27      Moment Reduction Method
28      Wood-to-Wood Force Transmission
29      Compression Reduction Rule for Plating
30      Wind Load Database Implementation
31      Fundamental vs. Risk-Targeted Spectral Response Acceleration
32      Roof Pitch and Slope Correction Factors
33      Repetitive Member Factor Application Protocol
34      Drag Strut and Diaphragm Load Transfer Methodology
35      Hip Set Engineering and Load Distribution
36      Cantilever Design Rules and Deflection Limits
37      Piggyback Truss Load Transfer Protocol
38      Structural Insulated Panel (SIP) Interface Design
39      Mono Truss Slope and Loading Protocol
40      Valley Set Design Methodology
41      Scissors Truss Design and Geometry Rules
42      Attic Truss Live Load and Storage Criteria
43      Parallel Chord Truss Panel Point Load Distribution
44      Floor Truss Vibration and Deflection Control
45      Strongback Bracing Design Methodology
46      Notch and Hole Placement Rules for Structural Members
47      Girder Hanger and Connector Load Path Rules
48      Engineering Judgment Override Protocol
49      Manufacturing Tolerance Integration Framework
50      Quality System Inspection and Certification Protocol
51      ANAB-Accredited Evaluation Criteria Integration
52      Seismic Design Category Implementation Protocol
53      Snow Drift and Unbalanced Load Protocol
54      Ponding and Rain-on-Snow Surcharge Methodology
55      Long-Term Deflection and Creep Adjustment Protocol
56      Truss Repair and Field Modification Engineering Protocol
57      Specialty Truss Configuration Rules (Bowstring, Curved)
58      Structural Component Manufacturer QC Certification Protocol
59      Multi-Story Load Stacking and Transfer Framework
60      PE Seal Workflow and Professional Responsibility Integration

**RESPONSE:**  Paragon Defendants deny the allegations.

24

43.    Distinct from the individual Engineering Inputs, the Enterprise's confidential business model is itself a trade secret of Plaintiffs. Described categorically and without disclosing its proprietary content, the business-model trade secret comprises: (i) the proprietary architecture of the collaborative relationship among the Enterprise participants—Clearspan as the manufacturing function, CBI as the testing function, DrJ as the professional-engineering function, and Paragon as the data-processing function—together with the related market-entry and expansion strategy by which the Enterprise was designed to operate independently of the dominant plate-manufacturer-controlled software ecosystem; (ii) confidential implementation procedures and pricing, including the processes for converting customer requests into sealed engineered design drawings, pricing structures, customer-acquisition workflows, and revenue-sharing arrangements; (iii) the confidential organizational and personnel structure of the Enterprise and the specialized roles contributed by each participant; (iv) the formation, purpose, and strategic rationale of IP-LLC and its function as the Enterprise's intellectual-property holding entity; and (v) the existence, interrelationship, and competitive significance of the Enterprise's underlying proprietary engineering and testing assets. The specific content of the business-model trade secret is maintained as confidential within the Enterprise and is set forth, under the applicable Protective Orders, in Plaintiffs' Answers to Interrogatories; it is not reproduced in this Complaint.

**RESPONSE:** Paragon Defendants deny the allegations.

44.    The generic descriptors in the table, and the categorical description of the business-model trade secret, identify the subject matter of those trade secrets for purposes of this pleading only. The specific content, methodology, and proprietary detail of each is set forth in the referenced discovery responses designated Confidential under the applicable Protective Orders. The use of generic descriptors and categorical descriptions in this Complaint is not a disclosure of that

confidential content and is not a waiver of any trade secret, confidentiality, or other protection applicable to the Engineering Inputs or the business-model trade secret.

**RESPONSE:** The statements in this complaint paragraph are not factual allegations and therefore no response is deemed necessary. To the extent a response it required, Paragon Defendants deny the allegations.

45. The Engineering Inputs are maintained by the Qualtim Companies in fixed form in their own records, including spreadsheets with defined cell formulas and calculation sequences, written engineering specifications and documented calculation protocols, annotated drawings and diagrams, documented decision frameworks, testing reports defining engineered product load-resistance performance, and audiovisual recordings of engineering meetings and technical sessions. In the course of the Enterprise, the Qualtim Companies communicated Engineering Inputs to Paragon's coders through bi-weekly meetings, email, and Slack communications, all within the Enterprise's confidential framework, for Paragon to use in building, updating, and refining the Paragon Truss Software.

**RESPONSE:** Paragon Defendants are without sufficient information to admit or deny the allegations regarding Plaintiffs' maintenance of internal documents and record keeping practices and therefore deny them. Paragon Defendants deny the remaining allegations, except to admit that representatives of the Qualtim Companies provided certain engineering consultation services that were communicated to Paragon through one or more in-person and remote meetings, emails, and Slack communications.

46. The produced record reflects a sustained and documented pattern in which Paragon's coders requested Engineering Inputs from the Qualtim Companies' licensed professional engineers and then used the engineering direction provided in the Paragon Truss

Software. Paragon's own internal records confirm this pattern, including records reflecting that software development was performed per DrJ's instructions and based on a specification from DrJ. Truss design drawings produced within the Enterprise, including those DrJ produced and sealed for Clearspan, carried a DrJ Engineering, LLC copyright notice from at least 2016 through Paragon's termination of the Qualtim Companies in 2024. Following termination, Paragon removed the DrJ copyright notice, as confirmed by James Holland at his deposition, who described seeing different paper and different engineer seals on Clearspan truss designs after the termination.

**RESPONSE:**    Paragon Defendants admit that representatives of the Qualtim Companies provided certain engineering consultation services that were communicated to Paragon through various meetings, emails, and Slack communications. Paragon Defendants admit that Paragon terminated the Qualtim Companies' use of Paragon's truss design sealing software application upon termination of the parties' business relationship. The remaining allegations are denied.

47.    Contemporaneous recordings confirm that the Enterprise treated this engineering knowledge and testing as proprietary property. As early as January 2017, Daniel Holland acknowledged in a recorded message that the Enterprise's truss design drawings contained innovations owned by DrJ and Paragon, proposed that any such design be invalidated unless produced by an authorized licensee, and discussed copyright or patent protection for those innovations. In August 2017, Kirk Grundahl described the Qualtim Companies' proprietary truss-plate testing program—testing the major manufacturers' plates to derive reliable design properties —which the parties kept proprietary as intellectual property and used to calibrate the Paragon Truss Software.

**RESPONSE:**    Paragon Defendants admit that one or more recordings have been made of conversation involving principals of the parties to this action but deny that any such

27

communications were conducted in furtherance of the operation of a cognizable "Enterprise." Paragon Defendants deny Plaintiffs' characterization of the alleged recordings. Paragon Defendants further admit that Dan Holland's statements made in or about January 2017 were recorded and aver that the recording speaks for itself. Paragon Defendants are without sufficient information to admit or deny the allegations regarding Mr. Grundahl's alleged statements and therefore deny them.

### D. Confidentiality of the Engineering Inputs and Enterprise Information

48.     Throughout the Enterprise period, the Engineering Inputs and the Enterprise's confidential business information were provided and used within a framework of confidentiality and non-disclosure, and Plaintiffs took measures that were reasonable under the circumstances to maintain their secrecy. Access was limited on a need-to-know basis: the Engineering Inputs and the Enterprise's planning were shared only with those directly involved in Enterprise operations and were not distributed publicly, and the full Enterprise model, including its strategic framework, its commercialization and go-to-market strategy, and its intellectual-property structure, was restricted to the Enterprise's core principals, Kirk Grundahl, Suzanne Grundahl, and Daniel Holland. Meeting agendas and operational and market-development communications were generally marked with confidentiality and trade-secret designations.

**RESPONSE:**   Paragon Defendants deny the allegations.

49.     The Enterprise's commercialization and go-to-market strategy, including its plate-agnostic strategy, pricing approaches, customer-acquisition strategies, and revenue-sharing structures, was itself treated as a trade secret, maintained in confidence within the Enterprise, and not publicly disclosed; memoranda outlining these activities were generally stamped confidential and trade secret. When the Enterprise's principals discussed the Enterprise and its go-to-market

28

strategy with prospective participants, they did so under non-disclosure agreements. The formation of IP-LLC was itself a confidentiality measure: it was organized initially in Texas in 2017 to protect the confidentiality of the Enterprise's formation and intellectual-property framework, and its membership was deliberately limited to the Enterprise's principals, so that the existence, structure, and purpose of the Enterprise were not made public.

**RESPONSE:**   Paragon Defendants deny the allegations.

50.     Plaintiffs' confidentiality measures further included confidentiality and trade-secret provisions in the Qualtim Companies' employment, contractor, and vendor agreements; the Qualtim Companies' physical and digital information-security measures, including role-based access controls and periodic permission audits, access revocation upon job change or termination, segregated secure repositories, multi-factor authentication and encrypted file transmission, firewalls, intrusion detection, and network segmentation, security cameras and locked, key-fob-controlled offices and laboratories, restricted visitor access requiring escort and execution of a non-disclosure agreement, and document marking identifying material as confidential intellectual property and trade secrets; the conduct of Engineering-Input communications through dedicated Slack channels with access limited to authorized Qualtim and DrJ personnel; and the controlled disclosure of Enterprise information, as in the confidential February 27–28, 2024 briefing at Clearspan's offices, which was presented solely within a controlled meeting of Enterprise participants and was not intended for distribution beyond that group.

**RESPONSE:**   Paragon Defendants are without sufficient information to admit or deny the allegations regarding Plaintiffs' purported internal confidentiality measures and therefore deny them.  Paragon Defendants deny the remaining allegations, except to admit that Qualtim and DrJ personnel communicated with representatives of Paragon through one or more Slack channels.

29

51. During the Enterprise, Paragon itself recognized and enforced the confidentiality of the Engineering Inputs and the related testing and engineering analysis. On March 8, 2022, Paragon's Product Manager, Matt Van Stelle, wrote to Kirk Grundahl to follow up on their discussion about protecting the parties' confidential intellectual property and asked how to identify and protect it. In response, on March 11, 2022, Kirk Grundahl provided a written Paragon/DrJ confidential intellectual property policy that defined confidential intellectual property to include, among other things, all Paragon and DrJ reports generated about software development and analysis, all Paragon and CBI testing, all Paragon and DrJ policy, and all Paragon and DrJ calibration and analog-change analysis. On July 14, 2022, Matt Van Stelle forwarded that policy to John Holland. This exchange confirms that Paragon understood the Engineering Inputs, the CBI testing, and the DrJ calibration and analysis to be confidential intellectual property and participated in measures to keep them confidential. At his deposition, Matt Van Stelle confirmed that Paragon treated the core technical information in its software as confidential and was careful not to let it leave Paragon.

**RESPONSE:** Paragon Defendants deny the allegations, except to admit that Paragon employee Matt Van Stelle and Kirk Grundahl communicated by one or more emails in or about March 2022 and that Paragon treats its Paragon Truss Software code as a highly confidential trade secret. Paragon Defendants aver that the contents of the emails speak for themselves. Paragon Defendants admit that Matt Van Stelle has given a deposition and aver that his testimony speaks for itself.

52. On or about August 8, 2023, at an Enterprise strategic planning meeting in Madison, Wisconsin, the Qualtim Companies and Paragon executed a Mutual Non-Disclosure Agreement (the "NDA"), which John Holland executed on behalf of Paragon, and which Paragon

personnel separately executed. The NDA required the parties to hold in confidence, and to refrain from using outside the permitted purpose, the Engineering Inputs, business strategies, and other confidential information associated with the Enterprise, and required the return or destruction of confidential information upon termination. As part of the Enterprise, Paragon received the Engineering Inputs in confidence and with full knowledge that they were the proprietary property of the Qualtim Companies.

**RESPONSE:**  Paragon Defendants deny Plaintiffs' characterization of the August 8, 2023 meeting in Madison, Wisconsin, and aver that meeting was in connection with Paragon's annual Summit meeting, which occurs annually at one of Paragon's client's sites. Paragon Defendants admit that John Holland and other employees of Paragon signed a Mutual Non-Disclosure Agreement on August 8, 2023, the terms of which speak for themselves, based on Qualtim's requirement in order for Paragon representatives to tour Plaintiffs' testing facility. The remaining allegations are denied.

### E. The Parties' Course of Dealing and Acknowledgments of the Partnership

53.     At a meeting on or about November 16, 2021, Daniel Holland acknowledged that Clearspan had recently made a large amount of money and that the Qualtim Companies had not been compensated for their contributions. Daniel Holland stated that he viewed the three participants as being at the same table pulling the rope the same way, that the money was coming to one leg and needed to be spread to the other two, and that the parties were on the same team and would take care of each other.

**RESPONSE:**  Paragon Defendants admit that Dan Holland participated in a conversation with Kirk Grundahl in or about November 2021 and aver that the complete conversation is set forth in audio and transcribed recordings that speak for themselves. Paragon Defendants deny

Plaintiffs' characterizations of the conversation.  Except admitted, the allegations are denied.

54.    In his own words at that meeting, Daniel Holland told Kirk Grundahl that "Clearspan, in the last couple of months, has made an enormous amount of money," that "part of the reason for that is DrJ sealing my trusses," and that "DrJ hasn't made any money doing that." He acknowledged that the Qualtim Companies "have spent a considerable amount of money supporting Paragon and Clearspan in ways that allowed us to buy plates from anybody," which he called "a significant factor in our success."

**RESPONSE:**  Paragon Defendants admit that Dan Holland participated in a conversation with Kirk Grundahl in or about November 2021 and aver that the complete conversation is set forth in audio and transcribed recordings that speak for themselves. Paragon Defendants deny Plaintiffs' characterizations of the conversation. Except admitted, the allegations are denied.

55.    Clearspan thus began benefiting from the Enterprise as soon as it could substitute lower-cost connector plates, while DrJ and the Qualtim Companies were not compensated for the engineering that made that substitution possible. Daniel Holland recognized this imbalance and stated that he needed to address it going forward, explaining that "the money's all coming to one leg and I need to spread it to the other two," and that he had "got to fix that, because I need you to keep going." That imbalance persisted, without profit-sharing or adequate compensation to the Qualtim Companies, through Daniel Holland's death in 2024.

**RESPONSE:**   Paragon Defendants deny the allegations, except to admit that Dan Holland participated in a conversation with Kirk Grundahl in or about November 2021 and aver that the complete conversation is set forth in audio and transcribed recordings that speak for themselves.

56.    Daniel Holland repeatedly acknowledged, in recorded Enterprise discussions that the Qualtim Companies' contributions were undercompensated and that Paragon and Clearspan

owed them value. In a May 2020 discussion, Daniel Holland recognized the co-dependency of the two companies: DrJ could not provide sealing without the Paragon tool and that Paragon could not develop or validate the truss design software without DrJ's engineering, referred to "the debt that Paragon owes to DrJ," and proposed recording that debt on Paragon's books.

**RESPONSE:**   Paragon Defendants deny the allegations, except to admit that Dan Holland participated in a conversation with Kirk Grundahl in or about May of 2020 and aver that the complete conversation is set forth in an audio recording that speaks for itself.

57.     In November 2021, after Clearspan earned substantial profits from selling trusses sealed by DrJ, Daniel Holland told Kirk Grundahl that the Qualtim Companies had spent a considerable amount of money supporting Paragon and Clearspan, that the three participants were "on the same team," and that he needed shift profit to the Qualtim Companies, including by having Paragon invoice Clearspan at an inflated amount in order to redistribute some of Clearspan's profits. On July 27, 2023, in a recorded Enterprise discussion, Daniel Holland reiterated his commitment to the partnership, stating that he was "committed to you guys" and that he wanted to "make this work as a whole."

**RESPONSE:**   Paragon Defendants admit that Dan Holland participated in conversations with Kirk Grundahl in or about November 2021 and July 2023 and aver that the complete conversations are set forth in audio or transcribed recordings that speak for themselves. Paragon Defendants deny Plaintiffs' characterizations of the conversation and the remaining allegations.

58.     In the same period, Clearspan paid Paragon $500,000, and a payment of $262,847 was made to the Qualtim Companies, implemented through invoicing at Daniel Holland's direction as a mechanism to redistribute Clearspan's profits to the other Enterprise participants. That payment was not a settlement of, or a partial payment toward, the Qualtim Companies'

contributions; it was a distribution of Enterprise profits, consistent with Daniel Holland's repeated direction to share Clearspan's profits among the Enterprise participants, and it is evidence of the profit-sharing character of the joint venture. No written settlement, release, or agreement of any kind accompanied that payment, and how that profit distribution should be treated in relation to the parties' respective contributions and the amounts at issue is disputed by the parties.

**RESPONSE:**    Paragon Defendants admit that in December 2021, Clearspan made a payment to Paragon for $500,000 for work related to a separate software project for Clearspan, and a payment to Qualtim in the amount of $262,847 under an invoice for "Engineering support for Paragon Software Development" that Qualtim prepared and issued.  The remaining allegations are denied.

59.    Throughout the Enterprise, and apart from the design-service and sealing payments that flowed among Enterprise participants, Clearspan paid Paragon no less than $30,000 per month for design service access, plus per-use sealing software fees. The per-use sealing software fee was nominal, billed at approximately fifteen cents per seal request, and was separate from the professional engineering seal itself, which DrJ provided. For the professional engineering seal on Clearspan's truss design drawings, Clearspan paid DrJ only commodity-level prices; the most recent per-seal price was $1.40 per seal in June 2024, and repair work was billed at $62 per half-hour unit, which is $104 per hour, well below the Qualtim Companies' published hourly rates of $150 to $250 per hour depending on the individual performing the work. These commodity per-seal and per-use fees were never intended to, and could not, compensate the Qualtim Companies for the engineering inputs, professional engineering judgment, and investment they contributed to the Enterprise.

**RESPONSE:**    Paragon Defendants admit that Clearspan has paid Paragon at varying amounts over the years for use of the Paragon Truss design software and other services, and, further, that DrJ has paid Paragon for use of Paragon's sealing software at varying per-use prices over several years.  Paragon Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations regarding the specific amounts paid by Clearspan to DrJ and therefore deny the allegations. Paragon Defendants deny the remaining allegations.

60.    Rob Eason confirmed at his deposition the monthly design-service-access payments from Clearspan to Paragon and the $500,000 payment, and confirmed that Daniel Holland authorized payments to Paragon by placing his initials on the invoices, after which Eason signed the checks. The Qualtim Companies continued to provide Engineering Inputs without full compensation up to Paragon's termination of the Enterprise in 2024.

**RESPONSE:**  Paragon Defendants admit that Defendant Rob Eason has given a deposition in this case and aver that his testimony speaks for itself. The remaining allegations are denied.

61.    Paragon and Clearspan were both Daniel Holland's companies, and they have at all relevant times functioned as a single, commonly controlled and financially intertwined Holland enterprise rather than as independent, arm's-length businesses. Daniel Holland funded Paragon's operations through his private funds and through Clearspan, transferring operating funds to Paragon. That arrangement continues today: Clearspan pays Paragon more than $30,000 per month —more than the cost of any software license seat—and continues to pay for the benefits of Paragon's employees. Paragon has never operated as a standalone, independently profitable software business; it has been sustained by Clearspan and the Holland family. This financial dependency confirms that the Enterprise participants on the Holland side were a unified, commonly controlled group and that Paragon's characterization of the Qualtim Companies'

Engineering Inputs as mere outside "consulting services" is false.

**RESPONSE:**  Paragon Defendants deny the allegations, except to admit that Clearspan currently pays Paragon more than $30,000/month for use of the Paragon Truss design Software and other services.

62.     At the time of his death, Daniel Holland owned an approximately forty-four percent membership interest in Paragon—with the remaining interests held by his wife Lisa Holland and John Holland—owned and controlled Clearspan, and was a fifty-percent member of IP-LLC; Paragon and Clearspan were Holland family-controlled companies rather than independent, arm's-length businesses.

**RESPONSE:**    Paragon Defendants admit the alleged membership interests held by Dan Holland with respect to Paragon and IP-LLC and that Dan Holland was the principal owner of Clearspan.  Except as admitted, the allegations are denied.

63.     At his deposition, John Holland confirmed that there were no written agreements governing the Paragon–Clearspan relationship, and acknowledged that the Grundahls and their companies spent money supporting Paragon, including by paying employees who provided valuable consultation to Paragon. The Qualtim Companies devoted close to 8,000 hours to Paragon alone, for which they received no compensation. Among other contributions, the Qualtim Companies provided an employee to perform interface testing and analysis for the Paragon Truss Software, the cost of which the Qualtim Companies shared. Paragon, however, did not even fully pay the limited amount it was billed for that work. The Paragon Truss Software has a functional user interface because of the Qualtim Companies' interface testing and analysis.

**RESPONSE:**  Paragon Defendants admit that John Holland has given a deposition in this case and aver that his testimony speaks for itself. Paragon Defendants deny Plaintiffs'

36

characterization of Mr. Holland's testimony. Paragon Defendants admit that Paragon consulted with a DrJ employee for purposes of assessing and developing the user interface of the Paragon Truss design software and were billed by Plaintiffs for the services that employee provided, and further aver that there is a dispute regarding whether any additional amounts are owed for those services. Except as admitted, the allegations are denied.

64.    On or about December 6, 2023, Kirk Grundahl and Daniel Holland met at Clearspan's facility in Meridian, Mississippi as part of a two-day Enterprise strategic planning session and addressed what constituted protected intellectual property as distinguished from the public engineering baseline. Daniel Holland confirmed that the Enterprise had a great deal of intellectual property consisting of everything past the TPI standard and the public domain, observed that a person without decades of experience could not even read the TPI standard, and expressed concern that Paragon's coders could not themselves distinguish the protected Engineering Inputs and might inadvertently disclose them. The parties agreed to document the intellectual property delineation; that documentation was never completed. Daniel Holland died on or about January 17, 2024, forty-two days later. The planned commercial launch of the integrated platform was scheduled for the first quarter of 2024.

**RESPONSE:**  Paragon Defendants admit that a meeting between Kirk Grundahl and Dan Holland occurred at Clearspan's facility in or about December 2023 and that Dan Holland passed away on or about January 17, 2024, but deny the remaining allegations.

### F. Commercialization and Marketing of the Enterprise

65.    A central part of the Enterprise was the commercialization of the parties' relationship and of the integrated platform, including how that platform was to function and be brought to market. The participants jointly developed how the Enterprise would operate and be

presented to the market, integrating the Qualtim Companies' testing and engineering contributions, the Paragon Truss Software, and Clearspan's manufacturing, together with the pricing, market-positioning, and customer-acquisition strategies that would allow the Enterprise to compete outside the plate-centric, supplier-controlled model.

**RESPONSE:**  Paragon Defendants deny the allegations and aver that no cognizable "Enterprise" was ever formed or consummated.

66.    As part of that commercialization effort, Daniel Holland, Kirk Grundahl, and at times John Holland, met with prospective clients to pitch the Enterprise's services and the integrated platform. For example, at a meeting on or about February 22, 2023 attended by John Holland, Daniel Holland, Kirk Grundahl, Suzanne Grundahl, and a prospective customer, John Holland demonstrated the Paragon Truss Software and described the value of Paragon's partnership with DrJ and Qualtim, including the ability to go beyond the TPI standard and the codes. As mentioned above, John Holland confirmed that Paragon's analysis was "completely our own and separate from anything" the other plate manufacturers do, and further acknowledged that "one of the great values of our partnership with DrJ/Qualtim" was the ability to go beyond what is contained in the TPI standard and the codes. John Holland's statement that Paragon's analysis was "their own" distinguished Paragon's results from those of the competing plate manufacturers.

**RESPONSE:**  Paragon Defendants admit that discussions with one or more prospective clients about possible collaborations involving services by Clearspan, Qualtim, and Paragon occurred but did not come to fruition.  Paragon Defendants admit that John Holland participated in a meeting on or about February 22, 2023 which was audio recorded  and that the quoted portions of statements are contained withing the recorded statement. Paragon Defendants deny Plaintiffs' characterizations of the statement and refer the Court to the complete recording for context and

accuracy.  Except as admitted, the allegations are denied.

67.    At that demonstration, John Holland presented the Paragon Truss Software to the prospective customer as a cloud-based commercial product. These statements reflect the parties' strategic approach to commercialization and marketing of the integrated platform.

**RESPONSE:**  Paragon Defendants admit that John Holland participated in the referenced demonstration of the Paragon software, which was audio recorded, and aver that the recording speaks for itself.  Except as admitted, the allegations are denied.

68.    [Intentionally Removed Per Oral Rule 06/26/26]

**RESPONSE:**  Paragraph 68 appears to be a placeholder and does not contain any factual allegations to which a response is required.  To the extent a response is required, Paragon Defendants are without sufficient information to admit or deny the allegation and, therefore, deny the same.

69.    The planned commercial launch of the integrated platform was scheduled for the first quarter of 2024, with sales visits scheduled, and the Qualtim Companies continued to provide their engineering contributions without full compensation in anticipation of that imminent commercialization.

**RESPONSE**:  Paragon Defendants deny the allegations.

### G. Termination of the Enterprise and Paragon's Unauthorized Commercialization

70.    On or about February 27–28, 2024, Kirk Grundahl and Suzanne Grundahl met with Rob Eason and James Holland at Clearspan's offices in Meridian, Mississippi and presented the full Enterprise framework, including the role and proprietary nature of the Qualtim Companies' Engineering Inputs that the Paragon Truss Software uses, the mutual dependencies among the participants, and the confidentiality framework governing the Enterprise's confidential

information. Rob Eason stated that the information would be provided to John Holland and that John Holland would need to be part of any meetings going forward.

**RESPONSE**:   Paragon Defendants admit that a meeting occurred on or about February 27-28, 2024 between Kirk Grundahl, Suzanne Grundahl, Rob Eason and James Holland at Clearspan's offices in Meridian, Mississippi. Paragon Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations regarding the specific discussions that occurred at the meetings and therefore deny them.

71.    On or about March 22, 2024, the Qualtim Companies transmitted a written memorandum to Paragon outlining their ownership interests in the Engineering Inputs, portions of which had previously been sent to Daniel Holland and John Holland in November 2023 and January 2024. James Holland confirmed at his deposition that he received and read this memorandum on or about March 25, 2024. Paragon thus had actual written notice of Plaintiffs' asserted ownership of the Engineering Inputs before it undertook the termination described below, before it commenced its declaratory-judgment litigation, and before its commercial market launch.

**RESPONSE:**    Paragon Defendants admit that the Qualtim Companies transmitted a memorandum dated March 22, 2024, purporting to outline their interest in the Paragon Truss Software.  Paragon Defendants admit that James Holland has given a deposition in this case and aver that his testimony speaks for itself.  Paragon Defendants deny that James Holland's personal knowledge can be imputed to Paragon as Plaintiffs allege, as James Holland was not a Paragon employee. Paragon Defendants further aver that the March 22, 2024 memorandum together with subsequent written communications by Kirk Grundahl in which he continued to assert ownership in the Paragon software resulted in Paragon filing the declaratory judgment action.  Except as admitted, the allegations are denied.

40

72.    Following Daniel Holland's death, Paragon and Clearspan, acting through John Holland, Rob Eason, and James Holland, undertook a series of actions to remove the Qualtim Companies from the Enterprise. On or about May 21, 2024, John Holland personally presented the Qualtim Companies, at Clearspan's offices, with a letter written as though Kirk Grundahl and Suzanne Grundahl were disclaiming all ownership interests in the Engineering Inputs and the Paragon Truss Software, which they had not authorized and did not sign.

**RESPONSE:**    Paragon Defendants admit that in the spring and summer of 2024, Paragon and Clearspan made independent decisions to terminate their respective business relationships with the Qualtim Companies. Paragon Defendants admit on or about May 21, 2024, John Holland presented Qualtim with a proposed letter for consideration, by which Qualtim agreed to disclaim its interest in the Paragon Truss Software, and that Qualtim did not sign the letter.  Except as admitted, the allegations are denied.

73.    On or about May 23, 2024, Paragon's counsel sent a letter asserting Paragon's sole and exclusive ownership of the software and characterizing the Qualtim Companies' Engineering Inputs as consulting services, and Paragon downgraded DrJ's access to a sealing-only tier. On or about June 3, 2024, Paragon's counsel sent further demands to the same effect, and Clearspan ceased all truss design drawing submissions to DrJ, ending a continuous sealing relationship dating to 2009.

**RESPONSE:**    Paragon Defendants admit that Paragon's counsel sent letters dated May 23, 2024 and June 3, 2024 in response to the March 22, 2024 memorandum and other written communications by Mr. Grundahl that asserted ownership in the Paragon Truss Software.  Paragon Defendants aver that the contents of these communications speak for themselves.  Except as admitted, the allegations are denied.

41

74.     Between on or about July 11 and July 24, 2024, Paragon restricted all of the Qualtim Companies' access to the Paragon Truss Software, the shared Slack communications, and other shared Enterprise systems, while retaining the complete Slack channel history containing Engineering Inputs, and directly emailed the Qualtim Companies' clients stating that they could no longer share jobs with DrJ. On or about July 26, 2024, Rob Eason terminated Clearspan's inspection agreement with CBI in writing.

**RESPONSE:**    Paragon Defendants admit that based on Mr. Grundahl's continued assertions of ownership in the Paragon Truss software and other hostile conduct, Paragon terminated its business relationship with Plaintiffs, including restricting DrJ's ability to use Paragon's sealing software and denying access to the Slack channel that Paragon had created and maintained.   Paragon Defendants aver that Paragon restored DrJ's ability to use the sealing software on a temporary basis to enable an orderly transition away from DrJ's use of the sealing software.   Paragon Defendants admit that Clearspan separately terminated its relationship with Qualtim.   Except as admitted, the allegations are denied.

75.     On or about July 23, 2024, Paragon, through its attorneys, commenced declaratory-judgment litigation against the Qualtim Companies in the United States District Court for the Eastern District of Tennessee and publicly filed on the court docket, without any motion to seal, exhibits that were marked confidential and trade secret and that disclosed the Enterprise's confidential business model, the existence and purpose of IP-LLC, and the Enterprise's related strategies.

**RESPONSE:**    Paragon Defendants admit that Paragon publicly filed its Complaint for Declaratory Judgment against the Qualtim Companies in the United States District Court for the Eastern District of Tennessee.   Paragon Defendants admit that the Complaint and exhibits thereto

42

were filed without a motion to seal because the exhibits, while purportedly labeled confidential, were not subject to any confidentiality agreement or other= protections.  The remaining allegations are denied.

76.    Competitors had no knowledge of IP-LLC's existence until that disclosure. Paragon and its attorneys were aware of the court's requirements for filing documents under seal, and there was no requirement that the exhibits be filed with the complaint; on information and belief, Paragon and its attorneys nonetheless filed the marked-confidential documents publicly, rather than under seal, in order to support an argument that the Engineering Inputs and Enterprise information were not trade secrets or had been publicly disclosed. Plaintiffs sought to have the documents sealed, and Paragon opposed those requests.

**RESPONSE:**   Paragon Defendants are without information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegation regarding competitors' knowledge and therefore deny the allegations.  Paragon Defendants admit that Paragon opposed Plaintiffs' attempt to seal the exhibits to Paragon's Complaint for Declaratory Judgment.  Except as admitted, the allegations are denied.

77.    Clearspan has continued to operate its structural-component manufacturing using the Paragon Truss Software and the Engineering Inputs while no longer obtaining DrJ's licensed professional engineering seal on its design drawings, and thus continues to exploit Plaintiffs' Engineering Inputs and engineering work without authorization and without the professional engineering sealing that was Plaintiffs' role in the Enterprise.

**RESPONSE:**  Paragon Defendants admit that Clearspan continues to pay for and use, as a customer, Paragon's truss software and that Clearspan's truss design drawings are no longer sealed by DrJ.  Except as admitted, the allegations are denied.

43

78.     In approximately October 2024, Paragon commercially launched the Paragon Truss Software to the broader market, licensing it to structural component manufacturers throughout the industry, including competitors of Clearspan, using the Qualtim Companies' Engineering Inputs, without Plaintiffs' authorization and without any accounting to Plaintiffs. This commercial launch was outside the Enterprise's intended integrated business model.

**RESPONSE:**   Paragon Defendants admit that Paragon launched its truss design software to the broader market in October 2024 and, since that time, has been marketing and selling subscription-based uses of the software to component manufacturers.  Except as admitted, the allegations are denied.

79.     Paragon also began publicly marketing the Enterprise's truss-plate-agnostic truss design drawing engineering strategy under the name "Paragon AnyPlate," and disclosed Enterprise information at industry conferences, including the May 2024 Virginia Tech conference, the October 2024 and October 2025 BCMC conferences, the February 2025 and February 2026 International Builders' Shows, and the October 2024 and October 2025 NCSEA Summit.

**RESPONSE:**    Paragon Defendants admit that Paragon has marketed its AnyPlate$^{TM}$ product at various trade shows, including those alleged, but deny the remaining allegations.

80.     Paragon continues to use, market, and license the Paragon Truss Software, using the Engineering Inputs, without authorization from, compensation to, or accounting to Plaintiffs. At his deposition, John Holland confirmed that Paragon applied to register the "AnyPlate" and "TrussLink" trademarks beginning in approximately June 2024, contemporaneously with Plaintiffs' exclusion from the Enterprise, and that Paragon now licenses the Paragon Truss Software through tiered subscription and enterprise plans ranging from monthly fees to enterprise arrangements that can cost hundreds of thousands of dollars.

**RESPONSE:**   Paragon Defendants admit that Paragon continues to market and sell tiered subscriptions and enterprise plans for its truss design software but denies that it has been unauthorized to do so or otherwise owes compensation or an accounting to Plaintiffs. Paragon Defendants admit that Paragon has sought trademark protections for "AnyPlate" and "TrussLink" trademarks. Except as admitted, the allegations are denied.

### H. The Estate's Conduct Following Daniel Holland's Death

81.    During his lifetime, Daniel Holland, as a 50% member and one of three Managers of IP-LLC, owed IP-LLC and its other members duties of loyalty, care, and good faith, and he conducted himself consistently with those duties, acknowledging the Qualtim Companies' contributions, seeking to compensate them, and treating the Enterprise participants as partners. Daniel Holland did not repudiate Plaintiffs' interests in the Engineering Inputs or the Enterprise.

**RESPONSE:**    Paragon Defendants admit that Dan Holland was a 50% member of IP-LLC, that his fiduciary duties, if any, were defined by the terms of the IP-LLC operating agreement and applicable law, and that he complied with all such duties. The remaining allegations are denied.

82.    Upon Daniel Holland's death, his financial interest in IP-LLC passed to the Estate, and responsibility for that interest and for the Enterprise relationship fell to the Estate and its representatives. On or about April 2024, the Estate was in contact with Plaintiffs regarding the valuation of IP-LLC. Without explanation, the Estate then ceased communications with Plaintiffs and aligned itself with the other Defendants in excluding Plaintiffs from the Enterprise.

**RESPONSE:**   Paragon Defendants admit that Dan Holland's financial interest in IP-LLC passed to his Estate and that, at some unknown time, a representative of the Estate contacted Kirk and Suzanne Grundahl regarding IP-LLC.  Paragon Defendants are without sufficient information to admit or deny the remaining allegations and therefore deny them.

45

83.      Lisa Holland served as executrix from February 8, 2024. Recognizing that she had a conflict of interest in the anticipated litigation because the Estate held interests in both Paragon and IP-LLC, Lisa Holland petitioned the Chancery Court of Lauderdale County, Mississippi, which on July 17, 2024 appointed Marvin B. Speed as Special Independent Executor under Miss. Code § 91-7-61, with exclusive fiduciary authority over matters involving Paragon, IP-LLC, and this litigation. Lisa Holland later resigned, and John Holland was appointed successor Executor on November 17, 2025.

**RESPONSE:**   Paragon Defendants admit that Lisa Holland served as Executrix of the Estate and that Marvin B. Speed was subsequently appointed as a Special Executor regarding matters involving litigation between Paragon and IP-LLC.  Paragon Defendants admit that John Holland was appointed as Executor following the resignation of Lisa Holland.   Paragon Defendants further aver that there are public records related to the Estate's probate proceeding in the Mississippi Chancery Court that speak for themselves and should be considered for context, accuracy, and completeness. Except as admitted the allegations are denied.

84.      Notwithstanding the contractual mandatory buy-sell mechanism in Paragon's operating agreement, the required life insurance, and the fair-market-value appraisal that Paragon had represented to the Mississippi Chancery Court was in progress, Daniel Holland's approximately forty-four percent membership interest in Paragon was ultimately acquired by Paragon for consideration of ten dollars, more than one million dollars below the contractual floor, leaving John Holland as the owner of approximately ninety-seven to ninety-nine percent of Paragon. At his deposition, John Holland confirmed that Paragon paid ten dollars for Daniel Holland's membership interest, that the sale price was determined by Lisa Holland, the executrix, and John Holland negotiating in his capacity as Paragon's President, and that he does not know

whether Marvin B. Speed, the Special Independent Executor who held exclusive authority over matters involving Paragon, ever approved the sale or the price. The sale of the Estate's Paragon interest—a matter within the Special Independent Executor's exclusive authority—was thus negotiated by conflicted insiders without the Special Independent Executor's approval.

**RESPONSE:**   Paragon Defendants admit that, pursuant to a Redemption Agreement dated July 9, 2024, Paragon redeemed the membership interests formerly held by Daniel Holland's Estate and Lisa Holland. Paragon Defendants further aver that the transaction was supported by an appraisal and approved by the Mississippi Chancery Court overseeing the probate proceeding.  The remaining allegations are denied.

85.     The Estate took no action to protect the value of Daniel Holland's interest in the Enterprise or in IP-LLC, or the Engineering Inputs and confidential information of the Enterprise; instead, it acquiesced in and facilitated Paragon's seizure and unauthorized commercialization of the Engineering Inputs, and in January 2026, under John Holland as Executor, the Estate obtained an order approving an interim distribution of substantially all of the Estate's property other than Daniel Holland's IP-LLC membership interest and a five-hundred-thousand-dollar reserve. The Estate thus continues to hold Daniel Holland's IP-LLC membership interest while taking no action to protect it, to assert the interests of IP-LLC and the Enterprise, or to wind up the Joint Venture Enterprise.

**RESPONSE:**   Paragon Defendants deny the allegations.

86.     Marvin B. Speed was appointed Special Independent Executor precisely so that the Estate's interests in the Paragon and Inspired Pursuits matters would be protected independently of the family's conflict of interest. He did the opposite. On the representations of John Holland and Lisa Holland alone, that the Estate did not own and did not claim any interest in Paragon or in

47

its intellectual property, and without obtaining the Estate's records or any independent valuation of Daniel Holland's interests, Marvin B. Speed executed a declaration in Paragon's related Tennessee action stating that the Estate owns no membership interest in Paragon and does not own or claim any of Paragon's intellectual property, software code, or trade secrets, and consenting to the personal jurisdiction of the Tennessee court.

**RESPONSE:**    Paragon Defendants admit that Marvin B. Speed was appointed Special Executor concerning matters involving litigation between Paragon and IP-LLC, and that he executed a declaration stating, among other things, that the Estate of Dan Holland owns no interest in Paragon and makes no claim to own any intellectual property, software code, trade secrets or other property of Paragon, and consenting to the jurisdiction of the Tennessee Court. Except as admitted, the allegations are denied.

87.    The Estate's separate counsel was suggested by Paragon's own counsel, and the Estate's counsel thereafter coordinated with Paragon's counsel. Marvin B. Speed also entered into a common-interest defense agreement with the other Defendants in this litigation. At his deposition, Marvin B. Speed testified, among other things, that he had not been provided many of the Estate's documents, that he did not know of any valuation of Daniel Holland's interests, and that he had not been informed of the Estate's distributions.

**RESPONSE:**  Paragon Defendants admit that Mr. Speed has given a deposition and aver that his testimony speaks for itself. Paragon Defendants admit that the defendants in this action have a joint defense agreement, and any communications between or among counsel are privileged. Except as admitted, Paragon Defendants deny the allegations.

88.    The Defendants have thus aligned themselves in a common defense of this litigation. At his deposition, John Holland confirmed that Paragon and Clearspan entered into a

48

common-interest defense agreement and that he personally entered into such an agreement with others in connection with the litigation; on information and belief, that common-interest defense arrangement includes Paragon, Clearspan, John Holland, James Holland, Rob Eason, and the Estate. The result is that the very fiduciary appointed to protect the Estate's interests in the Paragon and Inspired Pursuits matters independently of the family's conflict instead adopted the position of, and aligned the Estate with, the parties who seized and commercialized the Engineering Inputs, abandoning the Estate's interest in IP-LLC and the Enterprise, to the detriment of Plaintiffs as IP-LLC co-members and joint-venture co-venturers.

**RESPONSE:**    Paragon Defendants admit that the Defendants have entered into a joint defense agreement. The remaining allegations are denied.

## CAUSES OF ACTION

### COUNT I
### Misappropriation of Trade Secrets—Wis. Stat. § 134.90
### (Against Paragon, John Holland, Clearspan, James Holland, and Rob Eason)

89.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

**RESPONSE:**  Paragon Defendants incorporate by reference their admissions, denials, and averments as though fully set forth herein.

90.    The Engineering Inputs and the confidential Enterprise information identified above and in Plaintiffs' Answer to Interrogatory No. 10, Schedule A, are trade secrets within the meaning of Wis. Stat. § 134.90(1)(c). They derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use, and they are the

subject of efforts that are reasonable under the circumstances to maintain their secrecy, as described above.

**RESPONSE:**    Paragon Defendants deny the allegations.

91.    The categories of trade secrets and confidential information that Plaintiffs contend were misappropriated include, without limitation: engineering methodologies for structural component design; structural testing programs and empirical testing data developed through CBI; calibration frameworks and engineering adjustment systems; engineering decision systems and validation logic; engineering workflow systems integrating testing, analysis, and design; professional engineering validation and sealing procedures developed through DrJ; the Engineering Inputs as used in the Paragon Truss Software; and the confidential Enterprise structure and commercialization systems, including the plate-agnostic strategy, the structure and purpose of IP-LLC, and the Enterprise's pricing, market-development, and revenue-sharing strategies.

**RESPONSE:**    Paragon Defendants deny the allegations.

92.    Defendants Paragon, John Holland, Clearspan, James Holland, and Rob Eason acquired the Engineering Inputs and confidential information through their participation in the Enterprise and under circumstances giving rise to a duty to maintain their secrecy and limit their use, including the NDA and the Enterprise's confidential framework.

**RESPONSE:**    Paragon Defendants deny the allegations.

93.    These Defendants misappropriated the Engineering Inputs and confidential information by using and disclosing them after the termination of Plaintiffs' participation in the Enterprise, without Plaintiffs' express or implied consent, knowing or having reason to know that their knowledge of the trade secrets was acquired under a duty to limit their use. That use and disclosure includes Paragon's continued operation, marketing, and licensing of the Paragon Truss

50

Software using the Engineering Inputs after termination; the approximately October 2024 commercial launch to the broader market and to Clearspan's competitors; the "Paragon AnyPlate" marketing of the Enterprise's plate-agnostic strategy; the disclosures at industry conferences; and Clearspan's and its principals' continued use of the Engineering Inputs in design and manufacturing without authorization. This conduct constitutes misappropriation within the meaning of Wis. Stat. § 134.90(2).

**RESPONSE:** Paragon Defendants deny the allegations.

94.    Defendants' misappropriation was willful and malicious. Defendants acted with actual written notice of Plaintiffs' asserted ownership of the Engineering Inputs and continued to use and commercialize them. Plaintiffs are entitled to recover their actual loss and Defendants' unjust enrichment caused by the misappropriation under Wis. Stat. § 134.90(4)(a), to exemplary damages of up to twice that award under Wis. Stat. § 134.90(4)(b), and to their reasonable attorney fees under Wis. Stat. § 134.90(4)(c), together with injunctive relief under Wis. Stat. § 134.90(3).

**RESPONSE:** Paragon Defendants deny the allegations.

## COUNT II
### Breach of Contract—Mutual Non-Disclosure Agreement
### (Against Paragon and John Holland)

95.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

**RESPONSE:** Paragon Defendants incorporate by reference their admissions, denials, and averments as though fully set forth herein.

96.    The NDA executed on or about August 8, 2023 is a valid and enforceable contract. The Qualtim Companies performed all of their obligations under the NDA.

**RESPONSE:** Paragon Defendants admit that Paragon executed the August 8, 2023

51

Mutual Non-Disclosure Agreement and aver that the agreement speaks for itself.   Paragon Defendants deny the remaining allegations.

97.    Paragon, acting through John Holland, and John Holland in executing the NDA on Paragon's behalf, breached the NDA through, among other things: continuing to use the Engineering Inputs in the Paragon Truss Software and related commercial activities after termination, beyond the purpose permitted by the NDA; commercially exploiting the Engineering Inputs through the post-termination launch, the marketing to Clearspan's competitors, and the "Paragon AnyPlate" marketing; disclosing the Engineering Inputs to unauthorized third parties, including through the conference disclosures; failing to maintain adequate security for the Engineering Inputs, including by permitting confidential communications to be automatically forwarded to outside parties; failing to return or destroy the Engineering Inputs upon termination and instead retaining and continuing to use them, including the complete Slack channel history; attempting to extinguish Plaintiffs' ownership rights through the May 2024 surrender letter and ownership demands; publicly disclosing confidential Enterprise information; and communicating with Plaintiffs' customers in a manner that disclosed and disparaged Plaintiffs' rights to the Engineering Inputs. The specific provisions breached are identified in Plaintiffs' Answer to Interrogatory No. 14.

**RESPONSE:**   Paragon Defendants deny the allegations.

98.    As a direct and proximate result of these breaches, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

**RESPONSE:** Paragon Defendants deny the allegations.

## COUNT III
### Breach of Joint Venture Agreement
### (Against Paragon and Clearspan)

99.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

**RESPONSE:**    Paragon Defendants incorporate by reference their admissions, denials, and averments as though fully set forth herein.

100.    The Enterprise was a joint venture among the Qualtim Companies, Paragon, and Clearspan for a common business purpose—the commercialization of an independent, plate-agnostic, engineering-based structural component design platform. The joint venture arose from the parties' written, oral, and implied-in-fact agreements and course of conduct beginning in approximately 2009, under which the participants agreed to combine their respective contributions, to share in the venture's profits and benefits, and to deal with one another in good faith.

**RESPONSE:**    Paragon Defendants deny the allegations.

101.    At the time of Defendants' conduct, the joint venture's common purpose had not been accomplished; the planned commercial launch was scheduled for the first quarter of 2024, and the Qualtim Companies had continued providing Engineering Inputs without full compensation in anticipation of that imminent commercialization.

**RESPONSE:**    Paragon Defendants deny the allegations.

102.    Paragon and Clearspan breached the joint-venture agreement by terminating Plaintiffs' participation, excluding Plaintiffs from the Enterprise and its systems, seizing and commercializing the Enterprise's assets, refusing to share the venture's profits and benefits with Plaintiffs, and preventing Plaintiffs from performing the professional engineering, sealing, and other services that were Plaintiffs' role in the Enterprise. That termination and exclusion were not

authorized by the joint-venture agreement.

**RESPONSE:**   Paragon Defendants deny the allegations.

103.    Plaintiffs seek damages for Paragon's and Clearspan's breach of the joint venture, including the value of Plaintiffs' lost participation in the Enterprise, Plaintiffs' uncompensated contributions, and the profits and benefits of which Plaintiffs were deprived, in an amount to be proven at trial.

**RESPONSE:**    Paragon Defendants deny Plaintiffs are entitled to the relief sought.

**COUNT IV**
**Unjust Enrichment**
**(Against All Defendants)**

104.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein. No contract authorized Defendants' use or commercialization of the Engineering Inputs and confidential information following the termination of Plaintiffs' participation in the Enterprise.

**RESPONSE:**  Paragon Defendants incorporate by reference their admissions, denials, and averments as though fully set forth herein.  Paragon Defendants deny the remaining allegations.

105.    Plaintiffs conferred substantial benefits on Defendants, including the Engineering Inputs, professional engineering services, structural testing, software interface testing and analysis that gave the Paragon Truss Software its functional user interface, approximately 8,000 hours of work devoted to Paragon alone, and confidential business information, all provided to and for the benefit of the Enterprise on reduced-fee, deferred, uncompensated, and non-contemporaneously billed terms in anticipation of the imminent commercial launch.

**RESPONSE:**  Paragon Defendants deny the allegations.

106.    Defendants appreciated and knowingly accepted and retained those benefits, and

54

continue to use and profit from the Engineering Inputs and confidential information through the operation, marketing, and licensing of the Paragon Truss Software, under circumstances that make it inequitable for Defendants to retain the benefits without payment of their value.

**RESPONSE:**  Paragon Defendants deny the allegations.

107.    Defendants have been unjustly enriched at Plaintiffs' expense, and Plaintiffs are entitled to restitution and disgorgement of the value of the benefits conferred and the profits Defendants have derived, in an amount to be proven at trial.

**RESPONSE:**  Paragon Defendants deny the allegations.

**COUNT V**
**Tortious Interference with Contract and Prospective Economic Advantage**
**(Against Paragon, Clearspan, John Holland, James Holland, and Rob Eason)**

108.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

**RESPONSE:**  Paragon Defendants incorporate by reference their admissions, denials, and averments as though fully set forth herein.

109.    Plaintiffs had existing and prospective business relationships with structural component manufacturers and other industry participants, including the continuous professional engineering and sealing relationship between DrJ and Clearspan and relationships with truss-plant locations through the Enterprise, all with economic value to Plaintiffs.

**RESPONSE:**    Paragon Defendants deny there was a cognizable "Enterprise" and are without information sufficient to form a belief as to the truth or falsity of the remaining allegations and therefore deny them.

110.    Defendants Paragon, Clearspan, John Holland, James Holland, and Rob Eason knew of these relationships and intentionally and improperly interfered with them, including by

directing Clearspan to cease submitting truss design drawings to DrJ, by restricting Plaintiffs' access to the shared systems through which Plaintiffs served their customers, and by communicating to Plaintiffs' existing and prospective customers that Plaintiffs no longer had rights to the Engineering Inputs.

**RESPONSE:**   Paragon Defendants deny the allegations.

111.   Defendants' interference was not privileged or justified, was undertaken through improper means including the unauthorized use and disclosure of Plaintiffs' trade secrets and confidential information, and caused Plaintiffs to lose existing and prospective business and the benefit of the Enterprise's commercialization, in an amount to be proven at trial.

**RESPONSE:**   Paragon Defendants deny the allegations.

112.   Defendants Paragon, John Holland, James Holland, and Rob Eason also intentionally induced the Estate of Daniel Holland to breach the fiduciary duties it owed to Plaintiffs as IP-LLC co-members and joint-venture co-venturers, including by pressing the Estate to take the position that Daniel Holland's estate had no significant IP-LLC interest to protect, no fiduciary obligation to its IP-LLC co-members, and no responsibility to wind up the Enterprise.

**RESPONSE:**   Paragon Defendants deny the allegations.

113.   Because John Holland served simultaneously as Paragon's President and, from November 17, 2025, as the successor Executor of the Estate, the inducement was effected in part through John Holland's own dual role, constituting self-dealing by a fiduciary. This conduct caused the Estate to breach its fiduciary duties, to Plaintiffs' injury in an amount to be proven at trial. In interfering with Plaintiffs' relationships and inducing the Estate's breach as alleged in this Count, Defendants acted maliciously toward Plaintiffs and in intentional disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under Wis. Stat. § 895.043.

**RESPONSE:**   Paragon Defendants deny the allegations.

## COUNT VI
**Unfair Competition and Misappropriation of Confidential Business Information
(Against Paragon, Clearspan, John Holland, James Holland, and Rob Eason)**

114.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

**RESPONSE:**   Paragon Defendants incorporate by reference their admissions, denials, and averments as though fully set forth herein.

115.   To the extent any of the Enterprise's confidential business information does not qualify as a statutory trade secret, it nonetheless constitutes Plaintiffs' proprietary and confidential business information, including the confidential Enterprise structure, the plate-agnostic commercialization strategy, the structure and purpose of IP-LLC, and the Enterprise's pricing, market-development, and customer-acquisition strategies.

**RESPONSE:**   Paragon Defendants deny the allegations.

116.   Paragon, Clearspan, John Holland, James Holland, and Rob Eason wrongfully appropriated and used that confidential business information after the termination of Plaintiffs' participation in the Enterprise, without Plaintiffs' consent. Paragon and John Holland used it to compete with Plaintiffs, including by commercializing the Paragon Truss Software and the plate-agnostic strategy under the "Paragon AnyPlate" name, while restricting Plaintiffs' access to the very work product Plaintiffs had developed. Clearspan, acting through Rob Eason and James Holland, has continued to use the Paragon Truss Software and the Engineering Inputs in its structural-component manufacturing while no longer obtaining DrJ's licensed professional engineering seal. This conduct constitutes unfair competition and the misappropriation of Plaintiffs' confidential business information.

57

**RESPONSE:**  Paragon Defendants deny the allegations.

117.    As a direct and proximate result, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial. Defendants' appropriation and use of Plaintiffs' confidential business information was malicious toward Plaintiffs and in intentional disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under Wis. Stat. § 895.043.

**RESPONSE:**  Paragon Defendants deny the allegations.

### COUNT VII
### Breach of Fiduciary Duty
### (Against the Estate of Daniel Holland and John Holland)

118.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

**RESPONSE:**  Paragon Defendants incorporate by reference their admissions, denials, and averments as though fully set forth herein.

119.    During his lifetime, Daniel Holland, as a 50% member and one of three Managers of IP-LLC, owed IP-LLC and its other members, Kirk Grundahl and Suzanne Grundahl, fiduciary duties of loyalty, care, and good faith under the IP-LLC operating agreement and Wisconsin law, and he honored those duties. Daniel Holland did not breach any duty owed to Plaintiffs.

**RESPONSE:**    Paragon Defendants admit that Dan Holland was a 50% member of IP-LLC.  The remaining allegations state conclusions of law to which no response is required.  To the extent a response is required, Paragon Defendants are without knowledge to admit or deny them and therefore deny them.

120.    Upon Daniel Holland's death, his fifty-percent membership interest in IP-LLC, his position in the Joint Venture Enterprise, and the fiduciary obligations he owed to IP-LLC and its co-members passed to the Estate. As successor to Daniel Holland's IP-LLC membership and his

role as a joint venturer, and as a fiduciary in the administration of the Estate charged with preserving and not impairing or dissipating the Estate's assets, the Estate owed Plaintiffs, as IP-LLC co-members and joint-venture co-venturers, fiduciary duties including: to identify, collect, inventory, possess, and prudently manage Daniel Holland's IP-LLC membership interest as an Estate asset; to wind up the Joint Venture Enterprise in good faith and to account to the co-venturers; to refrain from appropriating the Enterprise's assets for the benefit of one venturer at the expense of the others; and to refrain from participating in or facilitating the misappropriation of Plaintiffs' Engineering Inputs and confidential information.

**RESPONSE:** Paragon Defendants admit that upon his death, Dan Holland's 50% ownership interest in IP-LLC passed to the Estate. The remaining allegations directed to Paragon Defendants are denied.

121.    The Estate breached those duties. Marvin B. Speed, as Special Independent Executor with exclusive fiduciary authority over matters involving Paragon, IP-LLC, and this litigation, took no action to identify, inventory, value, or prudently manage Daniel Holland's IP-LLC membership interest, to communicate with Plaintiffs as IP-LLC co-members, or to participate in a good-faith wind-up of the Joint Venture Enterprise; nor did he approve the sale of the Estate's Paragon interest, a matter within his exclusive authority, which conflicted insiders instead transacted for ten dollars.

**RESPONSE:** Paragon Defendants deny the allegations.

122.    Rather than protect those interests independently of the family's conflict, and on the family's representations alone and without obtaining the Estate's records or any valuation, he executed a declaration disclaiming that the Estate owns or claims any interest in Paragon or its intellectual property and consenting to jurisdiction in Paragon's related Tennessee action, and he

aligned the Estate with Paragon and Clearspan in a common defense of this litigation. After initially engaging with Plaintiffs regarding the valuation of IP-LLC in April 2024, the Estate ceased communications, aligned itself with Paragon and Clearspan in excluding Plaintiffs, and acquiesced in and facilitated Paragon's seizure and unauthorized commercialization of the Engineering Inputs—an alignment that served the interests of the Estate's heirs, including James Holland, an heir of the Estate and a member of Clearspan's board, at Plaintiffs' expense.

**RESPONSE:** Paragon Defendants admit that Special Executor Speed signed a declaration and that Defendants in this action have entered into a joint defense agreement. Except as admitted, the allegations are denied.

123.    John Holland became the successor Executor of the Estate of Daniel Holland on November 17, 2025. As Executor, John Holland owes fiduciary duties, including the duty of loyalty, to the Estate's beneficiaries and to IP-LLC's co-members, Kirk Grundahl and Suzanne Grundahl. John Holland has breached those duties through self-dealing and an irreconcilable conflict of interest: as Paragon's President and the owner of approximately ninety-seven to ninety-nine percent of Paragon, he negotiated and effected Paragon's ten-dollar acquisition of the Estate's Paragon interest, and, while serving as a fiduciary of the Estate, he has continued to direct Paragon to exclude Plaintiffs from the Enterprise and to appropriate and commercialize the Engineering Inputs and the Paragon Truss Software for Paragon's benefit, taking no action as Executor to protect the Estate's and IP-LLC's interests. The Estate's breach cannot be separated from that self-dealing, because the Estate's own Executor is the person directing the conduct that gave rise to the breach.

**RESPONSE:** Paragon Defendants admit that John Holland became successor executor on November 17, 2025 and, as such, was subject to certain fiduciary duties owed to beneficiaries of

60

the Estate. The remaining allegations are denied.

124.    As a direct and proximate result of the breaches by the Estate and John Holland, Plaintiffs have been damaged in an amount to be proven at trial. The breaches, including John Holland's self-dealing acquisition of the Estate's Paragon interest and his use of his dual role to direct the conduct giving rise to the breach, were malicious toward Plaintiffs and in intentional disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under Wis. Stat. § 895.043.

**RESPONSE:**    Paragon Defendants deny the allegations.

**Any allegation not admitted, explained, or denied shall be deemed denied.**

## PRAYER FOR RELIEF

Paragon Defendants deny that Plaintiffs are entitled to any of the relief sought in their Prayer for Relief including subparts a through h.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof that would not otherwise rest on Paragon Defendants, and without waiving any argument or right, Paragon Defendants assert the following affirmative defenses to Plaintiffs' Second Amended Complaint.

## FIRST DEFENSE—FAILURE TO STATE A CLAIM

The Second Amended Complaint, in whole or in part, fails to state a claim upon which relief may be granted.

## SECOND DEFENSE—STATUTE OF LIMITATIONS

Plaintiffs' claims, in whole or in part, which purport to allege conduct occurring as early as 2009, are barred by the applicable statutes of limitation.

61

**THIRD DEFENSE—ESTOPPEL, LACHES, AND WAIVER**

Plaintiffs' claims are barred, in whole or in part, by estoppel, laches, and waiver based on Plaintiffs' conduct, delay, acquiescence, voluntary conduct, and course of dealing.

**FOURTH DEFENSE—UNCLEAN HANDS**

Plaintiffs' claims and remedies are barred by unclean hands including, but not limited to, conduct inconsistent with their asserted rights and alleged confidentiality regime.

**FIFTH DEFENSE—CONSENT, AUTHORIZATION, AND IMPLIED LICENSE**

To the extent Plaintiffs' claims are premised on the alleged unauthorized use of information or collaboration within the parties' relationship, such use was with consent, authorization, and/or implied license arising from the parties' course of dealing.

**SIXTH DEFENSE—LACK OF OWNERSHIP OR PROTECTABLE INTEREST**

Plaintiffs cannot establish ownership of, or a legally protectable interest in, the subject matter they seek to enforce, in whole or in part, including any alleged "Engineering Inputs" to the extent they are generic, derived from public standards, are part of an employee's personal skill, knowledge, or know-how; assigned to third-parties by agreement; or otherwise not exclusively owned by Plaintiffs.

**SEVENTH DEFENSE—PUBLIC DOMAIN AND GENERALLY KNOWN INFORMATION**

Plaintiffs' misappropriation and breach of confidentiality claims are barred to the extent they are based on information that is publicly known, readily ascertainable by proper means, disclosed by Plaintiffs or others, or lacking reasonable measures to maintain secrecy.

62

## EIGHTH DEFENSE—STANDING AND REAL PARTY IN INTEREST

One or more Plaintiffs lack standing or are not the real party in interest because they have not shown a cognizable, non-speculative, legally protectable interest in the specific relief sought or that they are otherwise owed any cognizable duty of care.

## NINTH DEFENSE—PREEMPTION AND DISPLACEMENT

To the extent applicable, statutory trade secret law and/or the Copyright Act preempt or displace Plaintiffs' overlapping tort, unfair competition, unjust enrichment, and confidential-information claims based on the same nucleus of facts.

## TENTH DEFENSE—FAILURE TO MITIGATE

Plaintiffs failed to take reasonable steps to mitigate alleged damages, and any recovery must be barred or reduced accordingly.

## ELEVENTH DEFENSE—SPECULATIVE AND UNRECOVERABLE DAMAGES

Plaintiffs' claimed damages are speculative and unrecoverable, and any claim for exemplary or punitive damages is barred.

## TWELFTH DEFENSE—NO CAUSATION

Any harm Plaintiffs claim to have suffered was caused by Plaintiffs' own conduct, by independent market or industry factors, or by third parties, and not by Paragon Defendants.

## THIRTEENTH DEFENSE—PRIVILEGE AND COMPETITION

Plaintiffs' interference and unfair competition claims are barred to the extent the alleged conduct constitutes lawful competition, privileged communications, or justified protection of Defendants' business interests.

**FOURTEENTH DEFENSE—NO WILLFULNESS OR MALICE**

Plaintiffs are not entitled to exemplary, punitive, or fee-shifting remedies because Defendants did not act willfully, maliciously, or in intentional disregard of Plaintiffs' rights.

**FIFTEENTH DEFENSE—NO FIDUCIARY DUTY OWED**

Plaintiffs' fiduciary-duty theories fail because no fiduciary duty was owed to Plaintiffs by Paragon Defendants under the alleged relationships.

**SIXTEENTH DEFENSE—BUSINESS JUDGMENT/GOOD FAITH**

Even if any duty were owed, Paragon Defendants acted in good faith, consistent with their business judgment, and without self-dealing toward Plaintiffs.

**SEVENTEENTH DEFENSE—REASONABLE MEASURES AND SPECIFICITY**

Plaintiffs' claims for misappropriation of trade secrets fail because they have not adequately identified the alleged trade secrets with reasonable particularity, nor shown reasonable measures to maintain secrecy as to each item, barring statutory trade secret relief.

**EIGHTEENTH DEFENSE—PUBLIC OR NON-CONFIDENTIAL INFORMATION**

The asserted "engineering inputs" and "confidential business information," including but not limited to, business strategies, business models, market approaches, or strategic collaborations, are too general, vague, public, or disclosed to support liability.

**NINETEENTH DEFENSE—NO PERCEIVED OR ACTUAL VALUE DERIVED FROM SECRECY OF KNOWLEDGE**

Plaintiffs' claims for misappropriation of trade secrets fail because they do not derive perceived or actual value from the secrecy of any alleged "engineering inputs" or "confidential business information."

## TWENTIETH DEFENSE—VOLUNTEER DOCTRINE

Plaintiffs' claims for unjust enrichment and other equitable relief including restitution and disgorgement are barred by the volunteer doctrine.

## TWENTY-FIRST DEFENSE—ACCORD AND SATISFACTION

Plaintiffs' attempts to recover for alleged unpaid engineering services are barred, in whole or in part, under the doctrine of accord and satisfaction.

## TWENTY-SECOND DEFENSE—STATUTE OF FRAUDS

Plaintiffs' attempts to rely on oral agreements for any claims in this action are barred by the applicable statute of frauds.

## PRAYER FOR RELIEF

Paragon Defendants respectfully request that this Court:

1. Dismiss Plaintiffs' Second Amended Complaint with prejudice and deny all relief requested therein;

2. Award Paragon Defendants their attorneys' fees, costs, expenses, and interest incurred in defending this action; and

3. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Paragon Defendants demand a trial by jury on all claims and issues so triable.

Dated this 30th day of July, 2026.

/s/ Tamar B. Kelber
Tamar B. Kelber, SBN 1101802
Joshua S. Greenberg, SBN 1107959
Gass Turek LLC
241 North Broadway, Suite 300
Milwaukee, WI 53202
Telephone: (414) 223-3300
kelber@gassturek.com
greenberg@gassturek.com

James T. Williams, TN BPR 16341
Erin E. Steelman, TN BPR 38463
MILLER & MARTIN PLLC
832 Georgia Avenue, Suite 1200
Chattanooga, TN 37402-2289
Telephone: (423) 756-6600
James.Williams@millermartin.com
Erin.Steelman@millermartin.com

David S. Moreland, GA Bar No. 521998
Eileen Rumfelt, GA Bar No. 040608,
*appearing pro hac vice*
MILLER & MARTIN PLLC
1180 W. Peachtree Street NW, Suite 2100
Atlanta, Georgia 30309
Telephone: (404) 962-6100
david.moreland@millermartin.com
eileen.rumfelt@millermartin.com

***Attorneys for Defendants Paragon Component Systems, LLC and John Holland***